1  Jessica L. Blome
2  Cal. Bar No. 314898
   GREENFIRE LAW, PC
3  2748 Adeline Street, Suite A
   Berkeley, CA 94703
4  (510) 900-9502
5  jblome@greenfirelaw.com

6              **UNITED STATES DISTRICT COURT**

7              **CENTRAL DISTRICT OF CALIFORNIA**

8

9  UNITED STATES OF AMERICA,            Case No.: 2:25-cv-06230-MCS-AGR
10
11              Plaintiff,              **MEMORANDUM OF LAW IN**
                                        **SUPPORT OF THE CENTER FOR**
12        v.                            **A HUMANE ECONOMY AND**
                                        **ANIMAL WELLNESS ACTION'S**
13 THE STATE OF CALIFORNIA;             **MOTION TO DISMISS**
14 GAVIN C. NEWSOM, in his Official
   Capacity as Governor of California;  Date:      January 12, 2026
15 KAREN ROSS, in her Official Capacity Time:      9:00 a.m.
16 as Secretary of the California       Location:  Courtroom 7C, 7th Fl.
   Department of Food & Agriculture;    Judge:     Hon. Mark C. Scarsi
17 ERICA PAN, in her Official Capacity
   as Director of the California Department
18 of Public Health; and ROB BONTA, in
19 his Official Capacity as Attorney
   General of California,
20
21              Defendants.
22

28

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

**Table of Contents**

I.    Introduction ...................................................................................8

II.   Background...................................................................................12

      A.  Humane welfare and state markets. ....................................12

      B.  California's Proposition 12 ..................................................14

III.  Rule 12(b)(6) Standard ................................................................17

IV.   Argument .....................................................................................18

      A.  The Complaint should be dismissed under Rule 12(b)(6) because Plaintiff's preemption claims fail as a matter of law. ................................18

          1.  The EPIA is a food inspection and identification law, and was never intended to regulate production upstream.................................19

          2.  The EPIA does not expressly preempt AB 1437 nor Proposition 12 (Counts I and II)...................................................21

          3.  The EPIA also does not impliedly preempt AB 1437 nor Proposition 12, as there is no irreconcilable conflict between EPIA goals and humane standards (Counts I and II)...........................26

          4.  Plaintiff' claim for preemption regarding packaging and labeling of egg products fails (Count III). ........................................28

V.    Conclusion....................................................................................31

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

# Table of Authorities

**Cases**

*Altria Grp., Inc. v. Good*,
   555 U.S. 70 (2008) ...................................................................18, 21

*Ash v. Anderson Merchs., L.L.C.*,
   799 F. 3d 957 (8th Circuit 2015) ......................................................17

*Ashcroft v. Iqbal*,
   565 U.S. 662 (2009) ..........................................................................17

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*,
   870 F.3d 1140 (9th Cir. 2017)......................................................25, 27

*Bates v. Dow Agrosciences LLC*,
   544 U.S. 431 (2005) ...........................................................................21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...........................................................................17

*Berman v. Parker*,
   348 U.S. 26 (1954). ............................................................................14

*Chamber of Commerce v. Whiting*,
   563 U.S. 582 (2011) ...........................................................................26

*Claybaugh v. Trader Joe's Co.*,
   No. RG18897085 (Super. Ct. Alameda Cty., Cal., Mar. 15, 2018) ................31

*Cresenzi Bird Imps., Inc. v. New York*,
   658 F. Supp. 1441 (S.D.N.Y. 1987) .................................................13

Cresenzi Bird Imps., Inc. v. New York,
   831 F.2d 410 (2d Cir. 1987)..............................................................13

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ...........................................................................26

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
   505 U.S. 88 (1992) ......................................................................19, 26

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ...........................................................................26, 27

*Iowa Pork Producers Ass'n v. Bonta,*
    No. 22-55336, 2024 WL 3158532 (9th Cir. June 25, 2024) .............................27

*Iowa Pork Producers Ass'n v. Bonta,*
    No. 24-728, 2025 WL 1787818 (June 30, 2025) .............................................27

*Janecyk v. Eggland's Best, Inc.,*
    1:24-cv-06222 (N.D. Ill. July 23, 2024) ........................................................31

*Medicaid & Medicare Adv. Prod. Ass'n of Puerto Rico, Inc. v. Emanuelli Hernandez,*
    58 F.4th 5 (1st Cir. 2023) ................................................................................21

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ........................................................................................18

*Mogull v. Pete & Gerry's Organics,*
    588 F. Supp. 3d 448 (S.D.N.Y. 2022) ............................................................31

*Nat'l Meat Ass'n v. Harris,*
    565 U.S. 452 (2012) ..................................................................................23, 24

*National Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ........................................................................10, 12, 13

*People v. K. Sakai Co.,*
    56 Cal. App. 3d 531 (1976) .......................................................................13, 14

*Retail Clerks v. Schermerhorn,*
    375 U.S. 96 (1963) ..........................................................................................19

*Rice v. Norman Williams Co.,*
    458 U.S. 654 (1982) ........................................................................................21

