1  BRUCE A. WAGMAN (SBN 159987)
   bwagman@rshc-law.com
2  RILEY SAFER HOLMES & CANCILA LLP
   456 Montgomery Street, 16th Floor
3  San Francisco, CA 94104
   Phone:      (415) 275-8540
   Facsimile:  (415) 275-8551
4

5  *Attorneys for Defendant-Intervenors*
   *Humane World for Animals, Animal Legal*
   *Defense Fund, Animal Equality, The Humane*
6  *League, Farm Sanctuary, Compassion in*
   *World Farming USA, Animal Outlook*
7

8  REBECCA CARY (CSB No. 268519)
   rcary@humaneworld.org
9  HUMANE WORLD FOR ANIMALS
   1255 23rd St., NW, Suite 450
   Washington, D.C. 20037
10 Telephone:  (202) 676-2330
   Facsimile:   (202) 676-2357
11

12 *Attorneys for Defendant-Intervenor*
   *Humane World for Animals*

13                UNITED STATES DISTRICT COURT
14            FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 15  UNITED STATES OF AMERICA, | Case No. 2:25-cv-06230-MCS-AGR |
| 16        Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS** |
|     v. | |
| 17  THE STATE OF CALIFORNIA; | |
| 18  GAVIN C. NEWSOM, in his Official | |
| 19  Capacity as Governor of California; KAREN ROSS, in her Official Capacity | The Honorable Mark C. Scarsi |
| 20  as Secretary of the California | Date: January 12, 2026 |
| 21  Department of Food & Agriculture; ERICA PAN, in her Official Capacity | Time: 9:00 a.m. Location: Courtroom 7C |
| 22  as Director of the California | Trial Date: None Action Filed: July 9, 2025 |
| 23  Department of Public Health; and ROB BONTA, in his Official Capacity as | |
| 24  Attorney General of California, | |
| 25        Defendants, | |
| 26     and | |
| 27  ASSOCIATION OF CALIFORNIA EGG FARMERS; HUMANE WORLD | |
| 28  FOR ANIMALS, ET AL.; and ANIMAL WELLNESS ACTION, ET | |

i

AL.,

Defendant-Intervenors.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES.............................................1

I.       INTRODUCTION..................................................................................1

II.      BACKGROUND....................................................................................2

    A.    Battery Cages ..................................................................................2

    B.    The Hen Enclosure Laws ...............................................................4

    C.    Egg Products Inspection Act...........................................................4

    D.    Prior Litigation ...............................................................................5

III.     LEGAL STANDARD ...........................................................................6

IV.    ARGUMENT ........................................................................................6

    A.    The United States's Claims Are Non-Justiciable.........................7

        1.    The Court Should Exercise its Discretion to Dismiss this Complaint Based on Judicial Estoppel ..................................7

        2.    The United States Does Not Have Standing to Bring These Claims .. 11

    B.    The Hen Enclosure Laws Are Not Expressly Preempted by the Inspection Act's Clause on Standards of Quality or Condition for Eggs.................11

        1.    The Preemption Clause's Scope is Limited to State Egg-Grading Laws.................................................................. 12

        2.    The Inspection Act Does Not Regulate Hen Enclosure Size................... 15

        3.    The Hen Enclosure Laws Aren't Even Preempted Under the Amended Complaint's Incorrect Interpretation of the Inspection Act .................... 16

        4.    The Amended Complaint's Interpretation Conflicts with the Broader Egg Regulatory Framework ................................................. 18

    C.    The Implementing Regulations Are Not Expressly Preempted by the Inspection Act's Clause on Labeling and Packaging Requirements .......20

V.      CONCLUSION ...................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Apparel & Footwear Ass'n, Inc. v. Baden*,
    107 F.4th 934 (9th Cir. 2024) .................................................................. 18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................... 6

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*,
    870 F.3d 1140 (9th Cir. 2017) ......................................................... 15, 17

*Baughman v. Walt Disney World Co.*,
    685 F.3d 1131 (9th Cir. 2012) ................................................................ 9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................... 6

*California Ins. Guarantee Ass'n v. Azar*,
    940 F.3d 1061 (9th Cir. 2019) .............................................................. 11

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................................. 11

*Cresenzi Bird Importers, Inc. v. New York*,
    658 F. Supp. 1441 (S.D.N.Y. 1987), *aff 'd* 831 F.2d 410 (2d Cir.
    1987) .................................................................................................... 15

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001) .................................................................. 9

*Hayslett v. Tyson Foods, Inc*.,
    No. 1:22-CV-1123, 2023 WL 3666091 (W.D. Tenn. May 25,
    2023) .................................................................................................... 16

*Jones v. Rath Packing Co.*,
    430 U.S. 519 (1977) .............................................................................. 18

*Missouri ex rel. Koster* v. *Harris*,
    847 F.3d 646 (9th Cir. 2017), *cert denied*, 137 S. Ct. 2188 (2017) .............. 5, 11

iv

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ............................................................................ 11

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*,
  692 F.3d 983 (9th Cir. 2012) ............................................................... 9

*Missouri v. California*,
  586 U.S. 1065 (2019) ............................................................... 1, 5, 7, 8

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023) ............................................................................ 15

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ........................................................................ 9, 10

*Puerto Rico v. Franklin California Tax-free Tr.*,
  579 U.S. 115 (2016) ............................................................................ 16

