ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General
KRISTIN LISKA (SBN 315994)
KRISTEN C.A. KIDO (SBN 335667)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6528
  Fax:  (916) 731-2124
  E-mail:  Kristen.Kido@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>**v.**<br><br>**THE STATE OF CALIFORNIA; GAVIN C. NEWSOM, in his Official Capacity as Governor of California; KAREN ROSS, in her Official Capacity as Secretary of the California Department of Food & Agriculture; ERICA PAN, in her Official Capacity as Director of the California Department of Public Health; and ROB BONTA, in his Official Capacity as Attorney General of California,**<br><br>Defendants. | 2:25-cv-06230-MCS-AGR<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT UNDER F.R.C.P. RULE 12(B)**<br><br>Date:           January 12, 2026<br>Time:          9:00 a.m.<br>Courtroom:  7C<br>Judge:         The Honorable Mark C. Scarsi<br>Trial Date:   None Set<br>Action Filed: 7/09/2025 |
| **HUMANE WORLD FOR ANIMALS; ANIMAL LEGAL DEFENSE FUND; ANIMAL EQUALITY; THE HUMANE LEAGUE; FARM SANCTUARY; COMPASSION IN WORLD FARMING, INC.; ANIMAL OUTLOOK; ASSOCIATION OF CALIFORNIA EGG FARMERS; THE CENTER FOR A HUMANE ECONOMY; ANIMAL WELLNESS ACTION,**<br><br>Defendant-Intervenors. | |

Under Federal Rule of Evidence 201, Defendants the State of California; Gavin C. Newsom, in his Official Capacity as Governor of California; Karen Ross, in her Official Capacity as Secretary of the California Department of Food & Agriculture; Erica Pan, in her Official Capacity as Director of the California Department of Public Health; and Rob Bonta, in his Official Capacity as Attorney General of California (collectively, "Defendants"), respectfully request that the Court take judicial notice of the following documents in support of Defendants' motion to dismiss:

- Exhibit A: Brief of United States as *Amicus Curiae*, *Missouri v. California*, 586 U.S. 1065 (2019) (No. 22O148).
- Exhibit B: (UNITED STATES DEPARTMENT OF AGRICULTURE, UNITED STATES STANDARDS, GRADES, AND WEIGHT CLASSES FOR SHELL EGGS, AMS 56 (2000)), https://www.ams.usda.gov/sites/default/files/media/Shell_Egg_Standard%5B1%5D.pdf

The Court may take judicial notice of any fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court shall take judicial notice of such a fact if requested by a party and supplied with the necessary information. Fed. R. Evid. 201(d).

Specifically, a court "may take judicial notice of court filings from other state or federal court proceedings." *Jones v. City of Los Angeles*, 555 F. App'x 659, 661 n. 4 (9th Cir. 2014); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 n. 6 (9th Cir. 2006). Exhibit A is a court filing from another federal court proceeding. Further, a court may take judicial notice of official government guidance documents and other government publications. *See, e.g., Montera v.*

*Premier Nutrition Corp.,* 111 F.4th 1018, 1030, n.2 (9th Cir. 2024)*; Crofts v. Issaquah Sch. Dist. No. 411,* 22 F.4th 1048, 1051, n.1 (9th Cir. 2022).  Exhibit B is an official publication of the United States government setting forth the standards, grades, and weight classes for eggs developed and promulgated by the Agricultural Marketing Service of the United States Department of Food and Agriculture pursuant to federal statute.  The accuracy of these records cannot reasonably be questioned, and judicial notice of these records is therefore appropriate.

Dated:  October 6, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General
KRISTIN A. LISKA
Deputy Attorney General

*/s/ Kristen C.A. Kido*

KRISTEN C.A. KIDO
Deputy Attorney General
*Attorneys for Defendants*

SA20253040

# EXHIBIT A

**No. 148, Original**

# In the Supreme Court of the United States

———

STATE OF MISSOURI, ET AL., PLAINTIFFS

*v.*

STATE OF CALIFORNIA

———

*ON MOTION FOR LEAVE TO FILE A BILL OF COMPLAINT*

———

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

———

NOEL J. FRANCISCO
    *Solicitor General*
        *Counsel of Record*
JOSEPH H. HUNT
    *Assistant Attorney General*
EDWIN S. KNEEDLER
    *Deputy Solicitor General*
MICHAEL R. HUSTON
    *Assistant to the Solicitor
    General*
MARK B. STERN
ALISA B. KLEIN
ANDREW A. ROHRBACH
    *Attorneys*

    *Department of Justice
    Washington, D.C. 20530-0001
    SupremeCtBriefs@usdoj.gov
    (202) 514-2217*

## TABLE OF CONTENTS

Page

Statement .................................................................................. 1

Discussion ................................................................................ 7

Conclusion ............................................................................... 23

## TABLE OF AUTHORITIES

Cases:

*Alabama* v. *Arizona*, 291 U.S. 286 (1934) ..................... 14, 17

*Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel.*
*Barez*, 458 U.S. 592 (1982) ................................................. 14

*Allen* v. *Wright*, 468 U.S. 737 (1984)...................................... 13

*Arizona* v. *New Mexico*, 425 U.S. 794 (1976).......... 14, 16, 17

*Armstrong* v. *Exceptional Child Ctr., Inc.*,
135 S. Ct. 1378 (2015) ....................................................... 18

*Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U.S. 511 (1935).......... 22

*Brown-Forman Distillers Corp.* v. *New York State*
*Liquor Auth.*, 476 U.S. 573 (1986)..................................... 22

*Campbell* v. *Hussey*, 368 U.S. 297 (1961) ............................ 19

*Compassion Over Killing* v. *U.S. Food & Drug*
*Admin.*, 849 F.3d 849 (9th Cir. 2017)........................... 21, 22

*Connecticut* v. *Massachusetts*, 282 U.S. 660 (1931)............. 8

*Hans* v. *Louisiana*, 134 U.S. 1 (1890).................................... 9

*Healy* v. *The Beer Inst.*, 491 U.S. 324 (1989) ...................... 22

*Kimble* v. *Marvel Entm't, LLC*, 135 S. Ct. 2401 ................. 9

*Illinois* v. *City of Milwaukee*, 406 U.S. 91 (1972) ............ 8, 9

*Louisiana* v. *Texas*, 176 U.S. 1 (1900)........................ 8, 9, 11

*Maryland* v. *Louisiana*, 451 U.S. 725 (1981) .............. 11, 15

*Mississippi* v. *Louisiana*,
506 U.S. 73 (1992) ............................................ 7, 8, 9, 10, 16

*Missouri* v. *Harris*, 58 F. Supp. 3d 1059
(E.D. Cal. 2014)................................................................... 6

(I)

II

Cases—Continued:                                                                    Page

*Missouri ex rel. Koster* v. *Harris*, 847 F.3d 646
    (9th Cir.), cert. denied, 137 S. Ct. 2188 (2017) ................. 6

*National Meat Ass'n* v. *Harris*, 452 U.S. (2012).............. 19

*Nebraska* v. *Colorado*, 136 S. Ct. 1034 (2016).................... 14

*Nebraska* v. *Wyoming*, 515 U.S. 1 (1995) ............................ 8

*Ohio* v. *Wyandotte Chems. Corp.*,
    401 U.S. 493 (1971).............................................................. 15

*Pennsylvania* v. *New Jersey*, 426 U.S. 660 (1976)............. 11

*Pennsylvania* v. *West Virginia*,
    262 U.S. 553, aff'd, 263 U.S. 350 (1923) ..................... 11, 15

*Pike* v. *Bruce Church, Inc.*, 397 U.S. 137 (1970)................. 21

*Raymond Motor Transp., Inc.* v. *Rice*,
    434 U.S. 429 (1978)................................................................ 21

*South Carolina* v. *North Carolina*,
    558 U.S. 256 (2010).................................................................. 9

*South Dakota* v. *Wayfair, Inc.*,
    138 S. Ct. 2080 (2018) ........................................................ 20

*Southern Pac. Co.* v. *Arizona ex rel. Sullivan*,
    325 U.S. 761 (1945)................................................................ 21

*Texas* v. *New Mexico*, 462 U.S. 554 (1983)..................... 8, 10

*Wyoming* v. *Oklahoma*,
    502 U.S. 437 (1992).........................................8, 11, 15, 17, 21

Constitution, statutes, and regulations:

    U.S. Const.:
        Art. I, § 8, Cl. 3 (Commerce Clause) ................... *passim*
        Art. III.............................................................................. 9, 13
            § 2, Cl. 2 ........................................................................ 8
    Agricultural Marketing Act of 1946, 7 U.S.C. 1621
        *et seq.* ................................................................................ 2
        7 U.S.C. 1622(c) ..................................................... 2, 4, 18

III

Statutes and regulations—Continued:                            Page

Egg Products Inspection Act, 21 U.S.C. 1031 *et seq.* .......... 1

 21 U.S.C. 1031 ................................................................ 2

 21 U.S.C. 1032 ................................................................ 1

 21 U.S.C. 1033(f) .......................................................... 20

 21 U.S.C. 1033(g)(8) ...................................................... 2

 21 U.S.C. 1033(q) .......................................................... 20

 21 U.S.C. 1033(r) .......................................................... 19

 21 U.S.C. 1034(d) ...................................................... 2, 3

 21 U.S.C. 1035(a) ............................................................ 2

 21 U.S.C. 1037 ................................................................ 2

 21 U.S.C. 1038 ................................................................ 2

 21 U.S.C. 1052(a) .......................................................... 20

 21 U.S.C. 1052(b) ............................................... 7, 18, 20

 21 U.S.C. 1052(c) ............................................................ 2

Federal Food, Drug, and Cosmetic Act,
 21 U.S.C. 301 *et seq.* .................................................... 2

