Brian M. Boynton (SBN 222193)
  brian.boynton@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6137

Leah M. Fugere (SBN 354757)
  leah.fugere@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 S. Grand Avenue, 24th Floor
Los Angeles, CA 90071
Telephone: (213) 443-5300

Attorneys for Defendant-Intervenor
ASSOCIATION OF CALIFORNIA EGG FARMERS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 2:25-cv-06230-MCS-AGR |
|---|---|
| Plaintiff, | **DEFENDANT-INTERVENOR ASSOCIATION OF CALIFORNIA EGG FARMERS'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| THE STATE OF CALIFORNIA; GAVIN C. NEWSOM, in his Official Capacity as Governor of California; et al., | |
| Defendants, | Hearing Date: January 12, 2026 |
| ASSOCIATION OF CALIFORNIA EGG FARMERS; HUMANE WORLD FOR ANIMALS; et al., | Time: 9:00AM PT<br>Location: Courtroom 7C, 7th Floor |
| Defendant-Intervenors. | |

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................2

    Relevant Federal Provisions ............................................................................2

    Relevant State Law Provisions .........................................................................4

    Prior Challenges to the California Provisions .................................................7

ARGUMENT ........................................................................................................8

I.     THE UNITED STATES LACKS ARTICLE III STANDING ......................9

II.    THE EPIA ACT DOES NOT PREEMPT THE CHALLENGED PROVISIONS ...............................................................................................10

    A.    AB 1437 And Proposition 12 Are Not Preempted ...........................10

        1.    Section 1052(b)(1)'s Text ........................................................10

        2.    The EPIA's Structure ...............................................................14

        3.    Agency Interpretation ..............................................................17

    B.    Section 1320.4 Is Not Preempted ......................................................18

III.   THE COURT SHOULD EXERCISE ITS DISCRETION NOT TO GRANT DECLARATORY OR EQUITABLE RELIEF .............................21

    A.    Declaratory Relief Would Be Inappropriate .....................................21

    B.    The United States Is Not Entitled to Injunctive Relief ......................22

CONCLUSION ...................................................................................................23

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Allen v. Wright*, 468 U.S. 737 (1984) .........................................................9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).............................8

*Bond v. United States*, 572 U.S. 844 (2014) ..........................................16

*California Ins. Guarantee Ass'n v. Price*, 252 F. Supp. 3d 948 (C.D. Cal. 2017) ...............................................................................................21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................8, 9

*Cramer v. Brown*, No. 12-cv-3130, 2012 WL 13059699 (C.D. Cal. Sept. 12, 2012) ......................................................................................7

*Cramer v. Harris*, 591 F. App'x 634 (9th Cir. 2015) ..............................7

*Dubin v. United States*, 599 U.S. 110 (2023) ....................................12, 14

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ......................22

*Epic Systems Corp. v. Lewis*, 584 U. S. 497 (2018) ................................12

*Farmer v. Brennan*, 511 U.S. 825 (1994)...............................................22

*Fischer v. United States*, 603 U.S. 480 (2024) ........................................14

*Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220 (9th Cir. 1998) .........21, 22

*Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334 (1933) .......22

*Loughrin v. United States*, 573 U.S. 351 (2014)......................................15

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ......................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)............................................................................................9

*Meredith v. Winter Haven*, 320 U.S. 228 (1943).....................................22

ii

*Missouri ex rel. Koster v. Harris*, 847 F.3d 646 (9th Cir. 2017), *cert. denied sub nom. Missouri ex rel. Hawley v. Becerra*, 581 U.S. 1006 (2017)...................................................................................8

*Missouri v. California*, 586 U.S. 1065 (2019)........................................8

*Missouri v. Harris*, 58 F. Supp. 3d 1059 (E.D. Cal. 2014)......................8

*N. Am. Meat Inst. v. Becerra*, 825 F. App'x 518 (9th Cir. 2020), *cert. denied sub nom. N. Am. Meat Inst. v. Bonta,* 141 S. Ct. 2854 (2021)...................................................................................8

*N. Am. Meat Inst. v. Becerra*, No. 2:19-cv-08569 (C.D. Cal. Oct. 4, 2019)...................................................................................8

*National Meat Association v. Harris*, 565 U.S. 452 (2012) ...................16

*National Pork Producers Council v. Ross,* 598 U.S. 356 (2023) ............8

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (1945)...................................................................................23

*Principal Life Ins. Co. v. Robinson*, 394 F.3d 665 (9th Cir. 2005) ........21

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .................................9

*United States v. Arcata*, 629 F.3d 986 (9th Cir. 2010) .......................9, 10

*United States v. Desert Gold Min. Co.*, 448 F.2d 1230 (9th Cir. 1971) .................23

*United States v. Williams*, 553 U.S. 285 (2008) ....................................14

*United States v. Windsor*, 570 U.S. 744 (2013) ......................................9

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ...........................22

*Williams v. Taylor*, 529 U.S. 362 (2000) ...............................................15

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) ....................................21

## FEDERAL STATUTES

21 U.S.C. § 1032...................................................................................2

iii

21 U.S.C. § 1033 ....................................................................................2, 3, 11, 13, 16, 17

21 U.S.C. § 1034 ...............................................................................................................2, 3

21 U.S.C. § 1035 ...................................................................................................................2

21 U.S.C. § 1036 ........................................................................................................2, 16, 18

21 U.S.C. §1037 ..............................................................................................................3, 16

21 U.S.C. § 1040 ............................................................................................................16, 19

21 U.S.C. § 1052 ............................ 1, 2, 3, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 21

Agricultural Marketing Act of 1946, 7 U.S.C. § 1622 ....................................3, 11, 12

Egg Products Inspection Act, 21 U.S.C. §§ 1031-1056 ...................................*passim*

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 321 .........................................18

Federal Meat Inspection Act, 21 U.S.C. § 678 ........................................................16

Pub. L. 102-237, § 1012(g), 105 Stat. 1818 (1991)...................................................15

## FEDERAL RULES

Fed. R. Civ. P. 56 .........................................................................................................8, 9

## FEDERAL REGULATIONS

7 C.F.R. § 56 ...........................................................................................................12, 13

7 C.F.R. § 56.1 ...................................................................................................12, 13, 14

7 C.F.R. § 56.17 ...........................................................................................................13

7 C.F.R. § 56.63 ...........................................................................................................13

7 C.F.R. § 56.76 ...........................................................................................................14