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947) ............................................................................18, 19, 21

*Triumph Foods v. Campbell,*
    742 F. Supp. 3d 63 (D. Mass. 2024) ...............................................................25

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

*Triumph Foods v. Campbell*,
No. 24-1759, 2025 U.S. App. LEXIS 25777 (1st Cir. Oct. 3, 2025) ....19, 24, 27

*United States v. Agnew*,
931 F.2d 1397 (10th Cir. 1991)................................................................25

*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.*,
41 Cal. 4th 929 (2007) .............................................................................28

*Wyeth v. Levine*,
555 U.S. 555 (2009) .................................................................................18

**Statutes**

21 U.S.C. § 1031 *et seq.* ....................................................................9, 18

21 U.S.C. § 1032 ....................................................................................18

21 U.S.C. § 1052 ....................................................................................20

21 U.S.C. § 1052(b).................................................................................20

21 U.S.C.S. § 1033(a)..............................................................................23

21 U.S.C.S. § 1033(g)(8)..........................................................................24

7 U.S.C. § 6501 *et seq.* ...........................................................................11

Cal. Health & Safety Code, § 25990 .........................................................13

Cal. Health & Safety Code, § 25993.1 .......................................................14

Cal. Health & Safety Code, § 25995(e).......................................................13

Cal. Health & Safety Code, § 25996 ..........................................................14

Cal. Health & Safety Code, §§ 25990-25993 ...............................................14

Cal. Penal Code Ann. § 599f(a)–(c)...........................................................22

**Regulations**

88 Fed. Reg. 75394..................................................................................11

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

9 CFR § 590.200(8)................................................................28

9 CFR § 590.410-415.............................................................28

Cal. Code Regs. Tit. 3, § 1320.4.............................................27

Cal. Code Regs. Tit. 3, § 1320.4(a).........................................27

Cal. Code Regs. Tit. 3, § 1320.4(c).........................................29

Cal. Code Regs. Tit. 3, § 1320.4(d).........................................29

Cal. Code Regs. Tit. 3, § 1350...............................................13

Iowa Admin. Code r. 12-36.8(3)......................................21, 28

S.C. Code Regs. § 5-228(1)....................................................21

**Other Authorities**

*Cage-Free Verification Of USDA Graded Shell Eggs*, U.S. Dep't Agric.,
     Agric. Marketing Serv. (Dec. 1, 2019),
     https://www.ams.usda.gov/publications/content/cage-free-verification-
     usda-graded-shell-eggs................................................................30

Cal. Sec'y of State, Voter Information Guide 70 (2018),
     https://vig.cdn.sos.ca.gov/2018/general/pdf/complete-vig.pdf.......................15

Egg Products Inspection Act: Hearing Before the Committee on Agriculture
     and Forestry, 91st Cong. 30-1 (1969) (statement of U.S. Sen. George D.
     Aiken)....................................................................................20

Egg Products Inspection Act: Hearing Before the Committee on Agriculture
     and Forestry, 91st Cong. 48 (1969) (statement of Egg Committee
     Chairman of the Institute of American Poultry Industries M.J.
     Chamberlain ...........................................................................21

*Farm Animal Confinement Bans by State*, Am. Soc'y for the Prevention of
     Cruelty to Animals, https://www.aspca.org/improving-laws-
     animals/public-policy/farm-animal-confinement-bans (last visited Oct. 5,
     2025) ....................................................................................12

*Special Report: California Becomes 4th Largest Economy as Japan's
     Economy Slowed in 2024*, California Center for Jobs & the Economy,

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

https://centerforjobs.org/ca/special-reports/special-report-california-becomes-4th-largest-economy-as-japans-economy-slowed-in-2024 (last visited Oct. 5, 2025) ............................................................................14

Timothy Ruth, *Overall U.S. crop production is concentrated in California and the Midwest*, U.S. Dep't Agric. Econ. Research Serv. (Feb. 22, 2023), https://www.ers.usda.gov/data-products/chart-gallery/chart-detail?chartId=58320 ...........................................................................14

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

## I.    Introduction

The administration's most recent filing against California's Propositions 2 and 12, along with AB 1437, represents not only a direct attack on duly enacted state laws, but also a challenge to the democratic will of millions of Californians who voted—overwhelmingly and decisively—to improve the welfare of farm animals and ensure more humane standards for the products sold in their state. California voters first approved Proposition 2 in 2008, and then strengthened those standards through Proposition 12 in 2018, setting clear requirements for the space afforded to egg-laying hens. These measures reflect the voice of the people, freely expressed through the ballot box, and their decision to reject inhumane confinement systems and support higher animal-welfare standards.

In the past seventeen years since the enactment of Proposition 2, producers have spent billions of dollars to increase their cage-free systems to now account for approximately 45% of US production. Today, there are ten states who already have or are slated to ban the sale of eggs from battery cage systems. Yet despite the rapid spread of cage free production requirements across several states and a large share of the of industry shifting to accommodate those demands, the federal government has chosen to single out California to make its sudden claim that the cage free standards are somehow now, after seventeen years, implicating the safety of eggs in the marketplace. Such claims are, on their face, unfounded.