*Riegel v. Medtronic, Inc.*,
  552 U.S. 312 (2008) ............................................................................ 19

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) .............................................................. 6

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ............................................................................ 20

**Statutes**

7 U.S.C. § 1621 *et seq.* ........................................................................ 13

21 U.S.C. § 1031 *et seq* .................................................................*passim*

21 U.S.C. § 1033(f) ....................................................................... 12, 20

21 U.S.C. § 1033(g) ............................................................................ 12

21 U.S.C. § 1033(r) ............................................................................. 13

21 U.S.C. § 1034(d) ............................................................................ 18

21 U.S.C. § 1052(b) .......................................................................*passim*

3 Cal. Code Regs. § 1320.4 ................................................................. 20

v

Ariz. Admin Code § R3-2-907 ....................................................................20

Cal. Health & Safety Code §§ 25990-91 ......................................................15

Cal. Health & Safety Code § 25995 .......................................................4, 19

Mass. Gen. Laws 129 App. §§ 1-1 – 1-12 ....................................................3

Mich. Comp. Laws. Ann. § 287.746 ............................................................3

Nev. Rev. Stat. §§ 583.237 – 583.247 ..........................................................3

Ohio Adm. Code 901:12-9-03(F)(6) ............................................................3

Ore. Rev. Stat. §§ 632.835 – 632.850 ..........................................................3

R.I. Gen. Laws §§ 4-1.1-1 – 4-1.1-6 ............................................................3

Utah Code Ann. §§ 4-4a-101 – 4-4a-107 ....................................................3

Wash. Rev. Code §§ 69.25.010 – 69.25-930 ................................................3

**Court Rules**

Federal Rule of Civil Procedure 12(b)(1)..........................................*passim*

Federal Rule of Civil Procedure 12(b)(6)..........................................*passim*

**Other Authorities**

7 C.F.R. § 56.1 ...........................................................................................13

7 C.F.R. § 57.1 ...................................................................................14, 17

7 C.F.R. § 57.720..........................................................................................13

21 C.F.R. § 118.12(d) ................................................................................18

Alex Padilla, Secretary of State, *California General Election—
    Official Voter Information Guide* 68–71 (Nov. 6, 2018),
    https://vig.cdn.sos.ca.gov/2018/general/pdf/complete-vig.pdf ........................19

Alex Padilla, Secretary of State, *California General Election—Text of
    Proposed Laws* (Nov. 6, 2018),
    https://vig.cdn.sos.ca.gov/2018/general/pdf/topl.pdf ...........................................4

FDA, Salmonella Enteritidis in Eggs, 63 Fed. Reg. 27502 (May 19, 1998) .......................................................................................................... 18

USDA AMS, *United States Standards, Grades, and Weight Classes for Shell Eggs* (effective July 20, 2000), https://www.ams.usda.gov/sites/default/files/media/Shell_Egg_Sta ndard%5B1%5D.pdf ............................................................................ 13

USDA, *Egg Markets Overview* (July 25, 2025), https://downloads.usda.library.cornell.edu/usda-esmis/files/73667q50n/pz50jt723/hq37xn587/AMS_3725.PDF ........................ 2

vii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The federal government seeks to overturn duly enacted state animal cruelty laws that have been on the books for over a decade, using a legal theory that the United States *itself* has already debunked: express preemption under the federal Egg Products Inspection Act ("EPIA" or "Inspection Act"). The United States knows that its express preemption claim is meritless because the first Trump Administration already argued to the Supreme Court, in detail, that a near-identical challenge to California hen enclosure laws should be rejected. *Missouri v. California*, Brief for the United States as Amicus Curiae, No. 22O148 (Nov. 29, 2018) ("Solicitor General Brief").[1]

As the United States correctly explained in that brief, California's hen enclosure laws "are not preempted by the EPIA." *Id*. at 7. The preemption clause at 21 U.S.C. § 1052(b) only bars state laws imposing "grading standards" that differ from or add to federal grading standards, "[i]n accordance with Congress's mandate that [federal] grading standards be 'uniform[ ]' nationwide"—and "the California Egg Laws do not impose any additional or different assessment standards of that kind." *Id.* at 18–19. "[B]ecause USDA's egg-grading standards do not address confinement conditions for egg-laying hens," California's hen enclosure laws are not preempted by the Inspection Act. *Id*. at 7.

The United States has not explained its about-face here, and, indeed, has no legal basis for bringing this suit. Instead, its Complaint hints at a different motivation: blaming the State of California for the politically salient issue of recent egg price spikes. *See* First Amended Complaint, Dkt. 47 ("FAC") ¶¶ 1–2

---

[1]    Available at https://www.supremecourt.gov/DocketPDF/22/22O148/73669/20181129155455478_Orig.%20148%20State%20of%20Missouri%20v.%20Cal.pdf.

(referencing price spikes that the Government has already admitted have an entirely different cause—the nationwide outbreak of avian influenza[2]). But egg prices are not relevant to the legal claim here, and this suit is not an appropriate vehicle for addressing them. This Court should dismiss the Complaint with prejudice for failing to raise justiciable claims under Rule 12(b)(1), and for failing to state plausible express preemption claims under Rule 12(b)(6).