Federal Meat Inspection Act, 21 U.S.C. 601 *et seq.* ........... 19

 21 U.S.C. 678 .................................................................. 20

Judiciary Act of 1789, ch. 20, § 13, 1 Stat. 80 ...................... 8

Public Health Service Act, 42 U.S.C. 201 *et seq.* ................. 2

 42 U.S.C. 264(a) ................................................................ 2

28 U.S.C. 1251(a) ................................................................ 8, 9

Prevention of Cruelty to Farm Animals Act,
 Cal. Proposition 12 (2018), https://vig.cdn.sos.
 ca.gov/2018/general/pdf/topl.pdf#prop12 .......................... 6

Prevention of Farm Animal Cruelty Act,
 Cal. Health & Safety Code §§ 25990 *et seq.*
 (West 2010) ...................................................................... 4

  § 25991(f) ...................................................................... 4

  § 25991(i) ...................................................................... 4

**Exhibit A**
**RJN_Page 8**

IV

Statutes and regulations—Continued:                    Page

  Cal. Health & Safety Code (West Supp. 2018):

    § 25995(e)..................................................................5

    § 25996 .....................................................................5

  7 C.F.R.:

    Pt. 56 .......................................................................4

    Pt. 57:

      Section 57.1 .....................................................19

      Section 57.13 .....................................................2

      Section 57.28 .....................................................1

      Section 57.720...........................................2, 3, 4

  9 C.F.R. 590.20..............................................................2

  21 C.F.R. Pt. 118......................................................2, 19

  Cal. Code Regs. tit. 3 (2018):

    § 1350 ......................................................................5

    § 1350(d) ..................................................................5

Miscellaneous:

  Cal. Assembly Comm. on Agriculture AB 1437
    (2009), http://leginfo.legislature.ca.gov/faces/
    billAnalysisClient.xhtml?bill_id=
    200920100AB1437# .......................................4, 5, 7

  Dan Charles, *Most U.S. Egg Producers Are Now
    Choosing Cage-Free Houses*, Nat'l Pub. Radio
    (Jan. 15, 2016), https://www.npr.org/sections/
    thesalt/2016/01/15/463190984/most-new-hen-
    houses-are-now-cage-free ...................................12

  69 Fed. Reg. 56,824 (Sept. 22, 2004) .................... 1, 2

  74 Fed. Reg. 33,030 (July 9, 2009)........................ 19

  Restatement (Third) of Foreign Relations Law
    (1987)................................................................. 16

  Stephen M. Shapiro et al., *Supreme Court Practice*
    (10th ed. 2013) ............................................. 8, 10

V

Miscellaneous—Continued:                                    Page

USDA Agric. Mktg. Serv.:

*Egg-Grading Manual* (rev. July 2000),
  https://www.ams.usda.gov/sites/default/files/
  media/Egg%20Grading%20Manual.pdf .............. 3, 19

*United States Standards, Grades, and Weight
  Classes for Shell Eggs, AMS 56*
  (July 20, 2000), https://www.ams.usda.gov/
  sites/default/files/media/Shell_Egg_Standard
  %5B1%5D.pdf ........................................................ 3, 19

# In the Supreme Court of the United States

————————

No. 148, Original

STATE OF MISSOURI, ET AL., PLAINTIFFS

*v.*

STATE OF CALIFORNIA

————————

*ON MOTION FOR LEAVE TO FILE A BILL OF COMPLAINT*

————————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

————————

This brief is filed in response to the order of this Court inviting the Solicitor General to express the views of the United States.

## STATEMENT

1. The Egg Products Inspection Act (EPIA), 21 U.S.C. 1031 *et seq.*, "provide[s] for the inspection of certain egg products, restrictions upon the disposition of certain qualities of eggs, and uniformity of standards for eggs"—as well as other "regulat[ion of] the processing and distribution of eggs and egg products"—in order "to prevent the movement or sale for human food[ ] of eggs and egg products which are adulterated or misbranded or otherwise in violation of" federal law. 21 U.S.C. 1032. The U.S. Department of Agriculture (USDA), which has primary responsibility for implementing the EPIA, 69 Fed. Reg. 56,824, 56,827 (Sept. 22, 2004), divides responsibility between its Agricultural Marketing Service, which regulates shell eggs, 7 C.F.R. 57.28, and its Food Safety and Inspection Service, which regulates other egg products (liquid eggs,

(1)

2

for example), 9 C.F.R. 590.20. USDA inspects production facilities to "assure that only eggs fit for human food are used for such purpose" and that most poor-quality eggs (known as "restricted eggs") do not reach consumers. 21 U.S.C. 1034(d), 1035(a); see 21 U.S.C. 1033(g)(8), 1037; see also 7 C.F.R. 57.720.

USDA administers the EPIA in cooperation with the Food and Drug Administration (FDA), 21 U.S.C. 1031, which has general jurisdiction over food safety, including shell eggs, under the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. 301 *et seq.*, and the Public Health Service Act, 42 U.S.C. 201 *et seq.* See 21 U.S.C. 1052(c) (the EPIA does "not affect the applicability" of "other Federal laws" relating to "eggs, egg products, or other food products," except that USDA "ha[s] exclusive jurisdiction to regulate official plants processing egg products"); 69 Fed. Reg. at 56,827 (describing sources of authority and allocation of responsibility between USDA and FDA). FDA has authority to promulgate regulations that "are necessary to prevent the introduction, transmission, or spread of communicable diseases," including Salmonellosis from Salmonella-containing eggs. 42 U.S.C. 264(a). Pursuant to that authority and authority in the FDCA, FDA has adopted regulations to promote egg safety, including regulations applicable to farms where eggs are laid. 21 C.F.R. Pt. 118. USDA is also charged with administering the EPIA in consultation with States and localities. See 21 U.S.C. 1038; 7 C.F.R. 57.13.

For shell eggs to be sold to consumers, USDA's Agricultural Marketing Service has promulgated standards, grades, and weight classes pursuant to the Agricultural Marketing Act of 1946, 7 U.S.C. 1621 *et seq.* See 7 U.S.C. 1622(c) (directing Secretary of Agriculture

3

"[to] develop and improve standards of quality, condition, quantity, grade, and packaging, * * * in order to encourage uniformity and consistency in commercial practices"). See also USDA Agric. Mktg. Serv., *United States Standards, Grades, and Weight Classes for Shell Eggs, AMS 56* (July 20, 2000) (AMS).[1] The grading standards enable egg producers to separate eggs by quality and size, thereby "enabl[ing] more orderly marketing." *Id.* at 1; see also USDA Agric. Mktg. Serv., *Egg-Grading Manual* (rev. July 2000).[2] The standards also provide a basis for USDA to implement the EPIA's mandate to prevent restricted eggs from reaching consumers. See 21 U.S.C. 1034(d); 7 C.F.R. 57.720.

For example, under the current Agricultural Marketing Service standards, for an egg to qualify as "AA Quality":

> The shell must be clean, unbroken, and practically normal. The air cell must not exceed 1/8 inch in depth, may show unlimited movement, and may be free or bubbly. The white must be clear and firm so that the yolk is only slightly defined when the egg is twirled before the candling light. The yolk must be practically free from apparent defects.

AMS § 56.201. Grade B eggs, by contrast, may have "moderately stained areas," with an air cell "over 3/16 inch in depth," and a white that is "weak and watery so the yolk outline is plainly visible when the egg is twirled before the candling light." *Id.* § 56.203. Eggs below Grade B are restricted and generally may not be sold to

---

[1] https://www.ams.usda.gov/sites/default/files/media/Shell_Egg_Standard%5B1%5D.pdf.

[2] https://www.ams.usda.gov/sites/default/files/media/Egg%20Grading%20Manual.pdf.

4

consumers. 7 C.F.R. 57.720.[3] To facilitate interstate commerce in eggs, Congress has required that the Agricultural Marketing Service grading standards be "uniform[ ]" throughout the Nation. 7 U.S.C. 1622(c).

2. In 2008, California voters adopted Proposition 2, the Prevention of Farm Animal Cruelty Act, Cal. Health & Safety Code §§ 25990 *et seq.* (West 2010), in order to "prohibit the cruel confinement of farm animals." The statute bars California farmers from "tether[ing] or confin[ing] any covered animal, on a farm, for all or the majority of any day, in a manner that prevents such animal from: (a) Lying down, standing up, and fully extending his or her limbs; and (b) Turning around freely." *Id.* § 25990. The Act specifically requires that egg-laying hens be able to "fully spread[ ] both wings without touching the side of an enclosure or other egg-laying hens," as well as "turn[ ] in a complete circle without any impediment, including a tether, and without touching the side of an enclosure." *Id.* § 25991(f) and (i).[4]

In 2010, the California Legislature enacted Assembly Bill 1437 (AB 1437), which prohibits the sale of eggs in California from hens that were "confined on a farm or place"—either inside or outside California —"that is

---

[3] In addition to the EPIA's mandatory requirements, the Agricultural Marketing Service offers a voluntary egg-grading program that, when utilized by an egg producer, allows the producer to label its eggs as inspected by USDA. See 7 C.F.R. Pt. 56.

[4] Massachusetts has enacted a similar requirement governing confinement standards for egg-laying hens and some other farm animals, which is the subject of another pending motion for leave to file a bill of complaint in this Court. *Indiana* v. *Massachusetts*, No. 22O149 (filed Dec. 11, 2017).