7 C.F.R. § 57 .................................................................................................................12

7 C.F.R. § 57.1 ...................................................................................................11, 13, 18

16 C.F.R. § 500.2 .........................................................................................................18

21 C.F.R. § 115.50 ...................................................................................................15

21 C.F.R. § 118.12 ...................................................................................................16

81 Fed. Reg. 63675 (Sept. 16, 2016) ...............................................................12, 13

*Food Labeling, Safe Handling Statements, Labeling of Shell Eggs;
Refrigeration of Shell Eggs Held for Retail Distribution*, 65
Fed. Reg. 76,092 (Dec. 5, 2000)...................................................................15

*Prevention of Salmonella Enteritidis in Shell Eggs During
Production, Storage, and Transportation*, 74 Fed. Reg. 33,030
(July 9, 2009) ...............................................................................................16

## STATE STATUTES & REGULATIONS

01-001-213 ME CODE R. (2025) ...............................................................................16

4 R.I. GEN LAWS § 4-1.1-1 - 6 (2025).......................................................................6

31 PA. STAT. AND CONS. STAT. ANN. § 300.3 (2025) ...............................................16

AB 1437, Proposition 12, and California Department of Food and
Agriculture regulation Section 1320.4 ................................1, 2, 6, 10, 18, 19

ARIZ. ADMIN. CODE § R3-2-907 (2025) .....................................................................6

Cal. Code Regs. tit. 3, § 1320.1 .........................................................................20, 21

Cal. Code Regs. tit. 3, § 1320.4 ...........................................................6, 18, 19, 20, 21

CAL. CODE REGS. TIT. 3, § 1350 (2025)...................................................................16

Cal. Health & Safety Code §§ 25990-25993.1 ...........................................4, 5, 6, 20

Cal. Health & Safety Code §§ 25995-25996.3 ...................................................4, 5

Cal. Penal Code Ann. § 599f (West 2010) ..............................................................17

COLO. REV. STAT. § 35-21-201 - 21-209 (2025).......................................................6

MASS. GEN. LAWS ch. 129, § 1-1 - 1-12 (2025).......................................................6

MD. CODE ANN., AGRIC. § 4-310(b) (2025)...........................................................16

MICH. COMP. LAWS § 287.746 (2025) ................................................................6

NEV. REV. STAT. § 583.211 - .251 (2025) ...........................................................6

N.Y. COMP. CODES R. & REGS. tit. 1, § 57.7 (2025) ...............................16

OHIO ADMIN. CODE 901:12-9-03 (2025) ............................................................6

OR. REV. STAT. § 632.835- .850 (2025) .............................................................6

UTAH CODE ANN. § 4-4A-101 - 107 ....................................................................6

WASH. REV. CODE § 69.25.107 (2025) ...............................................................6

## OTHER AUTHORITIES

H. R. Rep. 91-1670, 91st Cong., 2d Session (1970) ..................................17

*Implied Warranty of Merchantability*, BLACK'S LAW DICTIONARY
    (10th ed. 2009) ..............................................................................................13

*Inherent*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969) .......................13

*Intrinsic*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed.
    2006) ...............................................................................................................13

S.820, §4(c) 113th Cong. (2013) ....................................................................15

*United States Standards, Grades, and Weight Classes for Shell Eggs*,
    *AMS 56* (July 20, 2000) ...........................................................3, 4, 11, 12

vi

# INTRODUCTION

Over two decades, California enacted a series of laws to ensure that egg-laying hens are treated humanely and to promote food safety in the state. Federal courts have uniformly upheld these measures as lawful exercises of California's police powers. Until July 2025, the United States had never taken a contrary position. Indeed, when several States filed an original action in the Supreme Court seeking to challenge two of the measures, the Solicitor General advised the Supreme Court in 2018 that the measures "are not preempted by the EPIA [the Egg Products Inspection Act] because USDA's egg-grading standards do not address confinement conditions for egg-laying hens."[1] The Supreme Court subsequently declined to hear the challenge. In the years since, numerous States have imposed minimum confinement standards for hens patterned on California's, and egg producers have upgraded their facilities. Cage-free eggs now make up roughly half of the U.S. egg market.

With this suit, the United States seeks to reverse course. It now contends that the EPIA preempts three provisions of California law: AB 1437, Proposition 12, and California Department of Food and Agriculture regulation Section 1320.4. That claim fails as a matter of law on multiple grounds.

First, the United States lacks Article III standing because it has not established that the challenged provisions injure the federal government.

Second, the United States's preemption challenge is meritless, for the reasons the United States itself previously explained. The United States invokes certain portions of EPIA's preemption clause, 21 U.S.C. § 1052(b). But both the plain text of § 1052(b) and the structure of the EPIA make it unmistakable that, in relevant part, § 1052(b) preempts only competing state-law standards for grading eggs and state laws regarding the labeling of egg cartons. Because AB 1437 and Proposition

---

[1] Declaration of Brian M. Boynton ("Boynton Decl."), Ex. 7.

12 do not impose any egg-grading standards, they are unaffected by § 1052(b).  And Section 1320.4 is not preempted because it (1) primarily imposes record keeping requirements, not labelling rules, and (2) falls within § 1052(b)'s anti-preemption clause.

Finally, the United States' request for discretionary and equitable relief should be denied.  This lawsuit threatens to upend serious reliance interests that have developed since the Solicitor General represented that California's minimum confinement standards are not preempted by the EPIA.

## BACKGROUND

Relevant Federal Provisions

Enacted in 1970, the Egg Products Inspection Act (EPIA), 21 U.S.C. §§ 1031-1056, aims to "prevent the movement or sale for human food, of eggs and egg products which are adulterated or misbranded."  21 U.S.C.  § 1032.  The EPIA primarily regulates food-processing facilities (i.e., "official plant[s]") that produce "egg products" (i.e., "dried, frozen, or liquid eggs") from shell eggs (i.e., whole eggs intact in their shells).  *See* 21 U.S.C. § 1033(f) (defining "egg product"); § 1033(q) (defining "official plant").  It sets out rules regarding egg processing (i.e., the manufacture of eggs, *see* § 1033(w)), including a framework for the inspection of egg products to ensure that they are not adulterated (§ 1034) and sanitation requirements (§ 1035).

The Act next addresses official plants' labeling obligations, requiring that they imprint certain information on the containers of eggs leaving their plants.  § 1036. The EPIA generally preempts state laws that add to or differ from its rules regarding official plants or the labeling of eggs' containers.  § 1052(a), (b)(3).