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

In its complaint, Plaintiff also claims that Proposition 12 has contributed to a "historic rise" in egg prices.[1] This assertion distorts both the facts and the broader context. While the government points to a 2023 study[2] as evidence to support their claim, that study evaluated only egg prices in California—not nationwide impacts—and thus cannot fairly be generalized as an impact to "American consumers" as Plaintiff states. Moreover, Plaintiff's claim disregards the most significant driver of recent egg price spikes: severe outbreaks of avian influenza across the United States, which have resulted in the culling of tens of millions of birds and substantial supply disruptions.[3] Ignoring these realities in order to scapegoat Proposition 12 misleads both the courts and the public.

Plaintiffs also falsely aver that by enacting these laws, "California has effectively prevented farmers *across the country* from using a number of agricultural production methods."[4] (Emphasis in original.) Propositions 2 and 12 do no such thing; indeed, farmers *across the country* are free to ignore the standards imposed by these laws and continue to produce eggs in any production

---

[1] Compl. ¶ 2, ECF No. 1.

[2] *Id.* at ¶ 5.

[3] *See, e.g.*, Bernt Nelson, *Egg Prices Continue Setting Records*, American Farm Bureau Federation (Mar. 11, 2025), https://www.fb.org/market-intel/egg-prices-continue-setting-records ("The loss of egg-laying chickens from HPAI [Highly Pathogenic Avian Influenza] is the biggest factor driving up egg prices…").

[4] Compl. ¶ 2, ECF No. 1.

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

method they choose. This was pointed out in the challenge to Proposition 12 that reached the Supreme Court. *See National Pork Producers Council v. Ross*, 598 U.S. 356 (2023) at 360, 385 (noting repeatedly that producers may or may not *choose* to comply with Proposition 12).

California's citizens weighed these very trade-offs, including impacts on costs of eggs in their state, when they cast their ballots. They recognized that more humane farming practices may entail higher production costs for eggs they purchase, but nonetheless voted for stronger protections because they believed that the ethical treatment of animals, the integrity of the food sold in their communities mattered, and the support of small family farms, more. Agricultural production has increasingly moved to be controlled by only a few major corporations—some of the largest of which are foreign-owned, including by America's geopolitical adversaries—and it has become increasingly challenging for small, authentic farms to economically compete with Big Agribusiness's factory-style of farming, especially with the federal government's apparent abandonment of supporting local American agriculture. But California's laws help to level this playing field, by ensuring that American traditional American farming practices, which pride proper husbandry, continue to be viable in an age where quantity is valued over quality. By challenging Proposition 12, the federal government is asking the courts to override the democratic choices of California's voters to support these long-held

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

farming values, and to undermine the state's ability to regulate the standards for products sold within its borders. Respect for the democratic process, as well as respect for the truth of what drives national food prices, requires rejection of Plaintiff's claims.

Plaintiff's legal footing in this matter is as infirm as their factual assertions. Plaintiff misconstrues the scope of the Egg Products Inspection Act (EPIA) and the legal requirements for preemption. Congress enacted the EPIA to regulate the safety of eggs and egg products at processing facilities. 21 U.S.C. § 1031 *et seq.* The EPIA seeks to ensure that food entering commerce is safe for human consumption, like its sister laws the Federal Meat Inspection Act (FMIA) and Poultry Products Inspection Act (PPIA). Also like the FMIA and the PPIA, Congress never intended the EPIA to displace state police powers over their own markets. In contrast, AB 1437 and Propositions 2 and 12 were enacted due to voters' multifold concerns regarding certain inhumane animal husbandry practices and the desire to avoid those products from entering their local markets. This type of legislation serves to align local consumer markets with more desirable agricultural practices and is within the States' historic police powers, given the federal government's regulatory neglect in the animal humane husbandry arena. As Justice Gorsuch also pointedly remarked in the U.S. Supreme Court decision upholding Proposition 12 under the Dormant Commerce Clause, "Congress has yet

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

to adopt any statute that might displace Proposition 12 or laws regulating pork production in other States." *Ross*, 598 U.S. at 368 (2023) (citing a host of unadopted federal bills). The same is true as to the lack of Congressional action to regulate humane husbandry of egg-laying hens.

## II.    Background

### A.    Humane welfare and state markets.

States began formulating animal anti-cruelty laws hundreds of years ago, *see Ross*, 598 U.S. at 365, and these laws are now part of the fabric of governance in every state. They address countless concerns, including malicious cruelty, dogfighting and cockfighting, puppy mills, wildlife and wildlife products import, farm animal welfare, and more. And in the face of these advancements, Congress has remained silent on the subject of farm animal confinement, much less humane husbandry or sales of products from intensively confined animals.[5] Humane standards for the raising of farmed animals, especially as this husbandry comprises and interacts with a state's economy, remain entirely within states' purview. As of now, more than one dozen states and counting have laws touching upon intensive