## II.    BACKGROUND

### A.    Battery Cages

The majority of America's nearly 290 million egg-laying hens[3] spend their lives confined in battery cages—wire contraptions so small that hens cannot flap their wings, lie down, or even turn around. These severely confined hens are unable to express natural behaviors, and suffer physically and psychologically as a result.[4] Battery cages are so cruel that jurisdictions around the world, including the

---

[2]    *See, e.g.*, *USDA Charts of Note*, USDA Econ. Res. Serv. (Aug. 7, 2025) ("Egg prices averaged . . . higher between January 2025 and June 2025 than they did in all months in 2024 on average primarily because of an outbreak of Highly Pathogenic Avian Influenza (HPAI) that began in 2022. HPAI contributes to elevated egg prices by reducing egg-layer flocks and egg production.")

[3]    *Egg Markets Overview*, USDA, 4 (July 25, 2025), https://downloads.usda.library.cornell.edu/usda-esmis/files/73667q50n/pz50jt723/hq37xn587/AMS_3725.PDF.

[4]    *E.g.*, K.M. Hartcher & B. Jones, *The welfare of layer hens in cage and cage-free housing systems*, 73 World's Poultry Sci. J. 767-782 (2017); I.A.S. Olsson & L.J. Keeling, *The push-door for measuring motivation in hens: laying hens are motivated to perch at night*. 11 *Animal Welfare* 11-19 (2002); J.J. Cooper J.J. & M.C. Appleby, *The value of environmental resources to domestic hens: a comparison of the work-rate for food and for nests as a function of time,* 12 *Animal Welfare* 39-52 (2003); M.K. Sharma et al., *Effects of the housing environment and laying hen strain on tibia and femur bone properties of different laying phases of Hy-Line hens*, 100

2

European Union,[5] have banned them or begun phaseouts because of animal welfare concerns. Numerous U.S. states have similarly banned, and eliminated local complicity in the use of, these cruel systems.[6]

Battery cages are also hotbeds of dangerous pathogens. Eggs are a leading cause of human *Salmonella* infection,[7] which kills more Americans than any other foodborne illness.[8] And some studies have shown that eggs from battery-caged hens have the highest rates of *Salmonella* contamination among all egg production systems.[9]

---

Poultry Sci., 100933 (2021); H. Jeon et al., *Welfare characteristics of laying hens in aviary and cage systems*, 104 Poultry Science, 104987 (2025).

[5] *See, e.g.*, Council Directive 1999/74/EC of 19 July 1999, Laying Down Minimum Standards for the Protection of Laying Hens, 1999 O.J. (EU); Tierschutzgesetz [TSchG] [Animal Welfare Law] Bundesgesetzblatt I [BGBl I] No. 118/2004, as amended, § 18(3), https://www.ris.bka.gv.at/GeltendeFassung.wxe?Abfrage=Bundesnormen&Gesetzesnummer=20003541 (Austria).

[6] Ariz. Admin Code § R3-2-907; Colo. Rev. Stat. Ann. § 35-21-201; Mass. Gen. Laws 129 App. §§ 1-1 – 1-12; Mich. Comp. Laws. Ann. § 287.746; Nev. Rev. Stat. §§ 583.237 - 583.247; Ohio Adm. Code 901:12-9-03(F)(6); Ore. Rev. Stat. §§ 632.835 – 632.850; R.I. Gen. Laws §§ 4-1.1-1 - 4-1.1-6; Utah Code Ann. §§ 4-4a-101 - 4-4a-107; Wash. Rev. Code §§ 69.25.010 – 69.25-930.

[7] *See, e.g.*, Inne Gantois et al., *Mechanisms of egg contamination by Salmonella Enteritidis*, 33 FEMS Microbiology Revs. 718 (2009).

[8] *Estimates: Burden of Foodborne Illness in the United States*, CDC (Mar. 19, 2025), https://www.cdc.gov/food-safety/php/data-research/foodborne-illness-burden/index.html.

[9] *See, e.g.*, European Food Safety Authority Panel on Biological Hazards, Scientific Opinion, *Salmonella control in poultry flocks and its public health impact*, 17 EFSA Journal 5596 at 47-48, 68 (as amended Apr. 8, 2019), https://www.efsa.europa.eu/en/efsajournal/pub/5596; D. R. Jones et al., *Influence of commercial laying hen housing systems on the incidence and*

3

## B.     The Hen Enclosure Laws

AB 1437 and Proposition 12 (collectively, the "Hen Enclosure Laws") were passed with overwhelming support from the California legislature and the California voting public, respectively. As the text of Proposition 12 makes clear, California's hen enclosure laws seek "to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness and associated negative fiscal impacts on the State of California." Proposition 12 § 2.[10] In the interest of judicial economy and to streamline the briefing in this matter and avoid unnecessary duplication, Defendant-Intervenors refer the Court to the description of the history and text of these laws contained in California's Motion to Dismiss brief. Of critical importance here: these Hen Enclosure Laws regulate the in-state housing of hens, and the in-state sale of eggs and egg products, and have nothing to do with the inspection, packing, grading, or processing of eggs and egg products.

## C.     Egg Products Inspection Act

The Inspection Act, 21 U.S.C. §§ 1031 *et seq.*, does not regulate hen-housing, nor impose uniform egg sales laws. It primarily establishes a system of inspection at certain egg processing facilities to "assur[e] that eggs and egg products" sold interstate "are wholesome, otherwise not adulterated, and properly labeled and packaged." 21 U.S.C. § 1031. In the interest of judicial economy and

---

*identification of Salmonella and Campylobacter*, 95 Poultry Science 1116 (2016).