5

not in compliance" with the standards enacted by Proposition 2. Cal. Health & Safety Code § 25996 (West Supp. 2018). The statute's stated purpose is "to protect California consumers from the deleterious, health, safety, and welfare effects of the sale and consumption of eggs derived from egg-laying hens that are exposed to significant stress and may result in increased exposure to disease pathogens including salmonella." *Id.* § 25995(e). The legislative history of AB 1437 suggests that the Legislature also sought to "level the playing field" between California egg producers who faced increased costs to comply with Proposition 2 and out-of-state producers. Compl. ¶ 66 (quoting Cal. Assembly Comm. on Agriculture AB 1437, at 1 (2009)).[5]

In 2013, California's Department of Food and Agriculture, promulgated a regulation with the stated objective to reduce the risk that shell eggs sold in California would be contaminated with Salmonella. Cal. Code Regs. tit. 3, § 1350 (2018). Among other measures, that regulation prohibits the sale in California of shell eggs that are the product of a hen confined in an enclosure that fails to meet certain standards, including by providing a minimum number of square inches per bird, as specified by a formula. See *id.* § 1350(d).

These three enactments (together the "California Egg Laws") took effect simultaneously on January 1, 2015. See Cal. Health & Safety Code § 25996 (West Supp. 2018); Cal. Code Regs. tit. 3, § 1350(d) (2018).[6]

---

[5] http://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=200920100AB1437#.

[6] In 2018, California voters adopted a new proposition that phases in additional standards for confinement of egg-laying hens and prohibits the sale in California of any shell or liquid eggs that are the

6

3. Before California's Egg Laws took effect, the State of Missouri and others sued various California officials in federal district court, alleging that the California Egg Laws are preempted by the EPIA and violate the negative prohibition of the Commerce Clause of the Constitution, Art. I, § 8, Cl. 3. See *Missouri* v. *Harris*, 58 F. Supp. 3d 1059, 1062-1063, 1065-1066 (E.D. Cal. 2014). The court dismissed the case with prejudice for lack of standing. *Id.* at 1079.

The court of appeals agreed with the district court that the plaintiffs had failed sufficiently to allege standing. *Missouri ex rel. Koster* v. *Harris*, 847 F.3d 646, 651-655 (9th Cir. 2017). The court of appeals concluded that the plaintiffs' allegations of harm to egg farmers could not support *parens patriae* standing because those farmers could pursue their own interests, *id.* at 652-653, and that the plaintiffs' allegations of harm to consumers through raised egg prices were "remote, speculative, and contingent upon the decisions of many independent actors in the causal chain in response to California['s] laws," *id.* at 654. The court suggested, however, that "post-effective-date facts * * * might support standing," so the court remanded with instructions to the district court to dismiss the action without prejudice. *Id.* at 656. This court denied the plaintiffs' petition for a writ of certiorari. 137 S. Ct. 2188 (2017).

4. In December 2017, the States of Missouri, Alabama, Arkansas, Indiana, Iowa, Louisiana, Nebraska, Nevada, North Dakota, Oklahoma, Texas, Utah, and

---

product of hens not confined according to those standards. Prevention of Cruelty to Farm Animals Act, Cal. Proposition 12 (2018), https://vig.cdn.sos.ca.gov/2018/general/pdf/topl.pdf#prop12. Plaintiffs' complaint is not directed at these new requirements, and we do not address them in this brief.

7

Wisconsin filed a motion in this Court for leave to file a bill of complaint against the State of California, claiming (Compl. ¶¶ 88-93) that the California Egg Laws are preempted by the EPIA, 21 U.S.C. 1052(b), and also (Compl. ¶¶ 94-101) violate the Commerce Clause. Plaintiffs assert *parens patriae* standing on the theory that their residents will experience increased eggs prices as a result of California's Egg Laws, and they additionally assert their own standing by alleging that state institutions such as prisons will pay higher prices for eggs. Compl. ¶¶ 24-27. Plaintiffs also assert an invasion of various sovereign interests. Compl. ¶¶ 28-31.

In opposition to the motion, California argues that this case does not warrant an exercise of this Court's original jurisdiction (Br. in Opp. 10-22); that plaintiffs lack standing (*id.* at 17-19); and that California's Egg Laws do not violate the Commerce Clause (*id.* at 22-25) and are not preempted by the EPIA (*id.* at 25-28).

### DISCUSSION

The motion for leave to file a bill of complaint should be denied because this is not an appropriate case for the exercise of this Court's original jurisdiction, which the Court has repeatedly stated should be exercised only "sparingly." *Mississippi* v. *Louisiana*, 506 U.S. 73, 76 (1992) (citations omitted). Moreover, contrary to plaintiffs' assertion, California's AB 1437 and Shell Egg Food Safety regulation are not preempted by the EPIA, because USDA's egg-grading standards do not address confinement conditions for egg-laying hens. And in order to resolve plaintiffs' Commerce Clause challenge, both on standing and the merits, it would be necessary to resolve complex factual disputes that are better suited to a district court.

8

1. a. The Constitution includes within this Court's original jurisdiction "all Cases * * * in which a State shall be Party." U.S. Const. Art. III, § 2, Cl. 2. Since the First Judiciary Act, Congress has provided by statute that this Court has "original and exclusive jurisdiction of all controversies between two or more States." 28 U.S.C. 1251(a); see Judiciary Act of 1789, ch. 20, § 13, 1 Stat. 80; see also Stephen M. Shapiro et al., *Supreme Court Practice* § 10.1, at 620-621 (10th ed. 2013). But although that jurisdiction is exclusive, the Court has "interpreted the Constitution and [Section] 1251(a) as making [its] original jurisdiction 'obligatory only in appropriate cases,'" *Mississippi*, 506 U.S. at 76 (quoting *Illinois* v. *City of Milwaukee*, 406 U.S. 91, 93 (1972)), and therefore "as providing [the Court] 'with substantial discretion to make case-by-case judgments as to the practical necessity of an original forum in this Court,'" *ibid.* (quoting *Texas* v. *New Mexico*, 462 U.S. 554, 570 (1983)).

In exercising that discretion, this Court has "said more than once" that its original jurisdiction should be invoked only "'sparingly,'" observing that original jurisdiction "'is of so delicate and grave a character that it was not contemplated that it would be exercised save when the necessity was absolute.'" *Mississippi*, 506 U.S. at 76 (quoting *Wyoming* v. *Oklahoma*, 502 U.S. 437, 450 (1992), and *Louisiana* v. *Texas*, 176 U.S. 1, 15 (1900)) (citations omitted). The Court has therefore expressed "reluctance to exercise original jurisdiction in any but the most serious of circumstances." *Nebraska* v. *Wyoming*, 515 U.S. 1, 8 (1995); see *Connecticut* v. *Massachusetts*, 282 U.S. 660, 669 (1931) ("[T]his Court will not exert its extraordinary power to control the conduct of one State at the suit of another, unless the threatened

9

invasion of rights is of serious magnitude and established by clear and convincing evidence.").

b. Plaintiffs (Br. in Support 13 n.1) and their amici invite the Court to reconsider its well-established conclusion—reaffirmed several times over more than 40 years—that the exercise of original jurisdiction in controversies between States under 28 U.S.C. 1251(a) is discretionary. That invitation should be declined. This Court's interpretation of Article III and the statute is grounded on the historical understanding that original jurisdiction over suits between States arose from the "'extinguishment of diplomatic relations between the States,'" and was therefore intended by "the framers of the Constitution" to be available only when absolutely necessary. *Louisiana* v. *Texas*, 176 U.S. at 15 (quoting *Hans* v. *Louisiana*, 134 U.S. 1, 15 (1890)). The Court's interpretation is also supported by structural limits on the Court's ability "to assume the role of a trial judge," *South Carolina* v. *North Carolina*, 558 U.S. 256, 278 (2010) (Roberts, C.J., concurring in the judgment in part and dissenting in part); the Court's duty to attend to its appellate docket, see *City of Milwaukee*, 406 U.S. at 93-94; and the doctrine of *stare decisis*, see *Kimble* v. *Marvel Entm't, LLC*, 135 S. Ct. 2401, 2409 (2015).

2. This is not one of the rare cases that warrants the exercise of this Court's original jurisdiction. In deciding whether to exercise jurisdiction, the Court considers "'the nature of the interest of the complaining State,' focusing on the 'seriousness and dignity of the claim,'" and whether there exists an alternative forum "in which the issue[s] tendered" to the Court "'may be litigated.'" *Mississippi*, 506 U.S. at 77 (citations omitted). Both factors weigh against the exercise of jurisdiction here.

10

a. This Court has explained that "[t]he model case for invocation of this Court's original jurisdiction is a dispute between States of such seriousness that it would amount to *casus belli* if the States were fully sovereign." *Mississippi*, 506 U.S. at 77 (quoting *Texas*, 462 U.S. at 571 n.18). In many of the instances in which this Court has exercised its original jurisdiction over a controversy between States, the disputed questions "sound[ed] in sovereignty and property, such as those between states in controversies concerning boundaries, and the manner of use of the waters of interstate lakes and rivers." *Supreme Court Practice* § 10.2, at 622 (collecting cases). The Court "has also exercised original jurisdiction in cases sounding in contract, such as suits by one state to enforce bonds or other financial obligations of another state," or "to construe and enforce an interstate compact." *Id.* at 624.