In addition, the EPIA imposes some requirements on egg handlers. *See, e.g.*, 21 U.S.C. § 1034(e) (refrigeration requirements).  It also prohibits buying, selling, or using in food preparation "restricted eggs," which are not fit for human

consumption for a variety of reasons.  §1037(a)(l)-(2); *see* § 1033(g)(8) (defining "restricted egg").

The EPIA does not regulate the living conditions of egg-laying hens or the sale of eggs from hens confined in specified conditions.  Nothing in the Act addresses hen enclosures.

Section 1052(b)(1)—the focal point of the United States's amended complaint—preempts state laws that purport to "require the use of standards of quality, condition, weight, quantity, or grade which are in addition to or different from the official Federal standards."  *Id.*  The EPIA defines "official standards" as the "standards of quality, grades, and weight classes for eggs in effect upon the effective date of this Act or thereafter amended, under the Agricultural Marketing Act."  § 1033(r).  The Agricultural Marketing Act of 1946, in turn, directs the Secretary of the U.S. Department of Agriculture (USDA) "[t]o develop and improve standards of quality, condition, quantity, grade, and packaging."  7 U.S.C. § 1622(c).

Pursuant to the Agricultural Marketing Act, the USDA's Agricultural Marketing Service has promulgated the *United States Standards, Grades, and Weight Classes for Shell Eggs*, *AMS 56* (July 20, 2000).[2]  They establish quality standards, grades, and weight classes that producers can use to separate eggs, thereby "enabl[ing] more orderly marketing" and ensuring that "[c]onsumers can purchase officially graded product with the confidence of receiving quality in accordance with the official identification."[3]

The "official standards" first set forth egg quality standards.  For an egg to qualify as AA quality, for example:

The shell must be clean, unbroken, and practically normal.  The air cell

---

[2] *See* Boynton Decl., Ex. 1.

[3] *Id.* (Foreword)*.*

must not exceed 1/8 inch in depth, may show unlimited movement, and may be free or bubbly.  The white must be clear and firm so that the yolk is only slightly defined when the egg is twirled before the candling light.  The yolk must be practically free from apparent defects.

AMS § 56.201.  These quality standards do not take into account the manner in which the hens were confined.

The official standards then set forth various "grades" of eggs that are determined for a "lot" of eggs rather than an individual egg.  For example, the standard for Grade AA (at the place of shipment of the egg) provides:

U.S. Consumer Grade AA (at origin) shall consist of eggs which are at least 87 percent AA quality.  The maximum tolerance of 13 percent which may be below AA quality may consist of A or B quality in any combination, except that within the tolerance for B quality not more than 1 percent may be B quality due to air cells over 3/8 inch, blood spots (aggregating not more than 1/8 inch in diameter), or serious yolk defects.  ….

AMS § 56.216(a)(1).

The official standards also define six different weight classes: Jumbo, Extra Large, Large, Medium, Small, and Peewee.  *See* AMS § 56.218(a).

Relevant State Law Provisions

Two provisions of California law mandate that eggs sold in California be produced from hens whose enclosures meet certain minimum space requirements: (1) AB 1437, codified as amended at Cal. Health & Safety Code §§ 25995-25996.3; and (2) Proposition 12, codified at Cal. Health & Safety Code §§ 25990-25993.1.

AB 1437 was signed into law by Governor Schwarzenegger over 15 years ago, on July 6, 2010.  It requires that all eggs sold in California come from hens

granted a minimum amount of enclosure space.  Cal. Health & Safety Code § 25996. Its legislative findings explain that "food animals that are treated well and provided with at least minimum accommodation of their natural behaviors and physical needs are healthier and safer for human consumption."  Cal. Health & Safety Code § 25995(a).  The Legislature noted its intent to "protect California consumers from the deleterious[] health, safety, and welfare effects of the sale and consumption of eggs derived from egg-laying hens that are exposed to significant stress and may result in increased exposure to disease pathogens including salmonella."  *Id.* § 25995(e).  AB 1437 provides:

> Commencing January 1, 2015, a shelled egg shall not be sold or contracted for sale for human consumption in California if the seller knows or should have known that the egg is the product of an egg-laying hen that was confined on a farm or place that is not in compliance with animal care standards set forth Chapter 13.8 (commencing with Section 25990).

Cal. Health & Safety Code § 25996.

The animal care standards referenced in AB 1437 were added by Proposition 2, an animal-welfare initiative adopted by the California voters in 2008.[4]  They were later amended by Proposition 12, which was adopted by the California voters in 2018.[5]  Proposition 12's stated purpose was to "phas[e] out extreme methods of farm animal confinement" that "threaten the health and safety of California consumers[] and increase the risk of foodborne illness."[6]

The cross-referenced animal care standards provide that "[a] farm owner or operator within the state shall not knowingly cause any covered animal [including

---

[4] *See* Boynton Decl., Ex. 2 at 82.

[5] *See* Boynton Decl., Ex. 3 at 87.

[6] *Id.* at 87 (§ 2).

egg-laying hens] to be confined in a cruel manner." Cal. Health & Safety Code § 25990. As amended by Proposition 12, the standards define "[c]onfined in a cruel manner," as of January 1, 2022, to include "confining an egg-laying hen with less than the amount of usable floorspace per hen required by the 2017 edition of the United Egg Producers' Animal Husbandry Guidelines for U.S. Egg-Laying Flocks." *Id.* § 25991(e)(5). Those Guidelines require cage-free systems that, "[d]epending on the system type," provide "a minimum range between 1.0 - 1.5 sq. ft. of usable floor space per hen" in order "to allow for normal behavior."[7]

Proposition 12 directs the California Department of Food and Agriculture and the State Department of Public Health to issue implementing regulations. Cal. Health & Safety Code § 25993. Section 1320.4 of title 3 of the California Code of Regulations, entitled "Shell Egg and Liquid Egg Shipping Document Requirements," is one such regulation. It primarily sets out requirements for the documents of title and shipping manifests that accompany "shipments of shell eggs or liquid eggs entering the state or transported within the state," *id.* § 1320.4(a)(1), in order to "facilitate product traceability" and "assist distributors and buyers in efforts to ensure products offered for sale in California come from … compliant enclosures."[8]

Since California enacted AB 1437 and Proposition 12, at least ten other States have adopted minimum confinement standards for hens.[9] During the same period,

---

[7] Boynton Decl., Ex. 4 at 20.