---

[5] The only federal regulations on humane farm animal confinement are found under the National Organic Program's regulations, most recently updated at 88 Fed. Reg. 75394 (Nov. 2, 2023), but these regulations only apply to products that opt into the federal organic labeling system. They are more aptly described as labeling regulations, rather than humane husbandry rules, and are not enacted pursuant to the FMIA but rather the Organic Foods Production Act, 7 U.S.C. § 6501 *et seq.*

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

confinement of farmed animals.[6] Some such laws incorporate prohibitions against the sale of certain products deemed undesirable due to intensive confinement farming practices. But this is nothing new: states have banned various products from entering their market out of welfare concerns falling squarely within states' rightful police power. *See, e.g.*, *People v. K. Sakai Co.*, 56 Cal. App. 3d 531, 535 (1976) (upholding California state ban against the sale of whale meat in a Supremacy Clause challenge) (cleaned up); *Cresenzi Bird Imps., Inc. v. New York*, 658 F. Supp. 1441, 1446 (S.D.N.Y. 1987) (holding New York law requiring wild birds sold in state to have been raised in captivity, be marked with leg bands from birth, and imposing record requirements, is not preempted by federal quarantine laws nor the Endangered Species Act), *aff'd*, 831 F.2d 410 (2d Cir. 1987). *See also Ross*, 598 U.S. at 387 (examples of product bans again horsemeat; fireworks; single-use plastic bags).

Regulation of moral, safety, and health are the "traditional" applications of the police power. "Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it." *Berman v. Parker*, 348 U.S. 26, 32

---

[6] *Farm Animal Confinement Bans by State*, Am. Soc'y for the Prevention of Cruelty to Animals, https://www.aspca.org/improving-laws-animals/public-policy/farm-animal-confinement-bans (last visited Oct. 5, 2025).

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

(1954). The scope of the police power is not only broad and delimited in scope, but also flexible and evolving. "changes with changing social and economic conditions." *People v. K. Sakai Co.*, 56 Cal. App. 3d at 535. "It is not a circumscribed prerogative, but is elastic and . . . capable of expansion to meet existing conditions of modern life and thereby keep pace with the social, economic, moral, and intellectual evolution of the human race." *Id.* (cleaned up). California's humane egg laws are emblematic of such an evolution, and other states have followed suit.

### B.    California's Proposition 12

California is the fourth largest economy in the world today.[7] It also produces more food in total—fruit, vegetables, meat, nuts, dairy, and eggs—than any other U.S. state by a wide margin.[8]

Due to growing public concerns about the negative impacts of intensive confinement of farm animals, California voters passed Proposition 2 in 2008 to, in the Legislature's own words, "protect California consumers from the deleterious[]

---

[7] In 2024, the International Monetary Fund's World Economic Outlook data found California's nominal GDP to be $4.1 trillion, behind only the United States, China and Germany. *See Special Report: California Becomes 4th Largest Economy as Japan's Economy Slowed in 2024*, California Center for Jobs & the Economy, https://centerforjobs.org/ca/special-reports/special-report-california-becomes-4th-largest-economy-as-japans-economy-slowed-in-2024 (last visited Oct. 5, 2025).

[8] Timothy Ruth, *Overall U.S. crop production is concentrated in California and the Midwest*, U.S. Dep't Agric. Econ. Research Serv. (Feb. 22, 2023), https://www.ers.usda.gov/data-products/chart-gallery/chart-detail?chartId=58320.

health, safety, and welfare effects of the sale and consumption of eggs derived from egg-laying hens that are exposed to significant stress," as well as potentially reducing some public health risks. Cal. Health & Safety Code, § 25995(e). In relevant part, Proposition 2 required that in-state farmers provide egg-laying hens enough room to turn around freely, lie down, stand up, and fully extend their limbs. *Id.* at § 25990 (2008). The state's implementing regulations required 0.8 square feet of floor space per egg-laying hen. Cal. Code Regs. Tit. 3, § 1350. Over the next decade, the law was further amended; in 2010, through AB 1437, the Legislature required that any shelled eggs sold in California come from animals housed in compliance with the standards in Chapter 13.8 of the California Health and Safety Code (i.e., the codified Proposition 2). *See* Cal. Health & Safety Code, § 25996.

Most recently, California voters overwhelming approved Proposition 12 in 2018. Proposition 12 aimed to create new and stronger minimum requirements for space afforded to egg-laying hens and again prohibited the sale of any eggs (including liquid eggs this time) in California that come from animals raised in conditions that are not compliant with the measure's upgraded minimum requirements. Cal. Prop. 12 (2018), Sections 3-7 (amending Cal. Health & Safety Code, §§ 25990-25993 and adding § 25993.1).

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

According to the 2018 Voter Information Guide provided to California voters, Proposition 12 has multifold rationales, including preventing cruel products from entering the market, improving the California economy by helping family farmers and providing more jobs, preventing cruel treatment of animals, and providing potential further risk reduction against pollution and disease given the links identified between intensive confinement and pathogen proliferation. Cal. Sec'y of State, Voter Information Guide 70 (2018), https://vig.cdn.sos.ca.gov/2018/general/pdf/complete-vig.pdf. In other words, Proposition 12 was designed and intended to improve the humaneness of California's economy in multiple ways while safeguarding both animal and human welfare and safety, much like its earlier relative Proposition 2.