[10] Alex Padilla, Secretary of State, *California General Election—Text of Proposed Laws* 87 (Nov. 6, 2018), https://vig.cdn.sos.ca.gov/2018/general/pdf/topl.pdf; *see also* Cal. Health & Safety Code § 25995 (AB 1437).

4

avoiding duplication, Defendant-Intervenors refer the Court to the description of the Inspection Act and its relevant preemption clause contained in California's Motion to Dismiss brief. In summary, the Inspection Act only covers a narrow segment of the stream of egg commerce; it does not establish a comprehensive federal scheme covering all aspects of the egg market from farm to table. Its relevant preemption clause does not contain language guaranteeing a right to sell eggs unencumbered by state laws. *See* 21 U.S.C. § 1052(b). To the contrary, it contains a savings clause expressly allowing concurrent state jurisdiction, permitting states to "exercise jurisdiction with respect to eggs and egg products for the purpose of preventing the distribution for human food purposes of any such articles which are outside of [an official] plant . . . ." *Id.*

### D.    Prior Litigation

As further detailed in the State's Motion to Dismiss briefing, the Hen Enclosure Laws have survived many lawsuits, including two lawsuits alleging Inspection Act preemption. *Missouri ex rel. Koster* v. *Harris*, 847 F.3d 646 (9th Cir. 2017), *cert denied*, 137 S. Ct. 2188 (2017); *Missouri v. California*, 586 U.S. 1065 (2019).

Critically, in *Missouri v. California*, where state plaintiffs sought to invoke the Supreme Court's original jurisdiction to hear their preemption challenge to AB 1437, the first Trump Administration provided the Supreme Court its view on the merits of that preemption challenge—and stated forcefully that AB 1437 was not preempted by the Inspection Act. Solicitor General Brief, at 7. Consistent with the United States's recommendation, the Supreme Court declined to exercise jurisdiction over that case. *Missouri v. California*, 586 U.S. 1065 (2019). The Solicitor General's brief, which squarely contradicts the claims in the United States' Complaint here, is discussed further below in Section IV.A.

5

## III.    LEGAL STANDARD

Defendant-Intervenors move to dismiss the United States's legally deficient Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," and "raise[s] a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Courts will generally accept well-pleaded allegations as true; however, mere "conclusions . . . are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Under Rule 12(b)(1), the plaintiff has the burden to establish that it has met the Article III requirements for standing. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

## IV.    ARGUMENT

The Complaint raises non-justiciable claims that the United States already argued were meritless in Supreme Court briefing. The Inspection Act does not prevent states from regulating in-state egg sales, and it does not expressly or otherwise preempt the Hen Enclosure Laws or their implementing regulations. The United States's express preemption claims have no basis in the text of the Inspection Act's preemption clause, which only bans state laws imposing egg-grading standards on shell eggs, temperature requirements on shell eggs, and certain labeling requirements. *See* 21 U.S.C. § 1052(b). The Hen Enclosure Laws address hen enclosure size—a subject entirely beyond the scope of the Inspection Act. The United States's claims should be dismissed under Rules 12(b)(1) and 12(b)(6).

## A.    The United States's Claims Are Non-Justiciable

The United States's suit is non-justiciable, and it raises serious separation-of-powers issues with respect to the integrity of the federal courts. The Complaint should be dismissed under Rule 12.

### 1.    The Court Should Exercise its Discretion to Dismiss this Complaint Based on Judicial Estoppel

As noted *supra*, this is the United States's second appearance before the federal judiciary addressing the merits of an Inspection Act preemption challenge to the Hen Enclosure Laws. In 2018, in *Missouri v. California*, President Trump's Solicitor General argued against plaintiffs' claim that the Inspection Act preempted AB 1437. In stark contrast to the allegations in this Complaint, the United States unequivocally advised the Supreme Court that "***California's AB 1437 and Shell Egg Food Safety regulation are not preempted by the EPIA***, because USDA's egg-grading standards do not address confinement conditions for egg-laying hens." Solicitor General Brief, at 7 (emphasis added). In an argument spanning several pages, the United States opined that:

(1)    "California Egg Laws are not preempted by the federal statute that plaintiffs invoke, 21 U.S.C. 1052(b)."

(2)    21 U.S.C. 1052(b) bans "use of standards of quality, condition, weight, quantity, or grade which are in addition to or different from the official Federal standards . . . The statute defines 'official standards' to mean 'the standards of quality, grades, and weight classes for eggs * * * under the Agricultural Marketing Act of 1946,' 21 U.S.C. 1033(r)—that is, the Agricultural Marketing Service's grading standards."

(3)    "[T]the California Egg Laws do not impose any additional or different assessment standards of that kind."

7

*Id.* at 18–20. The brief comprehensively debunked essentially every argument presented in this Complaint. In addition to explaining that section 1052(b) only preempts state laws regarding egg grading, the United States explained that:

> (4)    "Agricultural Marketing Service's standards do not regulate the size of cages for egg-laying hens on farms."
>
> (5)    The Food and Drug Administration (FDA) "has historically undertaken primary responsibility for regulating farms to prevent Salmonella and address other potential food-safety concerns," and "has stated that States may impose Salmonella-prevention requirements more stringent than federal standards"; California's hen enclosure regulations contained "the stated objective to reduce the risk that shell eggs sold in California would be contaminated with Salmonella."

*Id.* at 5, 18-20.