The plaintiff States' asserted interests in this case do not fall into any of those categories. Instead, plaintiffs allege that the California Egg Laws: (1) have resulted in higher egg prices for egg consumers in their States, including certain state institutions; (2) upset principles of federalism; and (3) offend their sovereignty by resulting in private egg producers inviting California inspectors within their borders without their consent. None of those asserted interests justifies the exercise of this Court's original jurisdiction.[7]

i. Plaintiffs' allegations (Compl. ¶¶ 71-75) regarding economic harm to state residents and institutions are insufficient because they do not persuasively show price

_____

[7] Though plaintiffs assert that California's Egg Laws have imposed "hundreds of millions of dollars in costs on the agricultural sector of the national economy," Br. in Support 15, they do not appear to premise their suit on alleged harm to egg producers.

11

increases outside California that are directly attributa-
ble to California's Egg Laws.

In original-jurisdiction cases where this Court has
allowed a State to proceed on a claim that another
State's regulatory actions have inflicted an economic
injury on the plaintiff State or its residents, this Court
has required the plaintiff State to demonstrate that "the
injury for which it seeks redress was *directly* caused by
the actions of another State." *Pennsylvania* v. *New
Jersey*, 426 U.S. 660, 663 (1976) (per curiam) (emphasis
added). Thus, in *Pennsylvania* v. *West Virginia*,
262 U.S. 553, aff'd, 263 U.S. 350 (1923), the Court held
that West Virginia had acted unlawfully when it
"largely curtail[ed] or cut off the supply of natural gas"
carried from its territory to neighboring States. *Id.* at
581; see *id.* at 591-593. In *Maryland* v. *Louisiana*,
451 U.S. 725 (1981), the Court invalidated a Louisiana
natural-gas tax that was "clearly intended to be passed
on to the ultimate consumer"—States and their
citizens—and was structured to minimize burdens on
in-state consumers "for the most part." *Id.* at 733, 736.
And in *Wyoming* v. *Oklahoma*, the Court invalidated an
Oklahoma law that required Oklahoma's utilities to pur-
chase a minimum percentage of their coal from mines in
Oklahoma, thereby diminishing purchases of coal mined
in Wyoming and depriving Wyoming of tax revenue on
Wyoming coal. 502 U.S. at 442-445, 451. By contrast,
the Court declined to exercise original jurisdiction in
*Louisiana* v. *Texas*, where the defendant State alleg-
edly permitted, but did not direct or approve, the action
that caused injury. 176 U.S. at 22-23. The Court held
that the Constitution requires a "direct issue between"
the States for this Court to exercise original jurisdic-
tion. *Id.* at 18.

12

Here, plaintiffs acknowledge (Reply Br. 9) that egg prices outside California depend on the cumulative effect of decisions by a series of marketplace actors, including major egg purchasers outside California such as food processing plants, which may elect whether to buy California-compliant eggs, conventionally farmed eggs, or both, and egg producers outside California, which may or may not increase their capital investment to produce California-compliant eggs and may or may not be able to pass those costs along to consumers. Plaintiffs' expert agrees that observing egg prices is not a reliable indicator of the impact of California's Egg Laws, because "[t]here are simply too many demand and supply forces operating over time." Compl. Ex. A8. Instead, plaintiffs' expert attempts to measure economic impact by estimating the total cost of compliance with California's Egg Laws and then dividing by the total number of eggs produced in the United States. *Id.* at A24. But as California observes (Br. in Opp. 13), that analysis does not disaggregate trends attributable to California's Egg Laws from those attributable to increased consumer demand for "cage-free" or similarly farmed eggs. See, *e.g.*, Dan Charles, *Most U.S. Egg Producers Are Now Choosing Cage-Free Houses*, Nat'l Pub. Radio (Jan. 15, 2016)[8]; Br. in Opp. 13-14 & nn.6-7 (describing rising consumer preference for cage-free eggs).

Plaintiffs' allegations of increased prices also do not account for the data identified by amicus curiae Association of California Egg Farmers (Br. 11-13), which shows a segmented market for California-compliant versus conventionally farmed eggs, with the result that

---

[8]  https://www.npr.org/sections/thesalt/2016/01/15/463190984/most-new-hen-houses-are-now-cage-free.

13

the price of conventionally farmed eggs is relatively unaffected by California's regulatory developments. Plaintiffs respond (Reply Br. 9) that out-of-state egg producers that ship to California will "inevitabl[y]" "pass along [compliance] costs to consumers, both inside and outside California," but that does not account for competitive constraints on the ability of out-of-state producers to pass on to non-California consumers any increased costs they incur in complying with California's laws for the portion of their production to be shipped to California. See Ass'n of Cal. Egg Farmers Amicus Br. 4, 11-14. Those questions of market forces and indirect effects would be best resolved by a district court that can conduct discovery and weigh expert testimony.

In the face of such uncertainty about whether plaintiffs and their residents have suffered economic injury at all, and if so, whether the harm is attributable to California's Egg Laws or to decisions by other market actors, plaintiffs' Article III standing is unclear. See *Allen* v. *Wright*, 468 U.S. 737, 757 (1984) (an injury is not "fairly traceable" to a defendant's conduct, as required for standing, when it "'results from the independent action of some third party not before the court'") (citation omitted). And even assuming that plaintiffs could ultimately demonstrate standing, their claim of injury—which depends on speculation about numerous decisions of third-parties in the marketplace—is not the type of direct harm imposed by another State that this Court has typically considered when exercising its original jurisdiction in cases like *Pennsylvania* v. *West Virginia*, *Maryland* v. *Louisiana*, and *Wyoming* v. *Oklahoma*.

14

ii. Plaintiffs also contend (Compl. ¶¶ 29-30) that this Court should exercise its original jurisdiction because California's Egg Laws violate principles of federalism. Plaintiffs assert an interest, "independent of the benefits that might accrue to any particular individual," in affording "the benefits of the federal system" to their citizens. Br. in Support 16 (quoting *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*, 458 U.S. 592, 608 (1982)) (internal quotation marks omitted). They further allege a "core sovereign interest" in opposing interstate trade barriers. *Id.* at 18.

The government is aware of no case in which this Court has held that a State may invoke this Court's original jurisdiction simply by raising such federalism concerns, including through a preemption or Commerce Clause claim. On the contrary, this Court has repeatedly denied motions to file bills of complaint that presented issues of preemption, federalism, and interstate commerce. See, *e.g.*, *Nebraska* v. *Colorado*, 136 S. Ct. 1034 (2016) (denying motion to file bill of complaint alleging Colorado's marijuana laws were preempted by the federal Controlled Substances Act); *Arizona* v. *New Mexico*, 425 U.S. 794, 795 (1976) (per curiam) (denying motion to file bill of complaint alleging New Mexico energy tax violated the Commerce Clause); *Alabama* v. *Arizona*, 291 U.S. 286, 288 (1934) (denying motion to file bill of complaint alleging five States' bans on the sale of articles produced by convict labor violated the Commerce Clause).

The cases that plaintiffs cite do not hold that asserted federalism concerns, including those arising from preemption arguments, are sufficient standing alone to justify the exercise of original jurisdiction. In

15

*Wyoming* v. *Oklahoma*, the Court concluded that Wyoming's claim had sufficient "seriousness and dignity" to warrant the exercise of original jurisdiction not merely because Wyoming asserted a Commerce Clause claim, but because the Oklahoma statue would "directly affect[ ] Wyoming's ability to collect severance tax revenues" on Wyoming-mined coal, "an action undertaken in [Wyoming's] sovereign capacity." 502 U.S. at 451. Plaintiffs do not assert a similar injury to a sovereign function; their allegations of direct injury are based on their status as purchasers of eggs in the market on par with other consumers. And although plaintiffs also assert standing as *parens patriae*, they have not demonstrated an injury that "affects the general population of [their] State[s] in a substantial way" akin to past cases in which this Court has accepted original jurisdiction. *Maryland* v. *Louisiana*, 451 U.S. at 737; cf. *Pennsylvania* v. *West Virginia*, 262 U.S. at 581 (alleging that challenged provision would "largely curtail or cut off the supply of natural gas" to the plaintiff States to be "used for fuel and lighting purposes").

Litigants frequently allege that a wide range of state enactments are preempted by federal law, violate the Commerce Clause, or both. If merely pleading a preemption or Commerce Clause claim could justify exercise of this Court's original jurisdiction, the Court would likely soon face the "quandary" of "opt[ing] either to pick and choose arbitrarily among similarly situated litigants" to preserve the Court's ability to attend its appellate docket, "or to devote truly enormous portions" of the Court's "energies to such matters." *Ohio* v. *Wyandotte Chems. Corp.*, 401 U.S. 493, 504 (1971).

16

iii. Plaintiffs argue, primarily in their reply brief, that their sovereignty is offended if California inspectors visit private egg-production facilities in their States to certify compliance with California's Egg Laws. Reply Br. 5-8; Compl. ¶ 13; Br. in Support 9.