[8] Boynton Decl., Ex. 5 at 27.

[9] *E.g.*, ARIZ. ADMIN. CODE § R3-2-907 (2025); COLO. REV. STAT. § 35-21-201 - 21-209 (2025); MASS. GEN. LAWS ch. 129, § 1-1 - 1-12 (2025); MICH. COMP. LAWS § 287.746 (2025); NEV. REV. STAT. § 583.211 - .251 (2025); OHIO ADMIN. CODE 901:12-9-03 (2025); OR. REV. STAT. § 632.835- .850 (2025); 4 R.I. GEN LAWS § 4-1.1-1 – 6 (2025); UTAH CODE ANN. § 4-4A-101 - 107; WASH. REV. CODE § 69.25.107 (2025).

egg farmers in California and across the country have made substantial investments in cage-free facilities. Murdock Decl. ¶¶ 4, 5; ACEF's Statement of Uncontroverted Facts ("ACEF SUF") ¶¶ 5-6; *see* First Amended Complaint for Declaratory and Injunctive Relief (September 2, 2025), Dkt. 47-1 ("FAC") ¶ 2 (describing shift in "agricultural production methods"). USDA estimates that cage-free hens made up less than 10% of the total U.S. flock in 2012 and less than 20% in 2018, when the Solicitor General represented to the Supreme Court that the EPIA does not address hens' confinement conditions. ACEF SUF ¶¶ 8-9. Since then, cage-free hens' share of the total U.S. flock has steadily increased. ACEF SUF ¶¶ 5-10. USDA estimates that cage-free hens currently make up 45% of the U.S. flock, more than double their share in 2018. ACEF SUF ¶ 10.

Prior Challenges to the California Provisions

Over the last decade, California's requirements have been subjected to repeated legal challenges that have been uniformly rejected. In 2012, a California egg producer challenged Proposition 2 on the grounds that it was unconstitutionally vague and violated the Dormant Commerce Clause. The U.S. District Court for the Central District of California dismissed the lawsuit for failure to state a claim, and the Ninth Circuit affirmed.[10]

In 2014, a coalition of States filed another challenge. They alleged that AB 1437 and a related California regulation violated the Dormant Commerce Clause and, in the alternative, that they were preempted by the EPIA. The United States District Court for the Eastern District of California dismissed for a lack of standing,

---

[10] *Cramer v. Brown*, No. 12-cv-3130, 2012 WL 13059699, at *6 (C.D. Cal. Sept. 12, 2012); *Cramer v. Harris*, 591 F. App'x 634 (9th Cir. 2015).

and the Ninth Circuit affirmed.[11]

Then in 2017, the States sought leave to file an original action in the United States Supreme Court that would have raised the same Dormant Commerce Clause and preemption claims. That challenge, too, was unsuccessful: the Supreme Court denied the motion for leave to file a bill of complaint[12] after the Solicitor General's Office filed an amicus brief advising the Court not to hear the case.[13] In that brief, the United States explained that "California's AB 1437 and [a related regulation] are not preempted by the EPIA, because USDA's egg-grading standards do not address confinement conditions for egg-laying hens."[14]

Since then, several other lawsuits have challenged Proposition 12, alleging that its regulation of the meat industry violated the Dormant Commerce Clause.[15] Lower courts rejected these challenges, as did the Supreme Court in *National Pork Producers Council v. Ross,* 598 U.S. 356 (2023).

## ARGUMENT

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A plaintiff opposing summary judgment must present evidence sufficient to prove each element of its claims to avoid

---

[11] *See Missouri v. Harris*, 58 F. Supp. 3d 1059 (E.D. Cal. 2014); *Missouri ex rel. Koster v. Harris*, 847 F.3d 646 (9th Cir. 2017), *cert. denied sub nom. Missouri ex rel. Hawley v. Becerra*, 581 U.S. 1006 (2017).

[12] *See Missouri v. California*, 586 U.S. 1065 (2019) (Mem.).

[13] Boynton Decl., Ex. 7.

[14] *Id.* at 7.

[15] *E.g.*, *N. Am. Meat Inst. v. Becerra*, No. 2:19-cv-08569 (C.D. Cal. Oct. 4, 2019); *N. Am. Meat Inst. v. Becerra*, 825 F. App'x 518, 519 (9th Cir. 2020), *cert. denied sub nom. N. Am. Meat Inst. v. Bonta,* 141 S. Ct. 2854 (2021).

summary judgment. *Celotex*, 477 U.S. at 322-23. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## I.    THE UNITED STATES LACKS ARTICLE III STANDING

As "the party invoking federal jurisdiction," the United States "bear[s] the burden of demonstrating that [it] ha[s] standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-431 (2021). Because the United States is not "the object of the government action" that it challenges, this is "'substantially more difficult' to establish" than it would be in a suit brought by a regulated party. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). At a bare minimum, the United States must establish that the California provisions that it challenges cause it "concrete and particularized injury." *TransUnion*, 594 U.S. at 423; *see Lujan*, 504 U.S. at 561 (explaining that to survive a motion for summary judgment, "the plaintiff … must 'set forth' by affidavit or other evidence 'specific facts'" establishing injury (quoting Fed. Rule. Civ. P. 56(e)).

The United States does not even allege, let alone establish, any injury to the federal government itself that would give the United States "a stake sufficient to support Article III jurisdiction." *United States v. Windsor*, 570 U.S. 744, 757 (2013) (holding that the United States had standing on appeal because the district court had ordered it to refund tax money). The absence of injury to the federal government marks a sharp contrast with *United States v. Arcata*, in which the Ninth Circuit held that the United States had standing to seek invalidation of municipal ordinances under the Supremacy Clause. 629 F.3d 986 (9th Cir. 2010). The challenged ordinances in that case "expressly forbid agents or employees of the United States" from engaging in certain military recruitment activities, such that the cities' "adoption and threatened enforcement of the ordinances thus subject the [federal]

government to an imminent adverse impact." *Id.* at 989-990.  The United States has established no such "adverse impact" here, and this Court accordingly lacks subject-matter jurisdiction.  *See* Cal. Defs.' Mot. to Dismiss (October 6, 2025), Dkt. 60 ("Cal. MTD"), at 17-19.