These laws reflect Californians' decision to shape their market around humane standards; i.e., creating a more "humane economy." This approach ensures that consumers can buy with confidence, aware that their purchases do not support practices they deem inhumane. This is especially so in a time where "humanewashing," like its environmental counterpart greenwashing, has become widespread and the use of terms such as "humane" and "cage free" are confusing and unregulated. *See infra* Part IV(A)(4). It also levels the economic playing field for farmers who have already invested in humane husbandry systems. Without such laws, producers committed to higher welfare standards face competition from

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

operators who rely on extreme confinement practices. By conditioning in-state product sales on humane husbandry practices, California's humane egg laws prevent this market distortion and ensure that humane farming can be economically viable.

## III.    Rule 12(b)(6) Standard

To survive a motion to dismiss, a complaint must demonstrate that the Plaintiff' claims are more than just "conceivable, "but are in fact "plausible on [their] face." *Ashcroft v. Iqbal*, 565 U.S. 662, 678 (2009 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In applying this plausibility standard, the Court should disregard conclusory statements, even when "couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted).

 "A claim has facial plausibility when the Plaintiff pleads factual content that allows the Court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Ash v. Anderson Merchs., L.L.C.,* 799 F. 3d 957, 960 (8th Circuit 2015) (quoting *Iqbal*, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. When evaluating a motion to dismiss, a Court does not need to accept a legal conclusion "couched as a factual allegation." *Id.* at 678.

## IV.    Argument

### A.    The Complaint should be dismissed under Rule 12(b)(6) because Plaintiff's preemption claims fail as a matter of law.

Plaintiff has presented no triable issue of fact, and their complaint must be dismissed. Each of the preemption claims fail as a matter of law.

First, Plaintiff necessarily faces a steep uphill battle due to the strong presumption against federal preemption of state law and, more broadly, the well-balanced federalism our system so zealously guards. "When addressing questions of express or implied pre-emption, [a court] begin[s] [its] analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). This presumption is especially powerful when the legislation in question is within the area traditionally governed by states, such as public health, consumer preferences and safety, product safety, marketing, and more. *Altria*, 555 U.S. at 77; *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Rice*, 331 U.S. at 230. The laws in question here fall squarely within this realm.

The "two cornerstones" of preemption analysis are, first, "Congressional intent [as] the ultimate touchstone," and second, a strong presumption against preemption. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic*, 518

U.S. at 494 (alteration in original) (internal quotation marks omitted); also citing *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963) and *Rice*, 331 U.S. at 230).

"Congress' intent, of course, is primarily discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it." *Medtronic* at 486 (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment)). This includes the "'structure and purpose of the statute as a whole' … as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the [federal] statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic* at 486 (citing *Gade*, 505 U.S. at 98 (opinion of O'Connor, J.)).

### 1. The EPIA is a food inspection and identification law, and was never intended to regulate production upstream.

The EPIA, like the FMIA, regulates food inspection, rather than food production. *See Triumph Foods v. Campbell*, No. 24-1759, 2025 U.S. App. LEXIS 25777, at *36 (1st Cir. Oct. 3, 2025) (because FMIA regulates meat inspection, not meat production, Massachusetts ban on sale of inhumanely produced pork not preempted by FMIA).

The EPIA's intent is plain from the statutory language itself: "It is essential, in the public interest, that the health and welfare of consumers be protected by the

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

adoption of measures prescribed herein for assuring that eggs and egg products distributed to them and used in the products consumed by them are wholesome, otherwise not adulterated, and properly labeled and packaged." 21 U.S.C. § 1031. The following section states that Congress "hereby…provide[s] for the inspection of certain egg products, restrictions upon the disposition of certain qualities of eggs, and uniformity of standards…to prevent the movement or sale for human food, of eggs and egg products which are adulterated or misbranded…". 21 U.S.C. § 1032. Simply stated, the entirety of intent of the EPIA is focused on concerns around adulteration and product safety.

The legislative history behind the EPIA reveals a solitary focus on consumer safety and confidence. In a 1969 Congressional hearing, testimony revealed the impetus behind the EPIA was the lack of confidence in the patchwork and haphazard state inspection regimes. *See* Egg Products Inspection Act: Hearing Before the Committee on Agriculture and Forestry, 91st Cong. 30-1 (1969) (statement of U.S. Sen. George D. Aiken) (characterizing the bill as one for consumer protection and to protect producers' markets from "bad eggs" slipping through inspection); 35-7 (statement of Asst. Sec. of Agric. Richard E. Lyng) (characterizing the EPIA again as an inspection bill and a bill to restrict "cracked," "leaking," or "dirty" eggs from being sold in liquid egg form via egg processing

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

plants; discussing previous voluntary federal inspection scheme for liquid egg production facilities and the need for a compulsory inspection regime).