The Supreme Court ultimately declined to exercise jurisdiction without a written opinion, *Missouri v. California*, 586 U.S. 1065 (2019), thus terminating the preemption claim in accordance with the United States' advice and asserted position regarding Inspection Act preemption.

This Court should not allow the United States to now advance an Inspection Act preemption claim that is diametrically opposed to its prior representations to the federal judiciary concerning the *same claim* for relief (as to AB 1437) and materially indistinguishable claims (as to Proposition 12), with respect to the *same California law* (AB 1437) and a *materially identically law* (Proposition 12)[11], under the *same federal preemption clause*, in an action involving *the same defendant*.

---

[11]    Only AB 1437 was at issue in *Missouri v. California*, but the United States' preemption argument here against both Hen Enclosure Laws is materially the same.

Judicial estoppel prevents a party who "assumes a certain position in a legal proceeding, and succeeds in maintaining that position," from later "assum[ing] a contrary position" "simply because his interests have changed." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). Courts "invoke[ ] judicial estoppel not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings, and to protect against a litigant playing fast and loose with the courts." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990) (quotation marks omitted)). The purpose of judicial estoppel is to "protect the integrity of the judicial process," by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 750 (citations omitted).

In deciding whether to invoke judicial estoppel, the Ninth Circuit applies a three-factor test: (1) whether "a party's later position [is] clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 993–94 (9th Cir. 2012) (quoting *New Hampshire*, 532 U.S. at 750–51). These factors are not "inflexible prerequisites" nor an "exhaustive formula"; because judicial estoppel is an equitable doctrine, other considerations may "inform the doctrine's application in specific factual contexts." *New Hampshire*, 532 U.S. at 751.

9

The United States's remarkable about-face here plainly satisfies the elements of judicial estoppel. First, its current position is "clearly inconsistent" with its prior representations. It previously told the Supreme Court that the *Missouri* plaintiffs' preemption claims were meritless: it now parrots those same claims to allege preemption. Second, the Supreme Court rejected the case, which is exactly what the United States had urged it to do. Taking diametrically opposite positions in two near-identical cases has the effect of "misle[ading]" the courts and should not be permitted. *See id.* at 750.

Third, permitting the United States to advance this lawsuit despite its prior representation that *its own claim is entirely meritless* would work an "unfair detriment" to California and the proponents of the laws challenged in this case, and to the federal judiciary itself. Since the United States presented its longstanding position regarding Inspection Act preemption of state hen enclosure laws to the Supreme Court in 2018, California has enacted implementing regulations and procedures regarding both Hen Enclosure Laws -- *in reliance on those representations*. Thousands of large and small farmers, retailers, and other businesses have invested time, capital, labor, and brand advertising in the California egg market in reliance upon these representations. *See New Hampshire*, 532 U.S. at 756 (judicially estopping New Hampshire from adopting a new position that departed radically from its prior litigation assertions, upon which Maine had long relied).

Allowing the same President's administration to advance two diametrically opposed legal positions, concerning the same claim for relief, in two closely related matters before the federal judiciary would undermine the integrity of the judicial process itself. The United States's preemption claims against the Hen Enclosure Laws should therefore be barred by judicial estoppel.

### 2. The United States Does Not Have Standing to Bring These Claims

Under Rule 12(b)(1), the United States bears the burden of plausibly alleging it has standing to bring its claims. "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). As the State explains in its Motion to Dismiss briefing, which argument Defendant-Intervenors adopt and agree with, the Complaint not only fails to identify any injury to the United States itself (or to anyone else), but it also fails to establish how any such injury is allegedly caused by the Hen Enclosure Laws, nor how an order of this Court would redress such an injury. Thus, the United States is no more than a "nominal party" here, and cannot meet any of the requirements of Article III. *Missouri ex rel. Koster*, 847 F.3d at 651 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)). Because the United States has not met its burden to establish standing, its Complaint must be dismissed under Rule 12(b)(1).

### B. The Hen Enclosure Laws Are Not Expressly Preempted by the Inspection Act's Clause on Standards of Quality or Condition for Eggs

The Complaint must also be dismissed under Rule 12(b)(6) for failing to state a viable claim upon which relief can be granted, because the Hen Enclosure Laws fall outside the plain text of the Inspection Act's express preemption clause. Congressional purpose is "the ultimate touchstone" in express preemption analysis and "primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996) (citations and quotation marks omitted). "[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept

the reading that disfavors pre-emption." *California Ins. Guarantee Ass'n v. Azar*, 940 F.3d 1061, 1067 (9th Cir. 2019) (quoting *McLellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015)) (quotation marks omitted).

The Inspection Act does not prevent states from regulating in-state egg sales. Instead, its preemption clause only bars states from "requir[ing] the use of standards of quality, condition, weight, quantity, or grade" for "eggs," "which are in addition to or different from the official Federal standards." 21 U.S.C. § 1052(b).[12] As the United States itself previously explained, the relevant "official Federal standards" are the federal egg-grading standards (*i.e.* those that determine whether a shell egg should be classified as "Grade A," "Grade AA," etc.). Solicitor General Brief, at 18–19. The Hen Enclosure Laws do not relate to egg grading, but instead to a topic entirely outside of the Inspection Act—henhouse enclosure size. They are thus not expressly preempted by the statute. *Id.*

### 1. The Preemption Clause's Scope is Limited to State Egg-Grading Laws

The Inspection Act's preemption clause does not prohibit state laws concerning egg "quality" or "condition" generally. It only bars those that "requir[e] the use of standards of quality, condition, weight, quantity, or grade *which are in addition to or different from official Federal standards.*" 21 U.S.C. § 1052(b) (emphasis added). That qualifier substantially limits the reach of this preemption clause to those "official Federal standards."