No authority supports plaintiffs' position that state sovereignty is implicated when a private producer or manufacturer in one State voluntarily invites regulators from another State to inspect and certify its goods as meeting the standards to be sold in the second State. Plaintiffs cite (Reply Br. 7) Section 432 of the Restatement (Third) of Foreign Relations Law (1987) for the proposition that a "state's law enforcement officers may exercise their functions in the territory of another state only with the consent of the other state." But that statement addressed relationships among foreign states, and it concerns only "Measures in Aid of Enforcement of Criminal Law." *Ibid.* (emphasis omitted). Plaintiffs do not contend that California's inspectors are violating plaintiffs' own laws—for example, a law purporting to prohibit out-of-state inspectors from conducting inspections within the state—or that the inspectors lack the private egg producers' consent. Plaintiffs cite no case where this Court has exercised original jurisdiction based on this type of asserted injury—or even recognized such a theory of injury at all.

b. Original jurisdiction is unwarranted in this case for the additional reason that plaintiffs' claims can be raised by other parties in a district-court action. See *Arizona* v. *New Mexico*, 425 U.S. at 796-787 (availability of actions by other parties raising same legal claims can militate against exercise of original jurisdiction); *Mississippi*, 506 U.S. at 76 (same). Here, egg produc-

17

ers who wish to sell eggs into California and are unwilling to comply with California's Egg Laws with respect to those eggs are free to sue the appropriate California officials for injunctive relief, asserting the same preemption and Commerce Clause claims raised in plaintiffs' complaint. Indeed, they would be the most natural plaintiffs, because they would be directly affected by those laws. Alternatively, out-of-state entities that purchase significant quantities of eggs, such as school systems, universities, bakeries, or institutional foodservice companies, could seek to raise those claims, attempting to demonstrate standing and an equitable cause of action through allegations and proof of increased prices.

Plaintiffs argue (Br. in Support 18-21) that there must be another action already pending for this Court to decline to exercise original jurisdiction. But while the Court has sometimes referenced "pending" actions, it has not stated that it will defer only to already-filed cases. See *Arizona* v. *New Mexico*, 425 U.S. at 797 (holding that pending state-court action provided appropriate alternative forum "[i]n the circumstances of this case"). Instead, the Court has stated that it will decline to exercise jurisdiction where the plaintiff State "fails to show that * * * [its] assertion of right may not, or indeed will not, speedily and conveniently be tested by [private parties]." *Alabama*, 291 U.S. at 292. In *Wyoming* v. *Oklahoma*, on which plaintiffs rely, the Court affirmed its jurisdiction after concluding that no other action was currently pending *and* that "[e]ven if such action were proceeding * * * Wyoming's interests [in protecting state tax revenue] would not be directly represented." 502 U.S. at 452.

18

Plaintiffs further contend (Reply Br. 12) that, even if other egg purchasers were permitted to assert preemption and Commerce Clause claims, a private-party suit would not fully represent their interests. But the plaintiff States' primary asserted interest is as *parens patriae* for egg consumers, Compl. ¶¶ 23-25, meaning that a private suit for injunctive relief would pursue the same goal. And to the extent plaintiffs rely on their own asserted economic injury as purchasers of eggs, Compl. ¶¶ 22-26, they give no reason why their interests differ from those of comparable egg purchasers.

3. Plaintiffs' preemption claim (Compl. ¶¶ 88-93) does not warrant an exercise of this Court's original jurisdiction for the additional reason that the California Egg Laws are not preempted by the federal statute that plaintiffs invoke, 21 U.S.C. 1052(b).[9]

In accordance with Congress's mandate that the Agricultural Marketing Service's grading standards be "uniform[ ]" nationwide, 7 U.S.C. 1622(c), the EPIA's preemption clause provides (as relevant here) that, for eggs moving in interstate commerce, "no State or local jurisdiction may require the use of standards of quality, condition, weight, quantity, or grade which are in addition to or different from the official Federal standards." 21 U.S.C. 1052(b). The statute defines "official standards" to mean "the standards of quality, grades, and weight classes for eggs  * * *  under the Agricultural

---

[9] There is also a question whether purchasers of shell eggs would have an equitable cause of action to challenge California's Egg Laws as preempted. See *Armstrong* v. *Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015). Such consumers are only derivatively or indirectly affected by California's Egg Laws, as compared to producers who sell eggs into California and are directly regulated or affected by those laws.

19

Marketing Act of 1946," 21 U.S.C. 1033(r)—that is, the Agricultural Marketing Service's grading standards. See 7 C.F.R. 57.1.

The Agricultural Marketing Service's standards are used to assess individual shell eggs and packages of eggs, so that most below-grade eggs are not sold to consumers and so that eggs can be sorted into batches of similar quality and size for commercial purposes. See AMS § 56.216(a)(2); *Egg-Grading Manual* 32. The standards ensure, for example, that all eggs sold across the Nation as "Jumbo" are of comparable size, that only the highest quality eggs are sold as "Grade AA," and that most eggs below Grade B are not sold as food. *Ibid.* But the California Egg Laws do not impose any additional or different assessment standards of that kind. Cf. *Campbell* v. *Hussey*, 368 U.S. 297, 302 (1961) (holding that a Georgia law requiring *labeling* of type 14 tobacco sold in Georgia was preempted by federal law standardizing the "type, grade, size, condition, or other characteristics" of tobacco).

The Agricultural Marketing Service's standards do not regulate the size of cages for egg-laying hens on farms. Instead, FDA has historically undertaken primary responsibility for regulating farms to prevent Salmonella and address other potential food-safety concerns. See 21 C.F.R. Pt. 118. Plaintiffs have not identified any conflict between the California Egg Laws and FDA's farm regulations. On the contrary, FDA has stated that States may impose Salmonella-prevention requirements more stringent than federal standards. See 74 Fed. Reg. 33,030, 33,091 (July 9, 2009).

Plaintiffs' reliance on *National Meat Ass'n* v. *Harris*, 565 U.S. 452 (2012), is misplaced. That case involved the Federal Meat Inspection Act's, 21 U.S.C.

20

601 *et seq.*, preemption provision, which generally prohibits States and localities from adopting "[r]equirements within the scope of [that Act] with respect to premises, facilities and operations of any establishment" inspected under that Act that are "in addition to, or different than those made under" the Act. 21 U.S.C. 678. The Court held that the federal statute preempted a California law preventing slaughterhouses from processing or selling nonambulatory animals because the California law "impose[d] additional or different requirements on swine slaughterhouses" by "compel[ling] them to deal with nonambulatory pigs on their premises in ways that the [Meat Inspection Act] d[id] not." *National Meat*, 565 U.S. at 460.

The EPIA preemption provision at issue here is materially different. It is not so broad as to cover any state regulation of the "premises, facilities, and operations" of any egg farm, but instead prohibits States and localities from adopting additional or different "standards of quality, condition, weight, quantity, or grade," for eggs. 21 U.S.C. 1052(a)-(b). The EPIA has a separate preemption provision very similar to the one at issue in *National Meat*, which prohibits state regulation of "premises, facilities, and operations." 21 U.S.C. 1052(a). But that provision applies only at "official plant[s]," *ibid.*, which are facilities where "egg products"—not shell eggs—are processed. 21 U.S.C. 1033(f) and (q).

4. Plaintiffs' Commerce Clause claim (Compl. ¶¶ 94-101) also does not warrant an exercise of the Court's original jurisdiction.

The Constitution forbids States from "discriminat[ing] against interstate commerce" or "impos[ing] undue burdens on interstate commerce." *South Dakota*

**Exhibit A**
**RJN_Page 30**

21

v. *Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018). But the California Egg Laws do not discriminate; California treats alike all eggs sold in that State, without any preference for local producers or local products. Cf. *Wyoming* v. *Oklahoma*, 502 U.S. at 455 (Oklahoma statute impermissibly reserved segment of Oklahoma's coal market for Oklahoma-mined coal).

States are permitted to "make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *Southern Pac. Co.* v. *Arizona ex rel. Sullivan*, 325 U.S. 761, 767 (1945). Under *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137 (1970), when a state statute "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142.

Assessing California's Egg Laws under *Pike* would require resolution of complex factual issues. California argues (Br. in Opp. 1-2, 25) that, for purposes of *Pike*, its laws are aimed at reducing the risk of Salmonella contamination, which is a type of safety rationale that "has long been recognized" as a legitimate state interest. 397 U.S. at 143 (citation omitted); see *Raymond Motor Transp., Inc.* v. *Rice*, 434 U.S. 429, 443-444 (1978) (stating that promoting safety is a legitimate local concern). Whether California's rules governing cage size advance that objective, however, is disputed. See, *e.g.*, Reply Br. 5; Compl. ¶¶ 76-81. In *Compassion Over Killing* v. *U.S. Food & Drug Administration*, 849 F.3d 849 (9th Cir. 2017), the court of appeals affirmed FDA's denial of a petition for rulemaking because the plaintiffs "had not provided persuasive evidence that eggs from

22

caged hens are either less nutritious or more likely to be contaminated with Salmonella than eggs from uncaged hens." *Id.* at 853. Also potentially relevant for application of *Pike* is the parties' dispute, as discussed above, pp. 10-13, *supra*, over whether nationwide egg prices have increased and, if so, whether that increase is attributable to California's Egg Laws as opposed to the choices of other actors in the marketplace. Each of those questions could bear on whether California's Egg Laws have so affected commerce in other States as to impose an undue burden.

This Court has held that the Constitution also forbids States from attempting to regulate the price of products sold in another State. See *Healy* v. *The Beer Inst.*, 491 U.S. 324, 335-337 (1989); *Brown-Forman Distillers Corp.* v. *New York State Liquor Auth.*, 476 U.S. 573, 579-582 (1986); *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U.S. 511, 527-528 (1935). To the extent plaintiffs argue that California's Egg Laws are invalid under *Baldwin* and its progeny, those precedents too would require an assessment of facts regarding "whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336.

Applying either *Pike* or *Baldwin* in this case would therefore require analyzing the economic impact of decisions by a host of different actors. Those questions would be best decided after development of a factual record in an adversary case brought in district court by a party directly regulated by the California laws.

23

### CONCLUSION

For the foregoing reasons, the motion for leave to file a bill of complaint should be denied.

Respectfully submitted.