## II.    THE EPIA ACT DOES NOT PREEMPT THE CHALLENGED PROVISIONS

The United States's preemption challenge to AB 1437, Proposition 12, and Section 1320.4 fails as a matter of law.

### A.    AB 1437 And Proposition 12 Are Not Preempted

As the United States itself previously explained, the preemption clause at issue—21 U.S.C. § 1052(b)(1)—addresses egg-*grading* standards.  It therefore does not preempt AB 1437 and Proposition 12, which address the sales of eggs from hens confined in certain conditions.  Contradicting its prior position, the United States now characterizes 21 U.S.C. § 1052(b)(1) as a sweeping ban on state laws that regulate the conditions in which egg-laying hens are confined.  But the plain text of § 1052(b)(1), the structure of the EPIA, and USDA's longstanding interpretation demonstrate that the provision "is not so broad."  Boynton Decl., Ex. 7 (Brief for the United States (S.Ct. 2018)) at 20.

#### 1.    Section 1052(b)(1)'s Text

The plain text of the EPIA defeats the United States's preemption argument.  Section 1052(b)(1) preempts state laws that "require the use of standards of quality, condition, weight, quantity, or grade which are in addition to or different from the official Federal standards." 21 U.S.C. § 1052(b)(l).  The United States argues that AB 1437 and Proposition 12 "impose [] standards of quality and condition on eggs." FAC ¶ 58 (AB 1437); *see id*. ¶ 62 (same for Proposition 12).  In its view, the fact that an egg is from a hen that was confined in conditions that comply with California law is itself a quality and condition.    FAC ¶¶ 58, 62.    But "quality" and

"condition"—like "weight," "quantity," and "grade"—address eggs' physical characteristics, not the conditions in which egg-laying hens are confined.

Section 1052(b)(1)'s reference to the "official Federal standards" makes clear that standards of quality and condition refer to standards regarding the physical characteristics of eggs. The EPIA defines "official standards" as "the standards of quality, grades, and weight classes for eggs, in effect upon the effective date of this chapter, or as thereafter amended, under the Agricultural Marketing Act of 1946." 21 U.S.C. § 1033(r); *see also* 7 C.F.R. § 57.1 ("Official standards means the official U.S. standards of quality, grades, and weight classes for shell eggs maintained by and available from Poultry Programs, [Agricultural Marketing Service]."); *id* § 56.l (same). The USDA has promulgated these egg grading standards in a document titled "United States Standards, Grades, and Weight Classes for Shell Eggs." *See* Boynton Decl., Ex. 1.

These official Federal grading "standards do not regulate the size of cages for egg-laying hens on farms." Boynton Decl., Ex. 7 (Brief for the United States (S.Ct. 2018)) at 19. Rather, as the United States explained to the Supreme Court, they classify "individual shell eggs and packages of eggs" based on their physical characteristics so that eggs "can be sorted into batches of similar quality and size for commercial purposes." *Id.* For example, as noted above, the standards specify that for an egg to be classified as "AA Quality," its shell must be "clean, unbroken, and practically normal" and have an "air cell" that does "not exceed 1/8 inch in depth." Boynton Decl., Ex. 1 at 2 (§ 56.201). Additionally, the egg white "must be clear and firm so that the yolk is only slightly defined when the egg is twirled before the candling light," and "[t]he yolk must be practically free from apparent defects." *Id.* For a lot of eggs to be classified as "Grade AA," 87% of the eggs must meet the AA Quality. *See id.* at 6 (§ 56.216). Similarly, the standards provide that a dozen eggs may be classified as Jumbo only if they weigh more than 30 ounces. *See id.* at 9

(§ 56.218).  As the United States previously observed, "the California Egg Laws do not impose any additional or different assessment standards of that kind."  Boynton Decl., Ex. 7 at 19.

Rather than consider the meaning of § 1052(b)(1) as a whole, the United States's new argument improperly focuses on the terms "condition" and "quality" in isolation.  *See* FAC ¶ 25; A. Scalia & B. Garner, Reading Law 356 (2012) ("Adhering to the fair meaning of the text (the textualist's touchstone) does not limit one to the hyperliteral meaning of each word in the text."); *Dubin v. United States*, 599 U.S. 110, 120 (2023) ("'A statute's meaning does not always turn solely on the broadest imaginable definitions of its component words.'  Instead, '[l]inguistic and statutory context also matter.'" (quoting *Epic Systems Corp. v. Lewis*, 584 U. S. 497, 523 (2018)) (citations omitted)).

In any event, the United States's hyperliteral approach fails on its own terms.  First, the challenged measures do not impose a standard of "condition."  The United States cites the definition from 7 C.F.R. § 57, the subpart containing regulations governing the inspection of eggs under the EPIA.  *See* FAC ¶ 25; *id*. ¶¶ 57-58.  But the relevant definition is supplied by 7 C.F.R. § 56, the subpart governing the "grading of egg shells" and interpreting the Agricultural Marketing Act, which authorizes the promulgation of the egg-grading standards that § 1052(b) references.  That subpart defines "condition" to mean "any characteristic detected by *sensory examination (visual, touch, or odor)*, including the state of preservation, cleanliness, soundness, or fitness for human food that affects the marketing of the product."  7 C.F.R. § 56.1 (emphasis added).  In a 2016 interpretive rule that added the operative definition, USDA explained that, for purposes of egg grading, "condition … relates solely to a quality determination and not food safety."  81 Fed. Reg. 63675, 63675 (Sept. 16, 2016).  Shell egg texture, air cell size, and weight—which are all regulated by the federal egg standards—are qualities detectable by sensory examination; the

eggs' manner of production is not.

The challenged measures also do not impose a standard of "condition" under the definition of that term the United States cites. *See* FAC ¶ 25 (quoting 7 C.F.R. § 57.1). That is because, unlike the EPIA, they do not regulate eggs' "merchantability" or "fitness for human food." *See Implied Warranty of Merchantability*, BLACK'S LAW DICTIONARY (10th ed. 2009) (defining "implied warranty of merchantability" as a guarantee that the "thing sold is fit for its ordinary purposes"). The EPIA defines several categories of eggs that Congress believed to be unfit for human consumption, and it prohibits their sale. 21 U.S.C. § 1033(a) (defining adulterated); 1033(g)(8) (defining restricted egg). AB 1437 and Proposition 12, by contrast, do not set a standard of merchantability in addition to or different from the EPIA. They focus instead on the manner in which an egg was produced.