### 2. The EPIA does not expressly preempt AB 1437 nor Proposition 12 (Counts I and II).

Plaintiff has failed to plausibly allege as a matter of law that California's laws are preempted by the EPIA. The intent of Congress to preempt state legislative powers must be "clear" and "manifest" in order to supersede state authority. *Rice*, 331 U.S. at 230. And "[w]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors preemption.'" *Altria*, 555 U.S. at 77 (2008) (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)). Further, preemption arises only where state and federal law are "irreconcilable." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). Because the EPIA contains an express preemption clause, 21 U.S.C. § 1052, the court first must determine the substance and scope of that clause, relying on "the plain language of the statute and its legislative history" to discern Congressional intent. *Altria,* 555 U.S. at 76; *Medicaid & Medicare Adv. Prod. Ass'n of Puerto Rico, Inc. v. Emanuelli Hernandez,* 58 F.4th 5, 11 (1st Cir. 2023) (quotation omitted)).

The express preemption clause of the EPIA prohibits states from "requir[ing] *the use of* standards of quality, condition, weight, quantity, or grade

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

which are in addition to, or different from the official Federal standards[.]" 21 U.S.C. § 1052(b) (emphasis added).

The words "use of" cannot be overlooked here. It is the *uniformity* of standards that is of concern for EPIA preemption, not the actual egg quality or grade per se. *See* Egg Products Inspection Act: Hearing Before the Committee on Agriculture and Forestry, 91st Cong. 48 (1969) (statement of Egg Committee Chairman of the Institute of American Poultry Industries M.J. Chamberlain, representing industry, in support of the bill that "will provide for uniformity through the establishment of official standards for quality, condition, quantity or grade and the prohibition of any requirements…inconsistent therewith"). And Plaintiff has failed to plausibly allege that California's laws conflict or are irreconcilable with the EPIA's uniformity of standards mandate.

Indeed, states today do, in fact, impose a variety of requirements on eggs sold within their borders that are in addition to the bottom-line requirements found in the EPIA. These regulations are lawful, however, because none conflict with the EPIA: none require the use of alternative or heightened identification schemes, standards, grades, and so on. Nor do any conflict with the uniformity of standards required by the EPIA. Iowa, for example, requires that the label on whole eggs in cartons "shall be printed in letters not less than ¼ inch in height, or plainly and conspicuously stamped or marked in letters not less than ½ inch in height." Iowa

Admin. Code r. 12-36.8(3). In contrast, South Carolina requires that "[l]etters [for "grade and size"] shall be not less than 5/16 inch in height. Also packer's or distributor's name and address letters not less than 1/8 inch in height." S.C. Code Regs. § 5-228(1).

So even though Iowa and South Carolina clearly directly regulate egg labeling in-state—and do so in a way that even contradicts *each other*'s laws— neither is preempted by the EPIA. Similarly, California's laws (which do not even require certain labels on the products themselves, but only require the documents of title and shipping manifests to record whether or not the eggs are compliant, *see infra* Part Part IV(A)(4)) do not conflict with the EPIA and are therefore not preempted.

Plaintiff also misconstrues *Nat'l Meat Ass'n v. Harris,* 565 U.S. 452 (2012), to argue that AB 1437 and Proposition 12 are preempted by the EPIA, though Plaintiff acknowledges that *Harris* dealt with the FMIA rather than the EPIA. The California law at issue in *Harris* prohibited slaughterhouses from "buy[ing], sell[ing], or receiv[ing] a nonambulatory animal;" "process[ing], butcher[ing], or sell[ing] meat or products of nonambulatory animals for human consumption;" or "hold[ing] a nonambulatory animal without taking immediate action to humanely euthanize the animal." Cal. Penal Code Ann. § 599f(a)–(c). In *Harris,* the Supreme Court held that the FMIA and its implementing regulations *explicitly* address the

handling of nonambulatory livestock during the slaughter process, so the many prohibitions contained in the California law "in essence … substitute[d] a new regulatory regime" in place of the FMIA's. *Harris*, 565 U.S. at 460. This is because California's law directly conflicted with the FMIA, which explicitly permitted slaughter of nonambulatory animals. The two were fully irreconcilable and contradictory. As such, the FMIA preempted California's attempt to regulate the welfare of animals offered for slaughter due to the plainly preemptive federal rules regulating slaughter. *See Triumph Foods v. Campbell*, No. 24-1759, 2025 U.S. App. LEXIS 25777, at *34-35 (distinguishing the challenged law in *Harris* from Massachusetts' Proposition 12 analogue and holding that Massachusetts law banning sale of certain pork in state is not preempted by the FMIA), *aff'd*, No. 24-1759, 2025 U.S. App. LEXIS 25777, at *36. In contrast, neither AB 1437 nor Proposition 12 impose any requirements on the inspection, processing, or handling of eggs within a federally-regulated processing plant, and Plaintiffs have failed to plausibly point to any way in which they do so.

Nor do the sale prohibitions impose quality or grade requirements on eggs based on eggs' "certain inherent properties," Compl. ¶ 57, ECF No. 1. It was this precise theory that was rejected by courts in the FMIA preemption challenge to Massachusetts' Proposition 12 analogue.[9] *See Triumph Foods v. Campbell*, 742 F.