The operative "official Federal standards" are plain from the text of the Inspection Act: the federal egg-grading standards. The Inspection Act defines "official standards" to "mean[ ] the standards of quality, grades, and weight classes

---

[12]    Because this preemption clause is limited to "eggs," it cannot preempt any of the Hen Enclosure Laws' provisions covering liquid eggs—which are "egg products," not "eggs," under the Inspection Act. 21 U.S.C. § 1033(f)-(g).

12

for eggs, in effect upon the effective date of this chapter, or as thereafter amended, under the Agricultural Marketing Act of 1946 [AMA]." 21 U.S.C. § 1033(r). The AMA, 7 U.S.C. § 1621 *et seq*., directs the USDA to set out "standards of quality, condition, quantity, grade, and packaging" for agricultural products. 7 U.S.C. § 1622(c). Accordingly, the USDA has established standards for a voluntary egg grading program,[13] and regulations restricting egg sales based on physical egg characteristics, including these grades. 7 C.F.R. § 57.720. These are the "official Federal standards" at issue in the preemption clause.

The USDA's egg grading program sets forth standards for shell eggs "grades," to give consumers "the confidence of receiving quality in accordance with the official identification."[14] Grades are based on eggs' physical characteristics. *Id.* Specifically, the "egg quality" assessed in the grading program is "based on the apparent condition of the interior contents of the egg as it is twirled before the candling light."[15] For example, Grade AA eggs must have "clean, unbroken, and practically normal" shells, a yolk "practically free from apparent defects," and a white "clear and firm so that the yolk is only slightly defined when the egg is twirled before the candling light."[16] Eggs below Grade B cannot be sold to consumers. 7 C.F.R. § 57.720(b). The egg grading program's focus on eggs' physical attributes is also clear from the regulatory definition of

---

[13]    USDA AMS, *United States Standards, Grades, and Weight Classes for Shell Eggs*, AMS-56 (effective July 20, 2000), https://www.ams.usda.gov/sites/default/files/media/Shell_Egg_Standard%5B1%5D.pdf ("*United States Standards*"); *see* 7 C.F.R. §§ 56.1 *et seq*. (voluntary grading program).

[14]    *United States Standards*, *supra* n.13, Foreword.

[15]    *Id*. § 56.200(b).

[16]    *Id*. § 56.201; *see also id.* at 12 (summary chart outlining physical attributes of each grade of egg).

13

"condition" used in the egg grading program, defined at 7 C.F.R. § 56.1: "Condition means any characteristic *detected by sensory examination* (visual, touch, or odor), including the state of preservation, cleanliness, soundness, or fitness for human food that affects the marketing of the product." (Emphasis added.) The United States ignores this on-point definition of "condition" in the regulations related to egg grading, and instead looks to the inspection regulations at 7 C.F.R. § 57.1 for a broader definition encompassing "any characteristic affecting a product[']s merchantability." *See* FAC ¶ 25.

The Amended Complaint does not, and cannot, allege that the Hen Enclosure Laws "require" any "standards" within this preemptive scope. They are concerned with minimum enclosure sizes for egg-laying hens, not with egg-grading standards. The Amended Complaint alleges nothing showing that enclosure size alters eggs' physical attributes under the federal egg-grading standards. The Hen Enclosure Laws thus fall outside the preemption clause's plain scope.

But the Court need not take Defendant-Intervenors' word for any of this. The United States already explained that the egg-grading standards are the "official Federal standards" at issue in § 1052(b), and that the Hen Enclosure Laws are not implicated by that provision. Solicitor General Brief, at 18–19. "The Agricultural Marketing Service's standards are used to assess individual shell eggs and packages of eggs, so that most below-grade eggs are not sold to consumers and so that eggs can be sorted into batches of similar quality and size for commercial purposes. . . . [T]he California Egg Laws *do not impose any additional or different assessment standards of that kind.*" *Id.* at 19 (emphasis added).

14

## 2.    The Inspection Act Does Not Regulate Hen Enclosure Size

As the United States already explained, the Inspection Act's preemption clause does not encompass laws concerning hen enclosure size. Solicitor General Brief, at 7 ("USDA's egg-grading standards do not address confinement conditions for egg-laying hens."); 21 U.S.C. §§ 1031 *et seq*. Indeed, no provision of the Inspection Act covers henhouse enclosure size, and the Amended Complaint identifies none.

Instead, laws concerning on-farm animal welfare standards and animal cruelty prevention have historically been the purview of the states. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 365 (2023) (noting "States (and their predecessors) have long enacted laws aimed at protecting animal welfare" and listing states with laws based on "animal confinement practices," including those that ban the sale of cruel products); *Cresenzi Bird Importers, Inc. v. New York*, 658 F. Supp. 1441, 1447 (S.D.N.Y. 1987), *aff 'd* 831 F.2d 410 (2d Cir. 1987) (the "State has an interest in cleansing its markets of commerce which the Legislature finds to be unethical"); *cf. Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1148 (9th Cir. 2017) (quoting USDA representation that it "has no authority to regulate the care or feeding of birds prior to their arrival at the slaughter facility" under federal poultry inspection statute).