NOEL J. FRANCISCO
  *Solicitor General*
JOSEPH H. HUNT
  *Assistant Attorney General*
EDWIN S. KNEEDLER
  *Deputy Solicitor General*
MICHAEL R. HUSTON
  *Assistant to the Solicitor General*
MARK B. STERN
ALISA B. KLEIN
ANDREW A. ROHRBACH
  *Attorneys*

NOVEMBER 2018

# EXHIBIT B



**United States
Department of
Agriculture**

Marketing and
Regulatory
Programs

Agricultural
Marketing
Service

Poultry
Programs

# United States Standards, Grades, and Weight Classes for Shell Eggs
## AMS 56

**Effective July 20, 2000**

# FOREWORD

These standards, grades, and weight classes have been developed and are promulgated pursuant to the authorities contained in the Agricultural Marketing Act of 1946, as amended (7 U.S.C. 1621 *et seq.*).  The voluntary USDA shell egg grading program operates under these standards, grades, and weight classes as well as the shell egg grading regulations.  The voluntary program provides for interested parties a national grading service based on official U.S. standards, grades, and weight classes for shell eggs.  The costs involved in furnishing this grading program are paid by the user of the service.

The grading program, regulations, standards, grades, and weight classes establish a basis for quality and price relationship and enable more orderly marketing.  Consumers can purchase officially graded product with the confidence of receiving quality in accordance with the official identification.

The Regulations Governing the Voluntary Grading of Shell Eggs are printed in the *Code of Federal Regulations* (CFR) as 7 CFR Part 56.  The regulations are also available on the Internet at www.ams.usda.gov/poultry/regulations.

The United States Standards, Grades, and Weight Classes for Shell Eggs were removed from the CFR on December 4, 1995.  They are maintained by the Agricultural Marketing Service, U.S. Department of Agriculture, as AMS 56.  This document contains the standards, grades, and weight classes that are the most current to date.  Past changes are enumerated in the bracketed footnotes following the applicable sections.  This document is also available on the Internet at www.ams.usda.gov/poultry.  Look under Publications

For printed copies of the regulations or the standards, grades and weight classes:
    Call: (202) 720-2356
    Fax: (202) 690-2930
    Write: USDA, AMS, Poultry Programs
        STOP 0259, Room 3944-South
        1400 Independence Avenue, SW
        Washington, DC 20250-0259

---

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

**Exhibit B**

# AMS-56
# United States Standards, Grades, and Weight Classes for Shell Eggs

Section                                                                 Page

## United States Standards for Quality of Individual Shell Eggs

| | | |
|---|---|---|
| 56.200 | Application | 2 |
| 56.201 | AA Quality | 2 |
| 56.202 | A Quality | 2 |
| 56.203 | B Quality | 2 |
| 56.205 | Dirty | 3 |
| 56.206 | Check | 3 |
| 56.208 | Terms descriptive of the shell | 3 |
| 56.209 | Terms descriptive of the air cell | 3 |
| 56.210 | Terms descriptive of the white | 4 |
| 56.211 | Terms descriptive of the yolk | 5 |
| 56.212 | General terms | 5 |

## United States Grades and Weight Classes for Shell Eggs

| | | |
|---|---|---|
| 56.215 | General | 6 |

## United States Consumer Grades and Weight Classes for Shell Eggs

| | | |
|---|---|---|
| 56.216 | Grades | 6 |
| 56.217 | Summary of grades | 8 |
| 56.218 | Weight classes | 9 |

## United States Nest-Run Grade and Weight Classes for Shell Eggs

| | | |
|---|---|---|
| 56.230 | Grade | 9 |
| 56.231 | Summary of grade | 10 |
| 56.232 | Weight classes | 11 |

Authority:  7 U.S.C. 1621-1627.

## Summary of U.S. Standards for Quality of Individual Shell Eggs

Shell Eggs ........................................................................................................ 12

**United States Standards for Quality of Individual Shell Eggs**

**§56.200  Application.**

(a)  The United States standards for quality of individual shell eggs contained in this subpart are applicable only to eggs that are the product of the domesticated chicken hen and are in the shell.

(b)  Interior egg quality specifications for these standards are based on the apparent condition of the interior contents of the egg as it is twirled before the candling light.  Any type or make of candling light may be used that will enable the particular grader to make consistently accurate determination of the interior quality of shell eggs.  It is desirable to break out an occasional egg and by determining the Haugh unit value of the broken-out egg, compare the broken-out and candled appearance, thereby aiding in correlating candled and broken-out appearance.

[28 FR 6346, June 20, 1963. Redesignated at 42 FR 32514, June 27, 1977, and amended at 46 FR 39571, Aug. 4, 1981. Redesignated at 46 FR 63203, Dec. 31, 1981]

**§56.201  AA Quality.**

The shell must be clean, unbroken, and practically normal.  The air cell must not exceed 1/8 inch in depth, may show unlimited movement, and may be free or bubbly.  The white must be clear and firm so that the yolk is only slightly defined when the egg is twirled before the candling light.  The yolk must be practically free from apparent defects.

[38 FR 26798, Sept. 26, 1973. Redesignated at 42 FR 32514, June 27, 1977, and at 46 FR 63203, Dec. 31, 1981]

**§56.202  A Quality.**

The shell must be clean, unbroken, and practically normal.  The air cell must not exceed 3/16 inch in depth, may show unlimited movement, and may be free or bubbly.  The white must be clear and at least reasonably firm so that the yolk outline is only fairly well defined when the egg is twirled before the candling light.  The yolk must be practically free from apparent defects.

[38 FR 26798, Sept. 26, 1973. Redesignated at 42 FR 32514, June 27, 1977, and at 46 FR 63203, Dec. 31, 1981]

**§56.203  B Quality.**

The shell must be unbroken, may be abnormal, and may have slightly stained areas.  Moderately stained areas are permitted if they do not cover more than 1/32 of the shell surface if localized, or 1/16 of the shell surface if scattered.  Eggs having shells with prominent stains or adhering dirt are not permitted.  The air cell may be over 3/16 inch in depth, may show unlimited movement, and may be free or bubbly.  The white may be weak and watery so that the yolk outline is plainly visible when the egg is twirled before the candling light.  The yolk may appear

dark, enlarged, and flattened, and may show clearly visible germ development but no blood due to such development.  It may show other serious defects that do not render the egg inedible.  Small blood spots or meat spots (aggregating not more than 1/8 inch in diameter) may be present.

[46 FR 39571, Aug. 4, 1981; 46 FR 42441, Aug. 21, 1981. Redesignated at 46 FR 63203, Dec. 31, 1981]

## §56.205  Dirty.

An individual egg that has an unbroken shell with adhering dirt or foreign material, prominent stains, or moderate stains covering more than 1/32 of the shell surface if localized, or 1/16 of the shell surface if scattered.

[46 FR 39571, Aug. 4, 1981. Redesignated at 46 FR 63203, Dec. 31, 1981]

## §56.206  Check.

An individual egg that has a broken shell or crack in the shell but with its shell membranes intact and its contents do not leak.  A "check" is considered to be lower in quality than a "dirty."

[32 FR 8232, June 8, 1967. Redesignated at 42 FR 32514, June 27, 1977, and at 46 FR 63203, Dec. 31, 1981]

## §56.208  Terms descriptive of the shell.

(a)  *Clean.*  A shell that is free from foreign material and from stains or discolorations that are readily visible.  An egg may be considered clean if it has only very small specks, stains, or cage marks, if such specks, stains, or cage marks are not of sufficient number or intensity to detract from the generally clean appearance of the egg.  Eggs that show traces of processing oil on the shell are considered clean unless otherwise soiled.

(b)  *Dirty.*  A shell that is unbroken and that has dirt or foreign material adhering to its surface, which has prominent stains, or moderate stains covering more than 1/32 of the shell surface if localized, or 1/16 of the shell surface if scattered.

(c)  *Practically normal (AA or A quality).*  A shell that approximates the usual shape and that is sound and is free from thin spots.  Ridges and rough areas that do not materially affect the shape and strength of the shell are permitted.

(d)  *Abnormal (B quality).*  A shell that may be somewhat unusual or decidedly misshapen or faulty in soundness or strength or that may show pronounced ridges or thin spots.

[46 FR 39571, Aug. 4, 1981. Redesignated at 46 FR 63203, Dec. 31, 1981]

## §56.209  Terms descriptive of the air cell.

(a) *Depth of air cell (air space between shell membranes, normally in the large end of the egg).* The depth of the air cell is the distance from its top to its bottom when the egg is held air cell upward.

(b) *Free air cell.* An air cell that moves freely toward the uppermost point in the egg as the egg is rotated slowly.

(c) *Bubbly air cell.* A ruptured air cell resulting in one or more small separate air bubbles usually floating beneath the main air cell.

[38 FR 26798, Sept. 26, 1973. Redesignated at 42 FR 32514, June 27, 1977, and at 46 FR 63203, Dec. 31, 1981]

### §56.210  Terms descriptive of the white.

(a) *Clear.* A white that is free from discolorations or from any foreign bodies floating in it.  (Prominent chalazas should not be confused with foreign bodies such as spots or blood clots.)

(b) *Firm (AA quality).* A white that is sufficiently thick or viscous to prevent the yolk outline from being more than slightly defined or indistinctly indicated when the egg is twirled. With respect to a broken-out egg, a firm white has a Haugh unit value of 72 or higher when measured at a temperature between 45 $^o$ and 60 $^o$F.