Second, the challenged measures also do not impose a standard of "quality." Both the applicable provision, 7 C.F.R. § 56.1, and the definition upon which the United States relies, 7 C.F.R. § 57.1, define "quality" to mean "the inherent properties of any product which determine its relative degree of excellence." An "inherent" property is "[a]n inseparable quality" that is "intrinsic to a thing." *Inherent*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969); *see Intrinsic*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2006) (an "intrinsic" property is one "belonging to the essential nature or constitution of a thing"). Shell eggs' qualities and inherent properties are their observable physical characteristics like texture, color, and air bubble size. This is consistent with USDA's understanding of "quality" in its 2016 amendment to the definition of condition. *See* 81 Fed Reg. at 63675. It is also consistent with other references to "quality" in 7 C.F.R. § 56. *See, e.g.*, § 56.17(a)(5) (egg graders shall be furnished with "two candling lights … to facilitate accurate interior and exterior quality determinations"); § 56.63 (application

for appeal grading may be denied if "the quality or condition of the product has undergone a material change since the original grading"); § 56.76(e)(1) (shell egg grading facilities shall apply protective oil to egg shells to "avoid contamination of the product and maximize conservation of its quality"). Extrinsic facts like where and how the eggs were produced, and the manner and temperature at which they were subsequently stored, may impact those physical characteristics but are not themselves "inherent properties." *See* Cal. MTD at 23-24.

Finally, the other terms in the list in which "quality" and "condition" appear confirm the implausibility of the United States's position. "[T]he canon of *noscitur a sociis* teaches that a word is 'given more precise content by the neighboring words with which it is associated.'" *Fischer v. United States*, 603 U.S. 480, 487 (2024) (*quoting United States v. Williams*, 553 U.S. 285, 294, (2008)). This "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with the company it keeps." *Id.* (internal quotation marks omitted). In addition to "quality" and "condition," § 1052(b)(l) specifies three other types of standards that States may not impose: "weight," "quantity," and "grade." Like "weight" and "quantity," "grade" refers to eggs' physical characteristics: it means the classification assigned to a "class" of eggs after "examining each unit thereof." 7 C.F.R. § 56.1. Because "weight," "quantity," and "grade" refer to eggs' physical characteristics detectable by sensory observation and not the manner of their production, "*noscitur a sociis* indicates that" "quality" and "condition" "should be read in a similar manner to its companions." *Dubin*, 599 U.S. at 126.

### 2.     The EPIA's Structure

The structure of the EPIA also refutes the United States's interpretation of the terms "quality" and "condition" and confirms that the "standards" referenced in § 1052(b)(l) have nothing to do with the living conditions of egg-laying hens.

In 1991, Congress supplemented § 1052(b) with a new subsection (2), which

provides that "with respect to egg handlers specified in paragraphs (1) and (2) of section 5(e), no State or local jurisdiction may impose temperature requirements pertaining to eggs packaged for the ultimate consumer which are in addition to, or different from, Federal requirements." Pub. L. 102-237, § 1012(g), 105 Stat. 1818, 1900 (1991). The purpose of temperature requirements is to prevent bacterial contamination of eggs.[16] If, as the United States now contends, § 1052(b)(1) preempts state laws like AB 1437 and Proposition 12 because they are intended in part to reduce the risk of food-borne pathogens in eggs, it would also preempt temperature requirements without any need for § 1052(b)(2). *See* FAC ¶¶ 29-30, 48. Because the United States's interpretation of § 1052(b)(1) would render § 1052(b)(2) meaningless, it should be rejected. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) (rejecting statutory construction that would "run[] afoul of the 'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute.'" (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)).

Reinforcing the conclusion that § 1052(b)(1) does not preempt state laws like AB 1437 and Proposition 12, an unsuccessful 2013 proposal to amend the EPIA to add minimum confinement standards for hens also proposed adding a new subsection to § 1052(b) prohibiting States from adopting "[r]equirements within the scope of this Act with respect to minimum floor space allotments or enrichments for egg-laying hens housed in commercial egg production." S.820, §4(c) 113th Cong. (2013). That preemption provision would have been unnecessary if, as the United

---

[16] *See, e.g.*, FDA, *Food Labeling, Safe Handling Statements, Labeling of Shell Eggs; Refrigeration of Shell Eggs Held for Retail Distribution*, 65 Fed. Reg. 76,092, 76,092 (Dec. 5, 2000) ("The agency also is requiring that … shell eggs be stored and displayed under refrigeration at a temperature of 7.2 degrees C (45 degrees F) or less. FDA is taking these actions because of the number of outbreaks of foodborne illnesses and deaths caused by Salmonella Enteritidis (SE) …."); *see* 21 C.F.R § 115.50(b)(2).

15

States argues, § 1052(b)(1) already performs that function.

Nor can the United States's construction of § 1052(b)(l) be squared with the overall federal regulatory scheme for eggs. EPIA principally regulates official egg-processing plants. *See e.g.*, 21 U.S.C. §§ 1033-1036. It also imposes some requirements on egg handlers and shippers. §§ 1037, 1040. No provision of the EPIA purports to regulate the living conditions of egg-laying hens or the sale of eggs from hens confined in specified conditions.

Thus, when the FDA promulgated regulations aimed at preventing Salmonella contamination in egg production, it did so under the Public Health Service Act and the Food, Drug, and Cosmetic Act—not the EPIA. *See Prevention of Salmonella Enteritidis in Shell Eggs During Production, Storage, and Transportation*, 74 Fed. Reg. 33,030, 33,049 (July 9, 2009). In that rulemaking, the FDA made clear that "States may impose Salmonella-prevention requirements more stringent than federal standards." Boynton Decl. Ex. 7 (Brief for United States) at 19 (citing 74 Fed. Reg 33,030 at 33,091)); *see* 21 C.F.R. § 118.12(d). Many States, including California, have imposed such supplemental requirements.[17] Yet under the United States's novel reading of § 1052(b)(1), the EPIA would preempt these laws. "That would not be a 'realistic assessment[] of congressional intent.'" *Bond v. United States*, 572 U.S. 844, 862 (2014) (rejecting United States' reliance on a statutory definition to give statute incongruous breath).