---

[9] Mass. G.L. c. 129 App. §§ 1- 1 *et seq*.

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Supp. 3d 63, 71 (D. Mass. 2024), *aff'd*, No. 24-1759, 2025 U.S. App. LEXIS 25777, at *36.

Within the EPIA, "adulterated" is defined solely in terms of food safety. An adulterated egg includes one that is poisoned; has an unsafe pesticide or other chemical or additive; is decomposing or putrid; has been irradiated; and has been packed in unsanitary conditions. 21 U.S.C.S. § 1033(a). Similarly, a "restricted egg" is defined as "any check [broken or cracked], dirty egg [unbroken shell but with adhering dirt or foreign material], incubator reject, inedible, leaker, or loss [unfit for human food due to any of the above, being overheated, frozen, contaminated, bloody]." 21 U.S.C.S. § 1033(g)(8).

These definitions are the egg corollaries of the meaning of the term "unadulterated" in the FMIA, and courts have rejected interpretations like those of Plaintiff that attempt to broaden this concept when in the context of the FMIA and PPIA. *See, e.g.*, *United States v. Agnew*, 931 F.2d 1397, 1404 (10th Cir. 1991), *cert. denied*, 112 S.Ct. 237 (1991) (finding that the term "adulterated" clearly means meat that is unfit for human consumption due to potentially being unsafe, rather than any other issue with it, despite the possible alternative meanings of terms such as "unsound"); *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1147-8 (9th Cir. 2017) (finding that the California state ban on products made by force-feeding birds was not preempted by the PPIA

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

because the force-feeding aspect, having nothing to do with physical composition of the product itself, was not an "ingredient requirement" under the PPIA's preemption clause). So too should Plaintiff's claims here be rejected.

> **3.    The EPIA also does not impliedly preempt AB 1437 nor Proposition 12, as there is no irreconcilable conflict between EPIA goals and humane standards (Counts I and II).**

The focus of implied preemption is Congressional intent. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Implied preemption, or "conflict preemption," occurs when compliance with both federal and state regulations is impossible, or when state law poses an "obstacle" to accomplishing Congress's full purposes and objectives. *Gade*, 505 U.S. at 98; *see also Hines v. Davidowitz,* 312 U.S. 52, 67 (1941).

In *Chamber of Commerce v. Whiting*, a four-Justice plurality warned that "implied preemption analysis does not justify a 'free-wheeling judicial inquiry into whether a state statute is in tension with federal objectives,'" which "'would undercut the principle that it is Congress rather than the courts that preempts state law.'" *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade*, 505 U.S. at 111 (Kennedy, J., concurring)). The Court adopted a "high threshold" burden that must be overcome to establish implied federal preemption of state law. *Id.*

Plaintiff has failed to meet this threshold in their pleading claims for implied

preemption. Plaintiff has failed to plausibly allege any specific way in which AB

1437 nor Proposition 12 are irreconcilable or mutually exclusive the EPIA. These

state laws do not "stand[] as an obstacle to the accomplishment and execution of

the full purposes and objectives of Congress" in the EPIA, given the above

discussion of the purposes of the EPIA. *See Hines v. Davidowitz*, 312 U.S. at 67,

70-71 (1941) (holding that a Pennsylvania naturalization law is preempted because

federal power in the field of foreign relations is supreme; there has been enacted a

broad and comprehensive federal naturalization system; there is a fundamental

importance of immigration and naturalization laws to personal liberties; and there

has been a history of political upheavals engendered by registration and

naturalization laws).  Courts have consistently recognized distinctions between

laws and regulations against inhumane treatment of animals and bans on products

deemed inhumane, and those that speak to other concerns, such as food safety,

species preservation, or commerce in wildlife products. *See, e.g.*, *Triumph Foods v.*

*Campbell*, No. 24-1759, 2025 U.S. App. LEXIS 25777, at \*36 (citing *Iowa Pork*

*Producers Ass'n v. Bonta*, No. 22-55336, 2024 WL 3158532, at \*5 (9th Cir. June

25, 2024), *cert. denied*, No. 24-728, 2025 WL 1787818 (June 30, 2025)); *Ass'n des*

*Éleveurs*, 870 F.3d at 1147-8 (9th Cir. 2017) (Court distinguishing between the

force-feeding aspect of the bird product and the PPIA's preemption of alternative

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

"ingredient requirement[s]"); *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.*, 41 Cal. 4th 929, 952 (2007) (California Supreme Court holding that California's ban against kangaroo leather products deemed inhumane is not expressly nor impliedly preempted by the Endangered Species Act because the "arrangement [in which federal law does not prohibit importation of kangaroo products, while state law does]…poses no obstacle to current federal policy").