The Hen Enclosure Laws, consistent with this historical practice, address the State's impact on farm animal welfare, ridding California's market of cruel products by imposing minimum hen enclosure size standards for California farmers and for the eggs and egg products sold in-state. Cal. Health & Safety Code §§ 25990-91. Numerous other states have similar laws.[17] And there is no dispute in this case that California can regulate on-farm practices like hen enclosure size

---

[17]    *Supra* n.6.

without implicating the Inspection Act: the United States concedes that "California may impose animal husbandry requirements on hens within its borders." FAC ¶ 58. Its unsupported contention that California's permissible husbandry provision should be treated differently under the Inspection Act than its sales provision based on husbandry practices ignores that *both* provisions fall outside the Inspection Act's scope.

### 3. The Hen Enclosure Laws Aren't Even Preempted Under the Amended Complaint's Incorrect Interpretation of the Inspection Act

The Amended Complaint sets forth an interpretation of the Inspection Act that ignores its plain text and substitutes the Inspection Act's plain language with a few definitions sourced from USDA regulations. This is improper, because express preemption analysis starts with the preemption clause's plain text. *See Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016). And even accepting the United States's interpretation *arguendo*, it has not plausibly alleged preemption.

The United States claims the Inspection Act's preemption clause bars state "use of standards of quality [or] condition," which regulate egg sales based on "certain inherent properties or qualities which purportedly affect such products' degree of excellence, wholesomeness, and fitness for human food weight, quantity, or grade," "which are in addition to or different from the official Federal standards." FAC ¶ 57. But it has not alleged (and cannot) the Hen Enclosure Laws meet these elements.

First, the United States does not identify what "official Federal standards" the Hen Enclosure Laws are "in addition to" or "different than." It offers only general paeans to alleged "uniformity" goals of the Inspection Act. FAC ¶ 19. But broad "uniformity" goals are not "official Federal standards." *Cf. Hayslett v. Tyson*

16

*Foods, Inc*., No. 1:22-CV-1123, 2023 WL 3666091 at *12–13 (W.D. Tenn. May 25, 2023) (rejecting Federal Meat Inspection Act preemption challenge based on "nothing more than the broad notion that COVID-19 vaccination falls within the scope of 'infectious disease'"). The only "official Federal standards" at issue in the statute are the federal egg-grading standards—as the United States previously recognized. Solicitor General Brief, at 18 (stating the Inspection Act's preemption clause effectuates "Congress's mandate that *the Agricultural Marketing Service's grading standards* be 'uniform[ ]' nationwide") (emphasis added). The Hen Enclosure Laws do not impose egg-grading standards.

Second, the United States has not alleged that hen enclosure size requirements are "inherent propert[ies]" of shell eggs under the Inspection Act or have any impact on such "properties." FAC ¶ 57. It fails to allege any facts showing that the type of hen housing changes the inherent properties in every egg laid, let alone that these determine a "relative degree of excellence" under the Inspection Act. 7 C.F.R. § 57.1. Moreover, treating hen enclosure size as an "inherent property" of eggs would contradict the United States's concession that the Inspection Act does not bar California from "impos[ing] animal husbandry requirements on hens within its borders." FAC ¶ 58. Such confinement standards would also affect egg "quality" under Plaintiff's definition. However, the treatment of animals is no more an "'inherent property" of the end food product than it is an "ingredient"—as this Circuit has previously determined. *Cf. Ass'n des Éleveurs*, 870 F.3d at 1149 ("'Cage-free' is no more an 'ingredient' than 'force-fed.'")

Since the United States does not plausibly allege that hen enclosure size is, or has any impact on, an "inherent property" of an egg, nor that the Hen Enclosure Laws' provisions impose standards that are "additional" or "different" than any identified "official Federal standards," the United States has not stated a claim that

17

the Hen Enclosure Laws are preempted, even under its proposed interpretation of the statute.

### 4.    The Amended Complaint's Interpretation Conflicts with the Broader Egg Regulatory Framework

The United States's interpretation is also implausible because it conflicts with the broader federal egg regulatory scheme, which specifically contemplates a role for state egg regulation. Courts must "look to the plain wording of the statute and surrounding statutory framework to determine whether Congress intended to preempt state law." *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 939 (9th Cir. 2024).

The Inspection Act anticipates that USDA will share jurisdiction with FDA to regulate egg safety. 21 U.S.C. §§ 1034(d), 1052(b)-(d). The FDA retains primary jurisdiction over shell-egg safety. *See* FDA, Salmonella Enteritidis in Eggs, 63 Fed. Reg. 27502, 27508 (May 19, 1998). As part of that authority, the FDA expressly welcomes state laws to reduce the risk of egg-borne *Salmonella* that are more "stringent" than federal law. 21 C.F.R. § 118.12(d) (prohibiting any state "requirement regarding prevention of [*Salmonella*] in shell eggs during production, storage, or transportation that is *less stringent* than those required by this part") (emphasis added); *see also* Solicitor General Brief, at 19 ("FDA has stated that States may impose Salmonella-prevention requirements more stringent than federal standards."). The Inspection Act *allows* state regulation to "prevent[ ] the distribution" of "eggs and egg products" in violation of the Inspection Act, the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, or the Fair Packaging and Labeling Act, 15 U.S.C. § 1451 *et seq.*, "or any State or local law *consistent therewith*." 21 U.S.C. § 1052(b) (emphasis added).[18] These statutes

---

[18]    The test for "consistency" is whether one could comply with both the state and federal laws at once. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 540

18

establish that federal egg safety regulations set a *floor*, which states can supplement with more stringent regulations.

The Hen Enclosure Laws fit this framework. While the Hen Enclosure Laws were clearly passed as animal welfare measures, legislative findings, the Voter Guide, and statutory text made clear that these Laws were also passed partly out of concern for the public health risks associated with extreme confinement of farm animals, including the often-lethal bacteria, *Salmonella*.[19] Because the United States's interpretation would invalidate state laws that the FDA expressly welcomes, it must be rejected.

Moreover, states have passed numerous other laws related to egg safety that would be similarly threatened by the Amended Complaint's broad interpretation banning laws that regulate eggs' undefined "inherent propert[ies]." For instance, all fifty states have adopted some version of the FDA's model set of recommendations for food safety, the FDA Food Code, which impose more stringent shell-egg safety requirements than the Inspection Act, such as pasteurization requirements. *See* FDA Food Code § 3-302.13.[20] Under the United States's interpretation, such laws are likely invalid because they regulate eggs' "inherent properties" in a manner that is not identical to the Inspection Act. *See*

---

(1977) ("Since it would be possible to comply with the state law without triggering federal enforcement action we conclude that the state requirement is not inconsistent with federal law.").

[19] Cal. Health & Safety Code § 25995; Proposition 12 § 2; Alex Padilla, Secretary of State, *California General Election—Official Voter Information Guide* 68–71 (Nov. 6, 2018), https://vig.cdn.sos.ca.gov/2018/general/pdf/complete-vig.pdf.

[20] FDA, Food Code, 2022 Recommendations of the United States Public Health Service Food and Drug Administration ("FDA Food Code"), *available at* https://www.fda.gov/food/fda-food-code/food-code-2022.

19

FAC ¶¶ 57-58.[21] Because the United States's interpretation threatens to preempt state laws across the country, it should be rejected. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not . . . hide elephants in mouseholes.").

### C. The Implementing Regulations Are Not Expressly Preempted by the Inspection Act's Clause on Labeling and Packaging Requirements

The United States's assertion that California's implementing regulations are preempted by the Inspection Act because they "impos[e] labeling and packaging requirements 'in addition to' and 'different than' those imposed by EPIA" also fails to state a claim under Rule 12(b)(6). *See* FAC ¶ 66.

As an initial matter, California's regulations cannot be preempted as applied to shell eggs. The labeling preemption clause only covers *egg products* and not shell eggs: "[l]abeling, packaging, or ingredient requirements, in addition to or different than those made under this chapter . . . may not be imposed by any State or local jurisdiction, with respect to *egg products* processed at any official plant." 21 U.S.C. § 1052(b) (emphasis added).[22]

In addition, administration of the Hen Enclosure Laws involves review of "documents of title and shipping manifests for shipments" of eggs or egg products, *not* regulation of packaging and labels. 3 Cal. Code Regs. § 1320.4(a). Such

---

[21]    State common-law tort actions for *Salmonella*-contaminated eggs would also likely be threatened. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008) (state common-law duties also constitute "requirements" for preemption purposes).

[22]    "Egg products" do not include shell eggs.  *See* 21 U.S.C. § 1033(f) ("The term 'egg product' means any dried, frozen, or liquid eggs, with or without added ingredients.").

20

documents, commonly in use, are physically and materially distinct from packages or labels of egg products regulated by the Inspection Act.

As to the general prohibitions in subsections 1320.4(b)-(c) barring "label[ing], identify[ing], mark[ing], advertis[ing], or otherwise represent[ing] shell eggs or liquid eggs for purposes of commercial sale" as either California-compliant or cage-free, these prohibitions manifestly cover a variety of conduct beyond "labeling" or "packaging"—for instance, commercial advertisements, fraudulent verbal claims, and point-of-sale displays. The United States's preemption challenge to any application of these regulations beyond a narrow subset of applications (*i.e.* "labels" and "packaging" under the Inspection Act) must fail.

Finally, even if the United States were correct that certain applications of the implementing egg *regulations* regarding labeling might be preempted, it would not affect the legitimacy of the underlying state statutes. Rather, this would merely require some regulatory tweaking by California regulators—something the United States could have pursued via normal channels of government cooperation, instead of filing an unnecessary lawsuit.

## V.    CONCLUSION

For the foregoing reasons, this Court should dismiss the Amended Complaint with prejudice.

21

1

Dated: October 6, 2025

RILEY SAFER HOLMES &
CANCILA LLP

2

3

*/s/ Bruce A. Wagman*

Bruce A. Wagman (CSB No. 159987)
BWagman@rshc-law.com
RILEY SAFER HOLMES &
CANCILA LLP

4

5

6

*Counsel for Defendant-Intervenors*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant-Intervenors, certifies that this brief contains 5,936 words, which:

__X__  complies with the word limit of L.R. 11-6.1


Dated: October 6, 2025                    RILEY SAFER HOLMES & CANCILA LLP


                                          */s/ Bruce A. Wagman*
                                          Bruce A. Wagman (CSB No. 159987)
                                          BWagman@rshc-law.com
                                          RILEY SAFER HOLMES & CANCILA LLP

                                          *Counsel for Defendant-Intervenors*