(c) *Reasonably firm (A quality).* A white that is somewhat less thick or viscous than a firm white.  A reasonably firm white permits the yolk to approach the shell more closely which results in a fairly well defined yolk outline when the egg is twirled.  With respect to a broken-out egg, a reasonably firm white has a Haugh unit value of 60 up to, but not including, 72 when measured at a temperature between 45 $^o$ and 60 $^o$F.

(d) *Weak and watery (B quality).* A white that is weak, thin, and generally lacking in viscosity.  A weak and watery white permits the yolk to approach the shell closely, thus causing the yolk outline to appear plainly visible and dark when the egg is twirled.  With respect to a broken-out egg, a weak and watery white has a Haugh unit value lower than 60 when measured at a temperature between 45 $^o$ and 60 $^o$F.

(e) *Blood spots or meat spots.*  Small blood spots or meat spots (aggregating not more than 1/8 inch in diameter) may be classified as B quality.  If larger, or showing diffusion of blood into the white surrounding a blood spot, the egg shall be classified as Loss.  Blood spots shall not be due to germ development.  They may be on the yolk or in the white.  Meat spots may be blood spots which have lost their characteristic red color or tissue from the reproductive organs.

(f) *Bloody white.* An egg which has blood diffused through the white.  Eggs with bloody whites are classed as Loss.  Eggs with blood spots which show a slight diffusion into the white around the localized spot are not to be classed as bloody whites.

[20 FR 676, Feb. 1, 1955, as amended at 31 FR 2774, Feb. 16, 1966; 42 FR 2971, Jan. 14, 1977. Redesignated at 42 FR 32514, June 27, 1977, and amended at 46 FR 39571, Aug. 4, 1981. Redesignated at 46 FR 63203, Dec. 31, 1981; 65 FR 38239, June 20, 2000]

## §56.211  Terms descriptive of the yolk.

(a)  *Outline slightly defined (AA quality).*  A yolk outline that is indistinctly indicated and appears to blend into the surrounding white as the egg is twirled.

(b)  *Outline fairly well defined (A quality).*  A yolk outline that is discernible but not clearly outlined as the egg is twirled.

(c)  *Outline plainly visible (B quality).*  A yolk outline that is clearly visible as a dark shadow when the egg is twirled.

(d)  *Enlarged and flattened (B quality).*  A yolk in which the yolk membranes and tissues have weakened and/or moisture has been absorbed from the white to such an extent that the yolk appears definitely enlarged and flat.

(e)  *Practically free from defects (AA or A quality).*  A yolk that shows no germ development but may show other very slight defects on its surface.

(f)  *Serious defects (B quality).*  A yolk that shows well developed spots or areas and other serious defects, such as olive yolks, which do not render the egg inedible.

(g)  *Clearly visible germ development (B quality).*  A development of the germ spot on the yolk of a fertile egg that has progressed to a point where it is plainly visible as a definite circular area or spot with no blood in evidence.

(h)  *Blood due to germ development.*  Blood caused by development of the germ in a fertile egg to the point where it is visible as definite lines or as a blood ring.  Such an egg is classified as inedible.

[46 FR 39571, Aug. 4, 1981. Redesignated at 46 FR 63203, Dec. 31, 1981]

## §56.212  General terms.

(a)  *Loss.*  An egg that is inedible, cooked, frozen, contaminated, musty, or moldy, or an egg that contains a large blood spot, large meat spot, bloody white, green white, rot, sour eggs, stuck yolk, blood ring, embryo chick (at or beyond the blood ring state), free yolk in the white, or other foreign material, or an egg that is adulterated as such term is defined pursuant to the Federal Food, Drug, and Cosmetic Act.

(b)  *Leaker.*  An individual egg that has a crack or break in the shell and shell membranes to the extent that the egg contents are exuding or free to exude through the shell.

[20 FR 677, Feb. 1, 1955, as amended at 31 FR 2774, Feb. 16, 1966; 32 FR 8232, June 8, 1967. Redesignated at 42 FR 32514, June 27, 1977, and at 46 FR 63203, Dec. 31, 1981, and amended at 47 FR 46070, Oct. 15, 1982; 47 FR 54421, Dec. 3, 1982; 65 FR 38239, June 20, 2000]

## United States Grades and Weight Classes for Shell Eggs

### §56.215  General.

(a)  These grades are applicable to edible shell eggs in "lot" quantities rather than on an "individual" egg basis.  A lot may contain any quantity of two or more eggs.  Reference in these standards to the term "case" means 30-dozen egg cases as used in commercial practices in the United States.  The size of the sample used to determine grade shall be on the basis of the requirements of 7 CFR Part 56.4 or as determined by the National Supervisor.

(b)  Terms used in this part that are defined in the United States Standards for Quality of Individual Shell Eggs (AMS 56.200 *et seq.*) have the same meaning in this part as in those standards.

(c)  Aggregate tolerances are permitted within each grade only as an allowance for variable efficiency and interpretation of graders, normal changes under favorable conditions during reasonable periods between grading, and reasonable variation of graders' interpretation.

(d)  Substitution of higher qualities for the lower qualities specified is permitted.

(e)  "No grade" means eggs of possible edible quality that fail to meet the requirements of an official U.S. Grade or that have been contaminated by smoke, chemicals, or other foreign material which has seriously affected the character, appearance, or flavor of the eggs.

[20 FR 677, Feb. 1, 1955, as amended at 28 FR 6346, June 20, 1963; 32 FR 8232, June 8, 1967. Redesignated at 42 FR 32514, June 27, 1977, and amended at 46 FR 39571, Aug. 4, 1981. Redesignated at 46 FR 63203, Dec. 31, 1981]

## United States Consumer Grades and Weight Classes for Shell Eggs

### §56.216  Grades.

(a)  *U.S. Grade AA.*

(1)  U.S. Consumer Grade AA (at origin) shall consist of eggs which are at least 87 percent AA quality.  The maximum tolerance of 13 percent which may be below AA quality may consist of A or B quality in any combination, except that within the tolerance for B quality not more than 1 percent may be B quality due to air cells over 3/8 inch, blood spots (aggregating not more than 1/8 inch in diameter), or serious yolk defects.  Not more than 5 percent (7 percent for Jumbo size) Checks are permitted and not more than 0.50 percent Leakers, Dirties, or Loss (due to meat or blood spots) in any combination, except that such Loss may not exceed 0.30 percent. Other types of Loss are not permitted.

(2)  U.S. Consumer Grade AA (destination) shall consist of eggs which are at least 72 percent AA quality.  The remaining tolerance of 28 percent shall consist of at least 10 percent A quality and the remainder shall be B quality, except that within the tolerance for B quality not more than 1 percent may be B quality due to air cells over 3/8 inch, blood spots (aggregating not more than 1/8 inch in diameter), or serious yolk defects.  Not more than 7 percent (9 percent for Jumbo size) Checks are permitted and not more than 1 percent Leakers, Dirties, or Loss (due to meat or blood spots) in any combination, except that such Loss may not exceed 0.30 percent. Other types of Loss are not permitted.

(b)  *U.S. Grade A.*

(1)  U.S. Consumer Grade A (at origin) shall consist of eggs which are at least 87 percent A quality or better.  Within the maximum tolerance of 13 percent which may be below A quality, not more than 1 percent may be B quality due to air cells over 3/8 inch, blood spots (aggregating not more than 1/8 inch in diameter), or serious yolk defects.  Not more than 5 percent (7 percent for Jumbo size) Checks are permitted and not more than 0.50 percent Leakers, Dirties, or Loss (due to meat or blood spots) in any combination, except that such Loss may not exceed 0.30 percent.  Other types of Loss are not permitted.

(2)  U.S. Consumer Grade A (destination) shall consist of eggs which are at least 82 percent A quality or better.  Within the maximum tolerance of 18 percent which may be below A quality, not more than 1 percent may be B quality due to air cells over 3/8 inch, blood spots (aggregating not more than 1/8 inch in diameter), or serious yolk defects.  Not more than 7 percent (9 percent for Jumbo size) Checks are permitted and not more than 1 percent Leakers, Dirties, or Loss (due to meat or blood spots) in any combination, except that such Loss may not exceed 0.30 percent.  Other types of Loss are not permitted.

(c)  *U.S. Grade B.*

(1)  U.S. Consumer Grade B (at origin) shall consist of eggs which are at least 90 percent B quality or better, not more than 10 percent may be Checks and not more than 0.50 percent Leakers, Dirties, or Loss (due to meat or blood spots) in any combination, except that such Loss may not exceed 0.30 percent.  Other types of Loss are not permitted.

(2)  U.S. Consumer Grade B (destination) shall consist of eggs which are at least 90 percent B quality or better, not more than 10 percent may be Checks and not more than 1 percent Leakers, Dirties, or Loss (due to meat or blood spots) in any combination, except that such Loss may not exceed 0.30 percent.  Other types of Loss are not permitted.

(d)  Additional tolerances:

(1)  In lots of two or more cases:

(i)  For Grade AA -- No individual case may exceed 10 percent less AA quality eggs than the minimum permitted for the lot average.

(ii)  For Grade A -- No individual case may exceed 10 percent less A quality eggs than the minimum permitted for the lot average.

(iii)  For Grade B -- No individual case may exceed 10 percent less B quality eggs than the minimum permitted for the lot average.

(2)  For Grades AA, A, and B, no lot shall be rejected or downgraded due to the quality of a single egg except for Loss other than blood or meat spots.

[46 FR 39572, Aug. 4, 1981; 46 FR 42441, Aug. 21, 1981. Redesignated at 46 FR 63203, Dec. 31, 1981]

**§56.217  Summary of grades.**

The summary of U.S. Consumer Grades for Shell Eggs follows as Table I and Table II of this section:

**Table I -- Summary of U.S. Consumer Grades for Shell Eggs**

| U.S. consumer grade (origin) | Quality required [1] | Tolerance permitted [2] | |
|---|---|---|---|
| | | Percent | Quality |
| Grade AA | 87 percent AA. | Up to 13 ......................... Not over 5 ...................... | A or B. [5] Checks. [6] |
| Grade A | 87 percent A or better. | Up to 13 ......................... Not over 5 ...................... | B. [5] Checks. [6] |
| Grade B | 90 percent B or better. | Not over 10 ................... | Checks. |

| U.S. consumer grade (destination) | Quality required [1] | Tolerance permitted [3] | |
|---|---|---|---|
| | | Percent | Quality |
| Grade AA | 72 percent AA. | Up to 28 [4] ...................... Not over 7 ...................... | A or B. [5] Checks. [6] |
| Grade A | 82 percent A or better. | Up to 18 ......................... Not over 7 ...................... | B. [5] Checks. [6] |
| Grade B | 90 percent B or better. | Not over 10 ................... | Checks. |

[1] In lots of two or more cases, see Table II of this section for tolerances for an individual case within a lot.

[2] For the U.S. Consumer grades (at origin), a tolerance of 0.50 percent Leakers, Dirties, or Loss (due to meat or blood spots) in any combination is permitted, except that such Loss may not exceed 0.30 percent.  Other types of Loss are not permitted.

[3] For the U.S. Consumer grades (destination), a tolerance of 1 percent Leakers, Dirties, or Loss (due to meat or blood spots) in any combination is permitted, except that such Loss may not exceed 0.30 percent.  Other types of Loss are not permitted.

[4] For U.S. Grade AA at destination, at least 10 percent must be A quality or better.

[5] For U.S. Grade AA and A at origin and destination within the tolerances permitted for B quality, not more than 1 percent may be B quality due to air cells over 3/8 inch, blood spots (aggregating not more than 1/8 inch in diameter), or serious yolk defects.

[6] For U.S. Grades AA and A Jumbo size eggs, the tolerance for Checks at origin and destination is 7 percent and 9 percent, respectively.

## Table II -- Tolerance for Individual Case Within a Lot

| U.S. consumer grade | Case quality | Origin (percent) | Destination (percent) |
|---|---|---|---|
| Grade AA | AA (min) ........................<br>A or B ............................<br>Check (max) ................... | 77<br>13<br>10 | 62<br>28<br>10 |
| Grade A | A (min) ..........................<br>B ....................................<br>Check (max) ................... | 77<br>13<br>10 | 72<br>18<br>10 |
| Grade B | B (min) ..........................<br>Check (max) ................... | 80<br>20 | 80<br>20 |

[46 FR 39572, Aug. 4, 1981; 46 FR 42441, Aug. 21, 1981. Redesignated at 46 FR 63203, Dec. 31, 1981]

## §56.218  Weight classes.

(a)  The weight classes for U.S. Consumer Grades for Shell Eggs shall be as indicated in Table I of this section and shall apply to all consumer grades.

## Table I -- U.S. Weight Classes for Consumer Grades for Shell Eggs

| Size or weight class | Minimum net weight per dozen (ounces) | Minimum net weight 30 per dozen (pounds) | Minimum net weight for individual eggs at rate per dozen (ounces) |
|---|---|---|---|
| Jumbo ............................. | 30 | 56 | 29 |
| Extra large ..................... | 27 | 50 1/2 | 26 |
| Large ............................. | 24 | 45 | 23 |
| Medium .......................... | 21 | 39 1/2 | 20 |
| Small ............................. | 18 | 34 | 17 |
| Peewee .......................... | 15 | 28 | -- |

(b)  A lot average tolerance of 3.3 percent for individual eggs in the next lower weight class is permitted as long as no individual case within the lot exceeds 5 percent.

[20 FR 677, Feb. 1, 1955, as amended at 20 FR 10015, Dec. 29, 1955; 32 FR 8233, June 8, 1967. Redesignated at 42 FR 32514, June 27, 1977, and at 46 FR 63203, Dec. 31, 1981]

## U.S. Nest-Run Grade and Weight Classes for Shell Eggs

**§56.230  Grade.**

"U.S. Nest Run __ % AA Quality" shall consist of eggs of current production of which at least 20 percent are AA quality; and the actual percentage of AA quality eggs shall be stated in the grade name.  Within the maximum of 15 percent which may be below A quality, not more than 10 percent may be B quality for shell shape, pronounced ridges or thin spots, interior quality (including meat or blood spots), or due to rusty or blackish-appearing cage marks or blood stains, not more than 5 percent may have adhering dirt or foreign material on the shell 1/2 inch or larger in diameter, not more than 6 percent may be Checks, and not more than 3 percent may be Loss.  Marks which are slightly gray in appearance and adhering dirt or foreign material on the shell less than 1/2 inch in diameter are not considered quality factors.  The eggs shall be officially graded for all other quality factors.  No case may contain less than 75 percent A quality and AA quality eggs in any combination.

[46 FR 39573, Aug. 4, 1981. Redesignated at 46 FR 63203, Dec. 31, 1981, and amended at 60 FR 12401, Mar. 7, 1995]

**§56.231  Summary of grade.**

A summary of the U.S. Nest-Run Grade for Shell Eggs follows in Table I of this section:

**Table I -- Summary of U.S. Nest-Run Grade for Shell Eggs**

|  | Nest-run grade, description [1] | U.S. nest run ___ percent AA quality [2] |
|---|---|---|
| Minimum percentage of quality required (lot average) [3] | AA quality [4] | 20 |
|  | A quality or better [5] | 85 |
| Maximum percentage tolerance permitted (15 percent lot average) [3] | B quality for shell shape, pronounced ridges or thin spots, interior quality (including blood & meat spots) or cage marks[6] and blood stains | 10 |
|  | Checks | 6 |
|  | Loss | 3 |
|  | Adhering dirt or foreign material 1/2 inch or larger in diameter | 5 |

[1] Stains (other than rusty or blackish appearing cage marks or blood stains), and adhering dirt and foreign material on the shell less than 1/2 inch in diameter shall not be considered as quality factors in determining the grade designation.
[2] The actual total percentage must be stated in the grade name.
[3] Substitution of eggs of higher qualities for lower specified qualities is permitted.
[4] No case may contain less than 10 percent AA quality.

**Exhibit B**
**RJN_Page 46**

[5] No case may contain less than 75 percent A quality and AA quality eggs in any combination.
[6] Cage marks which are rusty or blackish in appearance shall be considered as quality factors.  Marks which are slightly gray in appearance are not considered as quality factors.

[37 FR 22791, Oct. 25, 1972, as amended at 40 FR 20056, May 8, 1975. Redesignated at 42 FR 32514, June 27, 1977, and amended at 46 FR 39573, Aug. 4, 1981. Redesignated at 46 FR 63203, Dec. 31, 1981, and amended at 60 FR 12401, Mar. 7, 1995; 60 FR 13780, Mar. 14, 1995]

## §56.232  Weight classes.

The weight classes for the U.S. Nest-Run Grade for Shell Eggs shall be as indicated in Table I of this section and shall apply to Nest-Run Grade.

**Table I -- Weight Classes for U.S. Nest Run Grade for Shell Eggs**

| Weight classes | Minimum average net weight on lot basis 30-dozen cases (pounds) |
|---|---|
| Class XL ................................................................. | 51 |
| Class 1 ................................................................... | 48 |
| Class 2 ................................................................... | 45 |
| Class 3 ................................................................... | 42 |
| Class 4 ................................................................... | 39 |

No individual sample case may vary more than 2 pounds (plus or minus) from the lot average.

[37 FR 22791, Oct. 25, 1972. Redesignated at 42 FR 32514, June 27, 1977, and at 46 FR 63203, Dec. 31, 1981]

UNITED STATES DEPARTMENT OF AGRICULTURE
AGRICULTURAL MARKETING SERVICE
Poultry Programs

| SUMMARY OF U.S. STANDARDS FOR QUALITY OF INDIVIDUAL SHELL EGGS Specifications for Each Quality Factor | | | |
|---|---|---|---|
| **Quality Factor** | **AA Quality** | **A Quality** | **B Quality** |
| **Shell** | Clean. Unbroken. Practically normal. | Clean. Unbroken. Practically normal. | Clean to slightly stained.* Unbroken. Abnormal. |
| **Air Cell** | 1/8 inch or less in depth. Unlimited movement and free or bubbly. | 3/16 inch or less in depth. Unlimited movement and free or bubbly. | Over 3/16 inch in depth. Unlimited movement and free or bubbly. |
| **White** | Clear. Firm. | Clear. Reasonably firm. | Weak and watery. Small blood and meat spots present.** |
| **Yolk** | Outline slightly defined. Practically free from defects. | Outline fairly well defined. Practically free from defects. | Outline plainly visible. Enlarged and flattened. Clearly visible germ development but not blood. Other serous defects. |

For eggs with dirty or broken shells, the standards of quality provide two additional qualities. They are:

| **Dirty** | **Check** |
|---|---|
| Unbroken.  Adhering dirt or foreign material, prominent stains, moderate stained areas in excess of B quality. | Broken or cracked shell but membranes intact, not leaking.*** |

* Moderately stained areas permitted (1/32 of surface if localized, or 1/16 if scattered).
** If they are small (aggregating not more than 1/8 inch in diameter).
*** Leaker has broken or cracked shell membranes, and contents leaking or free to leak.