The United States's reliance on *National Meat Association v. Harris*, 565 U.S. 452 (2012), is also impossible to square with the EPIA. *See* FAC ¶ 24. That case involved the Federal Meat Inspection Act (FMIA), which preempts "[r]equirements

---

[17] *See, e.g.*, Cal. Code Regs. Tit. 3, § 1350 (2025); 01-001-213 Me Code R. (2025); Md. Code Ann., Agric. § 4-310(b) (2025); N.Y. Comp. Codes R. & Regs. tit. 1, § 57.7 (2025); 31 Pa. Stat. and Cons. Stat. Ann. § 300.3 (2025).

within the scope of this [Act] with respect to premises, facilities and operations of any establishment at which inspection is provided." 21 U.S.C. § 678.  The Court held that the FMIA preempted a California law that prohibited slaughterhouses from "process[ing], butcher[ing], or sell[ing] meat or products of nonambulatory animals for human consumption," Cal. Penal Code Ann. § 599f (West 2010), because it "impose[d] additional or different requirements" on *slaughterhouses* that fell "within the scope of the" FMIA.  565 U.S. at 459-460.

"The EPIA preemption provision at issue here is materially different." Boynton Decl., Ex. 7 (Brief for the United States (S.Ct. 2018)) at 20. Section 1052(b)(1) prohibits States only from adding to the Federal egg standards and "is not so broad as to cover any state regulation of the 'premises, facilities, and operations' of any egg farm." *Id.* at 20 (quoting 21 U.S.C. 1052(a)-(b)).  The EPIA does have a preemption provision similar to the one at issue in *National Meat*, but it is § 1052(a), not § 1052(b)(1).  Section 1052(a) broadly preempts state regulation of the "premises, facilities, and operations of any *official plant*," but it does not apply here because the challenged California laws do not apply to official plants.  § 1052(a) (emphasis added); *see* §1033(q) (defining official plant as a facility that processes eggs products).

### 3.    Agency Interpretation

The United States's novel interpretation of § 1052(b)(1) also conflicts with USDA's construction of the EPIA dating back to its enactment.  In a report submitted to the House Committee on Agriculture with respect to the EPIA, USDA explained that the preemption provision's purpose was to prevent states from imposing additional egg grading standards.  H. R. Rep. 91-1670, 91st Cong., 2d Session, at 5-6 (1970).  USDA stated that while "[m]ost States ha[d] closely patterned their requirements for standards, grades, and weight classes after the official [USDA] standards," a "few States ha[d] different requirements." *Id.* at 6.  This was "of great

concern to producers and handlers" because "they [we]re virtually grading under two sets of requirements." *Id.*; *see also id.* at 10.

### B. Section 1320.4 Is Not Preempted

Section 1052(b) of the EPIA also does not preempt California's "Shell Egg and Liquid Egg Shipping Document Requirements." Cal. Code Regs. tit. 3, § 1320.4. The United States relies on the portion of § 1052(b) that preempts state laws that purport to impose "[l]abeling, packaging, or ingredient requirements, in addition to or different than those made under" the EPIA "with respect to egg products processed at any official plant." 21 U.S.C. § 1052(b); *see* FAC ¶¶ 26, 66. But that provision is largely inapposite because the Shell Egg and Liquid Egg Shipping Document Requirements—as their title implies—primarily impose new requirements for shipping documents, not the labeling of egg cartons or packages.

The EPIA distinguishes between the labeling of egg products, which involves imprinting information on containers, and record keeping, which involves providing or maintaining information elsewhere. Section 1036, for example, covers the "labeling of egg products at official plants" and requires that they include specified information "in distinctly legible form on their shipping containers or immediate containers." 21 U.S.C. § 1036(a); *see* 7 C.F.R. § 57.1 ("Label means a display of any printed, graphic, or other method of identification upon the shipping container, if any, or upon the immediate container …."). Section 1052(b), in turn, preempts state laws that purport to impose "[l]abeling, packaging or ingredient requirements, in addition to or different from those made under this chapter, the Federal Food, Drug and Cosmetic Act, and the Fair Packaging Labeling Act." 21 U.S.C. § 1052(b). Like the EPIA, the other referenced statutes use "label" to refer to information imprinted on a product's container or package. 21 U.S.C. § 321(k) ("'label' [in the Food, Drug, and Cosmetic Act] means a display of written, printed or graphic matter upon the immediate container of any article[.]"); 16 C.F.R. § 500.2(e) ("label," as

used in the Fair Packing and Labeling Act, "means any written, printed, or graphic matter affixed to or appearing upon any consumer commodity or affixed to or appearing upon a package containing any consumer commodity").

By contrast, Section 1040 governs records related to egg products. It classifies shipping documents as a subset of records, requiring "all persons engaged in the business of transporting, shipping or receiving any eggs or egg products" to "maintain … records showing … the receipt, delivery, sale, movement, and disposition of all eggs and egg products handled by them." 21 U.S.C. § 1040. No provision of the EPIA purports to preempt state laws addressed to the record-keeping practices of egg handlers or shippers.

Section 1320.4 primarily imposes recordkeeping requirements that are not preempted by the EPIA. It requires that persons shipping eggs in or through California print, stamp, or otherwise label "documents of title and shipping manifests" with statements indicating whether the eggs were produced in compliance with Proposition 12. § 1320.4(a)(1)-(3). Section 1320.4 does not impose any affirmative labeling requirements as to egg cartons or packages, as confirmed by its regulatory history. The initial proposal of the regulations, titled "Shell Egg and Liquid Egg Shipping Document and Labeling Requirements," did propose egg carton labeling requirements (in proposed Section 1320.4(b)).[18] But when the California Department of Food and Agriculture unveiled the final "Shell Egg and Liquid Egg Shipping Document Requirements," it "struck all shell egg carton labeling requirements for purposes of implementing the requirements of [Proposition 12]."[19]

Sections 1320.4(b)-(c) prohibit falsely "label[ing], identify[ing], mark[ing],

---

[18] Boynton Decl., Ex. 5 at 27.

[19] *Id.*, Ex. 6 at 14.

advertis[ing], or otherwise represent[ing]" that eggs are Proposition 12 compliant or cage free if they do not meet the California requirements. But even if Sections 1320.4(b)-(c) were interpreted to impose labelling *requirements*, they would not be preempted because they fall within § 1052(b)'s anti-preemption provision:

> However, any State or local jurisdiction may exercise jurisdiction with respect to eggs and egg products for the purpose of preventing the distribution for human food purposes of any such articles which are outside of such a[n official] plant and are in violation of any of said Federal Acts or any State or local law consistent therewith.

21 U.S.C. § 1052(b).

As the California Department of Food and Agriculture has explained, "ensur[ing] shipments of shell eggs and liquid eggs entering and moving within" California are properly identified is necessary to enforcing Proposition 12 and Section 1320.1 (which lists necessary features of Proposition 12 compliant hen enclosures).[20] Without Sections 1320.4(b)-(c), the "misrepresentation of covered products" and "deceptive marketing ... could result in noncompliant shell eggs and liquid eggs entering California commerce."[21] Proposition 12 and Section 1320.1—consistently with the EPIA—prohibit the sale in California of certain eggs, outside of official plants, for any purpose, including human consumption. Cal. Health & Safety Code § 25990(b)(3)-(4); Cal. Code Regs. tit. 3, § 1320.1(a). Sections 1320.4(b)-(c) thus "prevent[] the distribution for human food purposes of [eggs and egg products] which are outside of [officials plants]" and "in violation of ... State ... law consistent" with the EPIA.

In any event, if § 1320.4(b)-(c) were interpreted to impose new labeling

---

[20] *Id.*, Ex. 5 at 28.

[21] *Id.* at 30.

"requirements" and deemed not to fall within the anti-preemption provision, any preemptive effect would extend only to application of the regulations to "egg products processed at any official plant," not to shell eggs. 21 U.S.C. § 1052(b).

## III. THE COURT SHOULD EXERCISE ITS DISCRETION NOT TO GRANT DECLARATORY OR EQUITABLE RELIEF

Under the unique circumstances of this case, there is no basis for the United States to obtain the declaratory and injunctive relief it seeks.

### A. Declaratory Relief Would Be Inappropriate

The Declaratory Judgment Act "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). "In deciding whether declaratory relief is warranted, the district court is '[e]ssentially ... balanc[ing] concerns of judicial administration, comity, and fairness to the litigants.'" *California Ins. Guarantee Ass'n v. Price*, 252 F. Supp. 3d 948, 955 (C.D. Cal. 2017) (quoting *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 672 (9th Cir. 2005)); *see Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998) (listing non-exclusive factors). Those concerns all favor this Court exercising its authority in this case to "dismiss an action seeking a declaratory judgment before trial." *Wilton*, 515 U.S. at 288.

The United States brings this preemption challenge fifteen years after AB 1437 was enacted, eleven years after the first preemption challenge was litigated in federal court, and seven years after the United States represented to the Supreme Court that AB 1437 is not preempted. Issuing a declaratory judgment at this late date would reward the United States for creating needlessly duplicative work for the federal courts and may encourage other litigants to do the same. It would also be unfair to egg producers who have structured their affairs around the belief that California's measures are lawful. *See* Murdock Decl. ¶¶ 4-8 (discussing egg producers' substantial investments in cage-free production methodologies); *Dizol*,

133 F.3d at 1226 (instructing district courts to consider "judicial economy" and inequitable behavior by litigants).

**B.    The United States Is Not Entitled to Injunctive Relief**

The United States also requests a permanent injunction against enforcing certain provisions of California law, but because doing so would be plainly inconsistent "with traditional principles of equity," summary judgment should be granted. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006) ("[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity.").

"It goes without saying that an injunction is an equitable remedy. It 'is not a remedy which issues as of course.'" *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) (quoting *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337–338 (1933)). Rather, "'[a]n appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity,' and any litigant making such an appeal must show that the intervention of equity is required." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (quoting *Meredith v. Winter Haven*, 320 U.S. 228, 235 (1943)).

The amended complaint and uncontroverted facts in the record show exactly the opposite. After AB 1437 was enacted, egg producers across the country made "substantial investments in cage-free housing," resulting in significant changes to their production methods and an ever-growing percentage of the U.S. egg-laying flock housed in cage-free conditions. Murdock Decl. ¶¶ 4-8; ACEF SUF ¶¶ 4-10; FAC ¶¶ 2-3 (alleging that farmers "across the country" have significantly altered their production methods after AB 1437 and Proposition 12 were enacted). Much of this investment and this shift to cage-free production came after the United States told the Supreme Court that AB 1437 was not preempted. Murdock Decl. ¶¶ 5-7;

22

*see id.* ¶ 6, Ex. 1 (measuring cage-free hens' increasing share of the total U.S. egg-laying flock after 2018); *id.* ¶ 7, Ex. 2; ACEF SUF ¶¶ 6-10.  Granting injunctive relief would mean undercutting the significant investments that farmers nationwide have made in production methodologies that comply with California law—investments that the United States induced in part.  That would be inconsistent with the bedrock equitable principle that the party seeking equitable relief must acted "fairly," especially "where a suit in equity concerns the public interest." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-815 (1945); *see United States v. Desert Gold Min. Co.*, 448 F.2d 1230, 1231 (9th Cir. 1971) ("[S]ince the Government had sought the intervention of equity, it was in no position to protest its corresponding obligation to do equity in order to obtain the equitable relief that it sought.").  Granting the United States's requested relief would also mean preventing California from enforcing measures that it layered on top of AB 1437 after the United States backed its lawfulness.  That, too, would infringe longstanding equitable principles.

## CONCLUSION

For the reasons given above, the Court should grant summary judgment on multiple independent grounds.

DATED:  October 6, 2025          Respectfully submitted,

**WILMER CUTLER PICKERING HALE AND DORR LLP**

/s/ *Brian M. Boynton*
Brian M. Boynton (SBN 222193)
  brian.boynton@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037

23

Telephone: (202) 663-6137

Leah M. Fugere (SBN 354757)
  leah.fugere@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 S. Grand Avenue, 24th Floor
Los Angeles, CA 90071
Telephone: (213) 443-5300

*Attorneys for Defendant-Intervenor*
*Association of California Egg Farmers*

24

## **LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant-Intervenor Association of California Egg Farmers, certifies that this brief contains 6,999 words, which complies with the word limit of L.R. 11-6.1.

DATED:  October 6, 2025                    Respectfully submitted,

**WILMER CUTLER PICKERING
   HALE AND DORR LLP**

/s/ *Brian M. Boynton*
Brian M. Boynton (SBN 222193)
   brian.boynton@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6137

Leah M. Fugere (SBN 354757)
   leah.fugere@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 S. Grand Avenue, 24th Floor
Los Angeles, CA 90071
Telephone: (213) 443-5300

*Attorneys for Defendant-Intervenor
Association of California Egg Farmers*