### 4. Plaintiff' claim for preemption regarding packaging and labeling of egg products fails (Count III).

Plaintiff's claim of preemption regarding packaging and labeling of egg products likewise fails under both an express and implied preemption analysis, even taking all Plaintiff's plausible factual allegations as true. Plaintiff alleges that California's regulations "regarding the packaging and labeling of egg products, *see* 3. Cal. Code Regs. § 1320.4," violate the EPIA and the Supremacy Clause. Compl. ¶ 66, ECF No. 1. California law prohibits the use of the term "cage free" "or other similar descriptive term unless the shell eggs or liquid eggs were produced in compliance with section 1320.1 of this Article." 3 Cal. Code Regs. § 1320.4. According to Plaintiff, this specific regulation is preempted by the regulations promulgated by EPIA. Compl. ¶ 65, ECF No. 1.  In support of this allegation, Plaintiff states that Cal. Code Regs § 1320.4 imposes labeling and packaging requirements "in addition to" and "different than" those imposed by the EPIA.

This argument fails for multiple reasons.

First, any regulation pursuant to AB 1437 or Proposition 12 that requires the affirmative identification of compliant items applies only to the *records* related to the shipments ("all documents of title and shipping manifests for shipments") of eggs and egg products imported into California, rather than the shell egg cartons, egg product containers, or case shipments themselves. Cal. Code Regs. Tit. 3, § 1320.4(a); *see* Compl. ¶ 52(a)–(c), ECF No. 1. Plaintiff has not plausibly alleged how California's requirements for the shipping *records* are irreconcilable with requirements of the EPIA for shipments. The EPIA and its implementing regulations require certain identifications given to egg and egg product shipments, *see* 9 CFR § 590.410-415 (requiring "Keep Frozen," date of loading, date of production, net contents, official inspection sign, and so on, for certain egg products' shipping containers), but none that would prevent California's rules for documents of title and manifests. The EPIA's preemption clause does not touch at all upon shipping manifests or title documents.

This is analogous to an Iowa regulation that requires all cases of loose-packed eggs sold in the state to identify the grade of the eggs in the case, though grading of eggs is voluntary federally and the EPIA does not require shipments of

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

cases to identify the grade.[10] Iowa Admin. Code r. 21-36.8 (2025). But Iowa's rule, like California's, are not an obstacle to the EPIA nor are irreconcilable with it.

Second, the remaining provisions identified by Plaintiff, *see* Compl. ¶ 52(d), ECF. No. 1, do not impose additional labeling requirements at all. Rather, they are prohibitions against deceptive labeling: "No person shall label, identify, mark, advertise, or otherwise represent shell eggs or liquid eggs for purposes of commercial sale in the state using the term "cage free" or other similar descriptive term unless the shell eggs or liquid eggs were produced in compliance with [Proposition 12]." Cal. Code Regs. Tit. 3, § 1320.4(c). There is a similar prohibition against labeling a product as Proposition 12-compliant when it is not. Cal. Code Regs. Tit. 3, § 1320.4(d). Such a prohibition is qualitatively distinct from an imposition of "additional" or "different" labeling requirements. Federal law does not regulate nor define the term "cage free" (except within the narrow context and confines of a specific, voluntary USDA certification for marketing purposes[11]). Because the USDA does not regulate the term in labelling broadly, California is entitled to step into this federal vacuum, using traditional state powers, and prohibit deceptive marketing and labeling practices in order to protect

---

[10] The EPIA only requires that egg handlers and shippers retain records of pertaining to certain categories, including graded eggs. 9 CFR § 590.200(8).

[11] *Cage-Free Verification Of USDA Graded Shell Eggs*, U.S. Dep't Agric., Agric. Marketing Serv. (Dec. 1, 2019), https://www.ams.usda.gov/publications/content/cage-free-verification-usda-graded-shell-eggs.

its consumers. Indeed the deceptive use of the label "cage free" has been the subject of countless lawsuits across the country over the years, *see Janecyk v. Eggland's Best, Inc.*, 1:24-cv-06222 (N.D. Ill. July 23, 2024); *Mogull v. Pete & Gerry's Organics*, 588 F. Supp. 3d 448 (S.D.N.Y. 2022); *Claybaugh v. Trader Joe's Co.*, No. RG18897085 (Super. Ct. Alameda Cty., Cal., Mar. 15, 2018), which itself illustrates that 1) the federal government has failed to protect consumers nationally by regulating the term, and 2) the states have good reason to do so.

**V.     Conclusion**

For the reasons set forth above, Defendant-Intervenors respectfully request that the court grant their Motion to Dismiss and dismiss the Complaint with prejudice.

Dated: October 6, 2025                    Respectfully submitted,

                    */s/ Jessica L. Blome*
                    Jessica L. Blome
                    Cal. Bar No. 314898
                    GREENFIRE LAW, PC
                    2748 Adeline Street, Suite A
                    Berkeley, CA 94703
                    (510) 900-9502
                    jblome@greenfirelaw.com

                    *Attorney for Intervenors The Center for a Humane Economy and Animal Wellness Action*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Proposed Defendant-Intervenors,

certifies that this brief contains 5,466 words, which complies with the word limit of

L.R. 11-6-1.

Dated: October 6, 2025

*/s/ Jessica L. Blome*
Jessica L. Blome

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS