BRETT A. SHUMATE
Assistant Attorney General
YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General
ERIC HAMILTON
Deputy Assistant Attorney General
ALEXANDER K. HAAS (Cal. Bar No.
220932),
Director, Federal Program Branch
JACQUELINE COLEMAN SNEAD
Assistant Director
JOHN BAILEY
Counsel to the Assistant Attorney General
Civil Division
U.S. Department of Justice
  950 Constitution Ave. NW
  Washington, D.C. 20005
  Telephone: (202) 514-6993
  E-mail: John.Bailey@usdoj.gov

BILAL A. ESSAYLI
First Assistant United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation
Section
JOSEPH W. TURSI (Cal. Bar No.
300063)
Assistant United States Attorney
  Federal Building, Suite 7516
  300 North Los Angeles Street
  Los Angeles, California 90012
  Telephone: (213) 894-3989
  E-mail: Joseph.Tursi@usdoj.gov

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF CALIFORNIA; GAVIN C. NEWSOM, in his Official Capacity as Governor of California; et al.,<br><br>Defendants,<br><br>ASSOCIATION OF CALIFORNIA EGG FARMERS; HUMANE WORLD FOR ANIMALS; et al.,<br><br>Defendant-Intervenors. | No. CV-25-6230-MCS-AGR<br><br>**PLAINTIFF'S CONSOLIDATED MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO MOTIONS TO DISMISS AND MOTION FOR SUMMARY JUDGMENT,**<br><br>Hearing Date: February 23, 2026<br>Hearing Time: 9:00 a.m.<br>Courtroom: 7C<br><br>Honorable Mark C. Scarsi<br>United States District Judge |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

    A.    Federal Egg Standards ........................................................................ 2

    B.    California Egg Standards .................................................................... 4

    C.    This Lawsuit ....................................................................................... 6

LEGAL STANDARDS ......................................................................................... 7

ARGUMENT ........................................................................................................ 8

I.    The United States Has Standing to Challenge State Laws that Congress Has Expressly Preempted. ........................................................................................ 9

II.    The EPIA Preempts California's Sales Ban. .................................................. 11

    A.    The Sales Ban functions as a new egg quality standard in violation of the EPIA's plain language .......................................................... 12

    B.    Opposing Parties' counterarguments fail. ......................................... 17

III.    The EPIA Preempts California's Labeling Requirements............................. 22

IV.    Equity Favors Granting Relief Against Preempted States Laws. .................... 23

CONCLUSION .................................................................................................... 25

i

# TABLE OF AUTHORITIES

## CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982)..................................................................................9

*Am. Apparel & Footwear Ass'n, Inc. v. Baden*,
  107 F.4th 934 (9th Cir. 2024)...........................................................11, 22

*Arizona v. United States*,
  567 U.S. 387 (2012)..................................................................................9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................7

*Baughman v. Walt Disney World Co.*,
  685 F.3d 1131 (9th Cir. 2012) ...............................................................25

*Campbell v. Hussey*,
  368 U.S. 297 (1962)................................................................................13

*Commonwealth of Puerto Rico v. Franklin Cal. Tax-free Trust*,
  579 U.S. 115 (2016)...........................................................................11, 21

*Cramer v. Brown*,
  No. 12-cv-3130, 2012 WL 13059699 (C.D. Cal. Sept. 12, 2012),
  *aff'd*, 591 F. App'x. 634 (9th Cir. 2015)..................................................8

*Daniels-Hall v. National Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010)....................................................................7

*Equal Emp. Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*,
  265 F. Supp. 3d 179 (D. Conn. 2017).....................................................10

*La Unión del Pueblo Entero v. Abbott*,
  604 F. Supp. 3d 512 (W.D. Tex. 2022)...................................................10

*Leite v. Crane Co.*,
  749 F.3d 1117 (9th Cir. 2014) ..................................................................7

*Missouri v. Harris*,
  58 F. Supp. 3d 1059 (E.D. Cal. 2014), *aff'd sub nom.*
  *Missouri ex rel. Koster v. Harris*, 847 F.3d 646 (9th Cir. 2014) ............8

*National Meat Ass'n v. Harris*,
    565 U.S. 452 (2012).................................................. 12, 13, 15, 17

*New York by James v. Pa. Higher Educ Assistance Agency*,
    No. 19-cv-9155, 2020 WL 2097640 (S.D.N.Y. May 1, 2020).............................. 10

*Parker v. Sager*,
    174 F.2d 657 (D.C. Cir. 1949)........................................................ 25

*Pension Ben. Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990).................................................................. 20

*Russel Motor Car Co. v. United States*,
    261 U.S. 514 (1923).................................................................. 18

*Stauffer v. Brooks Bros.*,
    619 F.3d 1321 (Fed. Cir. 2010) ...................................................... 10

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025).................................................................. 24

*United Egg Producers v. Davila*,
    871 F. Supp. 106 (D.P.R. 1994), *aff'd on other grounds*, *United Egg Producers
    v. Dep't of Agric. of Com. of Puerto Rico*, 77 F.3d 567 (1st Cir. 1996)................. 13

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ...................................................9, 10, 23

*United States v. California*,
    No. 2:19-cv-02142, 2020 WL 8183945 (E.D. Cal. Feb. 26, 2020)........................ 10

*United States v. City of Arcata*,
    629 F.3d 986 (9th Cir. 2010)......................................................... 11

*United States v. Idaho*,
    623 F. Supp. 3d 1096 (D. Idaho 2022)................................................ 10

*United States v. Mattson*,
    600 F.2d 1295 (9th Cir. 1979) .....................................................10, 11

*United States v. Michigan*,
    940 F.2d 143 (6th Cir. 1991)......................................................... 25

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2000)................................................................ 9, 10

iii

**FEDERAL STATUTES**

7 U.S.C. § 1622 ............................................................................................... 2

21 U.S.C. § 678 ............................................................................................. 12

21 U.S.C. § 1031 *et seq.* ................................................................................ 1

21 U.S.C. § 1031 ............................................................................................. 3

21 U.S.C. § 1032 ....................................................................... 1, 3, 12, 17

21 U.S.C. § 1033 ........................................................................................ 3, 4

21 U.S.C. § 1043 ............................................................................................. 4

21 U.S.C. § 1052 ................................................................................... *passim*

Food, Agriculture, Conservation, and Trade Act Amendments of 1991,
     Pub. L. No. 102-237, 105 Stat. 1818 (1991) ................................. 20

**STATE STATUTES**

2010 Cal. Legis. Serv. Ch. 51 (codified at Cal. Health & Safety Code § 25996)..5, 6, 15

2008 Cal. Legis. Serv. Prop. 2 ................................................................. 4, 5

2018 Cal. Legis. Serv. Prop. 12 ........................................................ 5, 6, 15

Cal. Health & Safety Code § 25990 .................................................. 5, 6, 13

Cal. Health & Safety Code § 25991 ....................................................... 5, 6

Cal. Health & Safety Code § 25993 .......................................................... 6

Cal. Health & Safety Code § 25995 .................................................... 5, 15

Cal. Health & Safety Code § 25996 ....................................................... 5, 6

**RULES**

Fed. R. Civ. P. 56 ........................................................................................... 8

**FEDERAL REGULATIONS**

7 C.F.R. § 56.1 ............................................................................................. 16

7 C.F.R. § 57 .................................................................................................... 16

7 C.F.R. § 57.1 ............................................................................................ 4, 16

7 C.F.R. § 57.35 .......................................................................................... 4, 16

21 C.F.R. § 118.12 ............................................................................................ 18

**STATE REGULATIONS**

Cal. Code Regs. tit. 3 § 1320.1 ................................................................... 6, 22

Cal. Code Regs. tit. 3 § 1320.4 ..........................................................2, 6, 7, 22

**UNITED STATES CONSTITUTION**

U.S. Const., art. VI ........................................................................................... 11

**OTHER AUTHORITIES**

*Condition*, OED Online,
    https://www.oed.com/dictionary/condition_n?tab=meaning_and_use#
    8688913 ...................................................................................................14, 15

H.R. Rep. No. 91-1670, 1970 WL 5922 (Dec. 3, 1970) ...................................... 3, 19

*Inherent*, OED Online,
    https://www.oed.com/dictionary/inherent_adj?tab=meaning_and_use#454518 ..16, 17

*Inherent*, Webster's Dictionary,
    https://www.merriam-webster.com/dictionary/inherent ...................................... 16

*Quality*, OED Online,
    https://www.oed.com/dictionary/quality_n?tab=meaning_and_use#27358090 ........ 14

*Merchantability*, OED Online,
    https://www.oed.com/dictionary/merchantability_n?tab=meaning_and_use#
    37296682 ........................................................................................................ 16

*Merchantable*, Black's Law Dictionary (rev. 4th ed. 1968) .................................... 16

S.820, 113th Cong. § 4 (2013) ........................................................................ 21

*Standard*, Webster's Dictionary,
    https://www.merriam-webster.com/dictionary/standard ...................................... 13

**INTRODUCTION**

For nearly eight decades, Congress has recognized that the national market for agricultural commodities demands uniform national rules. So in 1970, when Congress confronted the patchwork of state regulations governing eggs, it responded with the Egg Products Inspection Act, 21 U.S.C. § 1031 *et seq.* (EPIA). The EPIA does not hint, but states outright, that its purpose is to establish "uniformity of standards for eggs" moving in interstate commerce. *Id.* § 1032. Congress paired that command with an express preemption clause that invalidates additional or different State standards regulating the "quality" and "condition" of eggs sold across state lines. *Id.* § 1052(b).

California's ban on selling eggs with certain disqualifying characteristics disregards that instruction. Its prohibition on selling eggs laid by hens kept in non-California-compliant enclosures operates as a substantive standard on eggs themselves—one that disqualifies a category of eggs from interstate commerce based on state-imposed criteria that federal law does not recognize. The sales ban functions, in form and effect, as a new standard of "quality" and "condition": it turns on a characteristic that California itself has framed as bearing on the wholesomeness, safety, and marketability of the product. That is exactly what Congress foreclosed. The EPIA leaves room for States to regulate production practices and establish animal housing standards within their borders, but not to redefine which eggs may be sold in interstate commerce.

The issue here is thus a narrow one. Nothing in this case challenges California's authority to regulate the housing of hens inside California, including by prohibiting farming methods that it concludes are inhumane or unsafe. The question is instead whether California may impose its own quality standards *on eggs* shipped into the national marketplace. Congress answered that question clearly: no State "may require the use of standards of quality [or] condition . . . in addition to or different from" federal standards. *Id.* That is enough to conclude that California's egg-sales ban is preempted. No other interpretation of the EPIA's ordinary meaning is plausible nor compatible with Congress's expressed intent to establish "uniformity of standards for eggs." *Id.* § 1032.

1

In addition to the sales ban, California's labeling requirements for liquid eggs are also invalid, as the EPIA separately prohibits States from imposing non-federal "[l]abeling . . . requirements" on egg products. 21 U.S.C. § 1052(b)(3). California's labeling requirements as applied to "liquid eggs" should also be enjoined. Cal. Code Regs. tit. 3 § 1320.4(b)-(c).

None of the defending parties' arguments permits California to continue to enforce its own state-specific egg standards in violation of the EPIA's plain command. The United States has standing to challenge preempted State laws because it suffers an ongoing sovereign injury when a State usurps federal authority in violation of the Supremacy Clause, particularly where the federal government alleges that Congress has expressly preempted the State law at issue. And as for relief, equity always favors enjoining preempted laws because neither the State nor the public has any interest in the continued enforcement of unconstitutional statutes. Even if that were not the rule, enjoining the sales ban would not undermine any cognizable reliance interests.

At bottom, the dispute here does not concern California's authority to regulate production practices or animal welfare, but Congress' decision to impose uniform national standards for eggs through the EPIA. The Court should honor that directive and the statute's plain text by enjoining California's preempted sales and labeling requirements.

## BACKGROUND

Since 1946, Congress has consistently legislated in favor of nationally uniform standards for agricultural products. *See, e.g.*, 7 U.S.C. § 1622(c) (directing Secretary of Agriculture to "[t]o develop and improve standards of quality, condition, grade, and packaging . . . in order to encourage uniformity and consistency in commercial practices"). In 1970, Congress established uniform national quality standards for eggs, in particular, by passing the EPIA.

## A.    Federal Egg Standards

The EPIA governs the protection of human health in connection with the quality,

inspection, and labeling of eggs[1] and egg products.  Section 1031, titled "Congressional statement of findings," provides that:

> It is essential, in the public interest, that the health and welfare of consumers be protected by the adoption of measures prescribed herein for assuring that eggs and egg products distributed to them and used in products consumed by them are wholesome, otherwise not adulterated, and properly labeled and packaged.

21 U.S.C. § 1031.

In addition to protecting public health, Congress through the EPIA sought to promote free and unhindered commerce in the interstate market for eggs and egg products. The EPIA provides that "regulation by the Secretary of Agriculture . . . and cooperation by the States . . . are appropriate to prevent and eliminate burdens upon [interstate] commerce.  *Id.*  Congress saw the need to "insure uniformity of labeling, standards, and other provisions and enhance the free movement of eggs and egg products in interstate commerce."  H.R. Rep. No. 91-1670 at 66, 1970 WL 5922, at *5246 (Dec. 3, 1970).

To achieve these twin aims, the EPIA provided for uniform national market standards for eggs, and it expressly preempted any state or local standards for eggs that differ from or add to federal standards.  The EPIA declares "the policy of the Congress to provide for . . . uniformity of standards for eggs."  21 U.S.C. § 1032.

Most critically, section 1052(b) contains an express preemption provision that invalidates state laws intended to regulate the quality or condition of eggs.  It provides: "For eggs which have moved or are moving in interstate or foreign commerce, . . . no State or local jurisdiction may require the use of standards of quality, condition, weight, quantity, or grade which are *in addition to or different from* the official Federal standards[.]"  21 U.S.C. § 1052(b) (emphasis added).  Federal standards are thus the sole standards that govern eggs shipped in interstate commerce.

Congress delegated to the Secretary of Agriculture broad authority to issue "such

---

[1] "Egg" (as opposed to "egg product") means "the shell egg of the domesticated chicken, turkey, duck, goose, or guinea."  21 U.S.C. § 1033(g).

3

rules and regulations as he deems necessary to carry out the purposes or provisions of" the EPIA. 21 U.S.C. § 1043. Exercising that authority, the Secretary has codified the EPIA's express preemption provision in a federal regulation that provides, "[f]or eggs that moved or are moving in interstate or foreign commerce, no State or local jurisdiction . . . [m]ay require the use of standards of quality, condition, grade, or weight classes which are in addition to or different than the official standards[.]" 7 C.F.R. § 57.35(a)(1).

Although the terms "condition" and "quality" are not defined within the EPIA, the Secretary has expansively defined both terms for purposes of subpart 57. *See* 7 C.F.R. § 57.1. Relevant here:

> Condition means any characteristic affecting a product[']s merchantability including, but not being limited to, . . . [t]he state of preservation, cleanliness, soundness, wholesomeness, or fitness for human food of any product; or the processing, handling, or packaging which affects such product.
> . . .
> Quality means the inherent properties of any product which determine its relative degree of excellence.

*Id.*

In the EPIA, Congress also sought to remove barriers to the interstate trade of "eggs products"—which is defined to mean any product containing a meaningful proportion of dried, frozen, or liquid eggs. *See* 21 U.S.C. § 1033(f). Among other things, the Act preempts states from imposing on processors of egg products any "[l]abeling, packaging, or ingredient requirements, in addition to or different than those made under [the EPIA], the Federal Food, Drug, and Cosmetic Act and the Fair Packaging and Labeling Act." 21 U.S.C. § 1052(b).

**B.    California Egg Standards**

In 2008, California voters approved Proposition 2, a ballot initiative that amended the California Health and Safety Code with prescribed requirements for housing covered farm animals, including egg-laying hens, within California. *See* 2008 Cal. Legis. Serv. Prop. 2 (Proposition 2). Effective January 2015, Proposition 2 prohibited farmers from

housing covered animals "for all or the majority of any day" in a way that prevents the animal from either (1) lying down, standing up, and fully extending its limbs, or (2) turning around freely. *See id.* § 3. To enforce its requirements, a violation of Proposition 2 was made a misdemeanor offense punishable by a $1,000 fine or up to 180 days in jail. *See id.*

Two years later, the California Legislature enacted AB 1437. *See* 2010 Cal. Legis. Serv. Ch. 51 (AB 1437). Unlike Proposition 2, which prohibited certain *production* practices (and is not at issue here), AB 1437 reaches beyond methods to the product itself, barring the sale of eggs that fail to meet specified standards. The legislature's codified intent in passing AB 1437 was "to protect California consumers from the deleterious, health, safety, and welfare effects of the sale and consumption of eggs derived from egg-laying hens that are exposed to significant stress and may result in increased exposure to disease pathogens including salmonella." Cal. Health & Safety Code § 25995(e). To that end, AB 1437 banned the sale of eggs that were produced by hens kept in violation of Proposition 2's housing requirements. *See* AB 1437 §1, codified at Cal. Health & Safety Code § 25996. This prohibition applies to all egg sales in the State—even if the eggs were produced entirely outside California. *See id.*

In November 2018, California voters approved Proposition 12, a ballot initiative that amends and adds to the egg standards and animal housing requirements already imposed by Proposition 2 and AB 1437. *See* 2018 Cal. Legis. Serv. Prop. 12 (Proposition 12). As for the new housing standards (which are not at issue here), Proposition 12 prohibits "[c]onfining [egg-laying hens] in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely"—not just for the majority of a day, but (with limited exceptions) *at any time. See id.* § 4; Cal. Health & Safety Code § 25990(a) (prohibition on confining covered animal "in a cruel manner"); *id.* § 25991(e) (defining "[c]onfined in a cruel manner"). This means an egg-laying hen must be able to fully extend all of its limbs "without touching the side of an enclosure, or another animal," and must be able to "tur[n] in a complete circle without any impediment, including a tether, and without touching the side of an enclosure or another animal

enclosure." Cal. Health & Safety Code § 25991(e)(1), (k), (q).  Moreover, Proposition 12 bans the use of any "enclosure[s] other than a cage-free housing system," and imposes minimum floorspace requirements per hen.  *See id.* § 25991(e)(5).

In addition to imposing housing requirements on farmers, Proposition 12 (like AB 1437 before it) reached beyond production and banned the sale of eggs produced by hens kept in conditions that fail to meet its mandates.[2]  *See* Proposition 12 § 3; Cal. Health & Safety Code § 25990(b)(3).  The ban applies to sales of shell eggs and liquid eggs in California even if the product derives from a farm animal raised entirely outside of California.  *See id.*  That is, covered products from an egg-laying hen cannot be sold in California if the egg-laying hen was ever confined in conditions that do not satisfy Proposition 12.  A sale of eggs that does not comply with Proposition 12 is a criminal offense that carries a penalty of up to a $1,000 fine and 180 days in jail.  *See* Proposition 12 § 6; Cal. Health & Safety Code § 25993(b).  A violation is also defined as "unfair competition" under California Business & Professional Code § 17200, subjecting a noncompliant seller to civil liability.  *Id.*

California has promulgated numerous regulations to implement Proposition 12 and its predecessors.  For example, Cal. Code Regs. § 1320.1 makes it a regulatory offense to sell eggs that were not produced in line with the suite of "standards" that hen enclosures must meet under California law.  Cal. Code Regs. tit. 3 § 1320.1(a).  Another provision requires that labels on eggs and egg products using the term "cage free" be fully compliant with Proposition 12's animal housing standards.  *Id.* § 1320.4(c); *see also id.* § 1320.4(b).

## C.    This Lawsuit

In July 2025, the United States filed this lawsuit against the Sales Ban (Counts I and II) and certain labeling requirements (Count III).  *See* Am. Compl. (Compl.) ¶¶ 53-66,

---

[2] References in this brief to California's "Sales Ban" collectively refer to the provisions enacted by AB 1437 (now codified at Cal. Health & Safety Code § 25996) and Proposition 12 (codified at Cal. Health & Safety Code § 25990(b)(3)) that prohibit the sale of shell eggs that were produced by hens kept in conditions that fail to satisfy California law.

ECF No. 47. More specifically, Count I asserts the egg sales prohibition codified by AB 1437 (and tied initially to Proposition 2) is preempted, *see id.* ¶¶ 53-59, and Count II similarly asserts preemption as to Proposition 12's parallel sales ban—and only that part of Proposition 12, *see id.* ¶¶ 60-63. Last, Count III asserts that California's labeling requirements for liquid eggs are preempted.[3] *See id.* ¶¶ 64-66.

This Court has granted motions to intervene by three sets of Defendant-Intervenors: (1) the Association of California Egg Farmers ("ACEF"); (2) The Center for a Humane Economy and Animal Wellness Action (together, "AWA"); and (3) Humane World for Animals, Animal Legal Defense Fund, Animal Equality, The Humane League, Farm Sanctuary, Compassion in World Farming, Inc., and Animal Outlook (together, "Humane World"). All parties have moved for dispositive relief.[4]

## LEGAL STANDARDS

In resolving a facial challenge to this Court's jurisdiction under Rule 12(b)(1), the Court must accept the complaint's allegations as true and draw all reasonable inferences in favor of the party asserting jurisdiction. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

Similarly, on a motion to dismiss under Rule 12(b)(6), the court must "accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party." *Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). A 12(b)(6) motion fails when the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

---

[3] Count III challenges only the labeling requirements codified at Cal. Code Regs. tit. 3 § 1320.4(b)-(c) (collectively, "Labeling Requirements"). The United States thus does not address Opposing Parties arguments pertaining to § 1320.4(a).

[4] Collectively, Defendants and Defendant-Intervenors are referred to as the "Opposing Parties." All pin cites to filings refer to the CM/ECF-assigned page numbers appearing in the docket header.

1    A movant is entitled to summary judgment if it shows "there is no genuine dispute
2    as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
3    Civ. P. 56(a).

4                                    **ARGUMENT**

5        The merits question here is one of first impression.  No court has ever answered
6    whether the EPIA preempts the specific provisions at issue.  Indeed, no court has yet to
7    decide whether *any* of California's egg sales bans or array of animal housing mandates
8    can survive the EPIA's preemptive scope.  But because several parties suggest otherwise,
9    the United States briefly recounts prior related litigation involving California.

10       In 2012, a farmer's constitutional challenge to Proposition 2 was dismissed for
11   failure to state a claim.  *Cramer v. Brown*, No. 12-cv-3130, 2012 WL 13059699, at *6
12   (C.D. Cal. Sept. 12, 2012), *aff'd*, 591 F. App'x. 634 (9th Cir. 2015).  The complaint there
13   did not assert EPIA preemption.  Nor does the United States here challenge any part of
14   Proposition 2.

15       In 2014, a group of States challenged AB 1437 and a related California regulation
16   on constitutional and statutory grounds.  Without reaching the merits, the court dismissed
17   the complaint for lack of subject matter jurisdiction after finding that the States could not
18   maintain *parens patriae* standing based on alleged harm to egg farmers.  *See Missouri v.*
19   *Harris*, 58 F. Supp. 3d 1059 (E.D. Cal. 2014), *aff'd sub nom. Missouri ex rel. Koster v.*
20   *Harris*, 847 F.3d 646 (9th Cir. 2014).

21       In 2017, several States sought leave to invoke the Supreme Court's original
22   jurisdiction to challenge both Proposition 2 and AB 1437, alleging that each violated the
23   Dormant Commerce Clause and the EPIA.  *See* Bill of Compl. ¶ 2, *Missouri v. California*,
24   No. 22O148 (Dec. 4, 2017).   Their submission treated Proposition 2's housing
25   requirements and AB 1437's sales ban as a single regulatory regime—analyzing those
26   distinct requirements collectively as the "California Regulations."  *Id.* ¶ 4.  After the
27   Supreme Court requested the views of the United States, the Solicitor General filed an
28   amicus brief recommending that the Court decline to exercise its discretion to hear the

dispute, principally citing "uncertainty" about the plaintiffs' standing and "the additional reason that plaintiffs' claims c[ould] be raised by other parties in a district-court action." Br. for the United States as *Amicus Curiae* at 13, 16, *Missouri v. California*, No. 22O148 (Nov. 29, 2018) (USA *Missouri* Br.) (attached as Ex. 7 to Boynton Decl., ECF 61-10). The United States also took the position that the "California Regulations," including AB 1437, were not preempted by the EPIA. *See id.* at 18. The Supreme Court ultimately denied leave to file, with Justice Thomas noting his dissent.

## I.    The United States Has Standing to Challenge State Laws that Congress Has Expressly Preempted.

The United States has standing to seek relief against enforcement of preempted state laws like California's Sales Ban. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012) (pre-enforcement preemption challenge to state immigration law). Opposing Parties argue that the United States has failed to allege a cognizable injury. That is plainly wrong. The United States suffers sovereign harm when a state legislates in violation of federal law and the Supremacy Clause. *See, e.g.*, *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations.").

The United States is suffering an ongoing injury to its sovereignty because the Sales Ban and Labeling Requirements violate the EPIA and are expressly preempted. The federal government, like each state, has cognizable "sovereign interests," not only in its "power to create and enforce a legal code, both civil and criminal," but also in "recognition [of that code] from other sovereigns." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *Arizona*, 567 U.S. at 398 ("Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect.").

The Supreme Court has thus explained: "It is beyond doubt" that a complaint "asserts an injury to the United States" if it alleges an "injury to [U.S.] sovereignty arising from violation of its laws." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,

529 U.S. 765, 771 (2000). So "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *Alabama*, 691 F.3d at 1301; *accord, e.g.*, *La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 527 (W.D. Tex. 2022) ("When state governments enact laws that impugn the United States' sovereignty, a personal injury to the United States arises."); *see also id.* at 526 ("Undoubtedly, the United States suffers a concrete harm to its sovereignty when its laws are violated" by a state.).

Courts have repeatedly and uniformly applied this principle to hold that "the United States' sovereign interests are harmed when its laws are violated." *United States v. Idaho*, 623 F. Supp. 3d 1096, 1107 (D. Idaho 2022); *see also, e.g.*, *Stauffer v. Brooks Bros.*, 619 F.3d 1321, 1326 (Fed. Cir. 2010) ("From the government's perspective, a harm arises from an 'injury to its sovereignty arising from violation of its laws.'" (quoting *Vermont Agency*, 529 U.S. at 771)); *United States v. California*, No. 2:19-cv-02142, 2020 WL 8183945, at *3 (E.D. Cal. Feb. 26, 2020) ("The United States has plausibly alleged its claimed injury— the usurpation of federal authority to conduct foreign affairs."); *New York by James v. Pa. Higher Educ Assistance Agency*, No. 19-cv-9155, 2020 WL 2097640, at *11 (S.D.N.Y. May 1, 2020) ("a sovereign is injured by a violation of its law"); *Equal Emp. Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179, 192 (D. Conn. 2017) (The United States suffers an "injury to its sovereignty . . . from violation of its laws.").

The challenged provisions—which are in full effect and being implemented—injure U.S. sovereignty by violating the EPIA's express preemption provision and usurping Congress' authority to regulate interstate commerce and set uniform national standards for agricultural commodities. And an injunction from this Court would fully redress that harm. That is sufficient for standing.

California's reliance on *United States v. Mattson*, 600 F.2d 1295 (9th Cir. 1979), *see* ECF 60 at 13, is thus misplaced. That case did not involve a preemption challenge to state law or any alleged sovereign injury to the United States. Rather, the Attorney General sued to "protect[] the constitutional rights" of disabled individuals housed in a

facility owned by the state of Montana.  *See Mattson*, 600 F.2 at 1297.  That does not remotely describe the theory of standing asserted here.

ACEF's citation to *United States v. City of Arcata*, 629 F.3d 986, 990 (9th Cir. 2010), is similarly off base.  ECF 61-1 at 9.  There, in rejecting a challenge to the United States' standing, the Ninth Circuit simply held that the federal government *could* challenge a local ordinance that would "require federal recruiters to alter their conduct or face civil penalties." *Arcata*, 629 F.3d at 990.  The Court certainly did not suggest that those are the only types of cognizable Article III injuries that the United States can plead to establish its standing to sue.

## II.    The EPIA Preempts California's Sales Ban.

The EPIA expressly preempts the Sales Ban.  That prohibition creates additional, or different, requirements governing what constitutes safe, wholesome, and unadulterated eggs entering interstate commerce.  California is free under the EPIA to regulate egg production within its borders, including by imposing housing and other production-related requirements on California farmers.  But California may not impose non-federal standards on eggs themselves without running afoul of the express preemption provision of the EPIA.

The Supremacy Clause of the U.S. Constitution provides that federal law is "the supreme Law of the Land," notwithstanding any contrary state enactment.  U.S. Const., art. VI, cl. 2.  Thus, Congress "may expressly preempt state law" by statute. *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 939 (9th Cir. 2024).  "Express preemption is a question of statutory construction, requiring a court to look to the plain wording of the statute and surrounding statutory framework to determine whether Congress intended to preempt state law." *Id.*  And when, as here, a "statute contains an express pre-emption clause," courts "do not invoke any presumption against pre-emption." *Commonwealth of Puerto Rico v. Franklin Cal. Tax-free Trust*, 579 U.S. 115, 125 (2016).  The inquiry instead "focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Id.*

That inquiry is easy here. Congress declared its "policy . . . to provide for . . . uniformity of standards for eggs," leaving no doubt that the EPIA was intended to preempt state-imposed egg standards such as California's Sales Ban. 21 U.S.C. § 1032. The preemption clause's ordinary meaning, on-point Supreme Court precedent, and even the California legislature's own findings all point to the same result. And none of Opposing Parties' numerous (though often overlapping) counterarguments comes close to rescuing the Sales Ban.

### A.    The Sales Ban functions as a new egg quality standard in violation of the EPIA's plain language.

The EPIA's preemption clause invalidates all state laws "requir[ing] the use of standards of quality, condition, weight, quantity, or grade which are in addition to or different from the official Federal standards." *Id.* § 1052(b)(1). This expansive provision reflects Congress' stated purpose to "provid[e] for the 'uniformity of standards for eggs.'" ECF 60 at 16 (quoting 21 U.S.C. § 1032). And the Sales Ban rather straightforwardly violates this provision by imposing non-federal standards on eggs shipped in interstate commerce.

At the threshold, this Court does not write on a blank slate in determining the EPIA's preemptive scope. Supreme Court precedent leaves no doubt about the import of the EPIA's preemption clause. The key language—"in addition to or different from"—appears in materially identical terms in a comparable preemption clause in the Federal Meat Inspection Act (FMIA). The FMIA prohibits States from imposing standards for slaughterhouses that are "in addition to, or different than" federal standards. *See* 21 U.S.C. § 678 (providing that "[r]equirements" for animal slaughterhouses "which are in addition to, or different than those made under this [Act] may not be imposed by any State"). In *National Meat Ass'n v. Harris*, the Supreme Court unanimously held that the FMIA's preemption clause preempted a California statute that prohibited the slaughter of nonambulatory animals for human consumption. 565 U.S. 452, 459 (2012). The Court held that the FMIA's preemption provision "sweeps widely" and "prevents a State from

12

imposing any additional or different—even if non-conflicting—requirements" on agricultural products covered by the Act. *Id.* at 459-60. Likewise, the EPIA's preemption clause "covers not just conflicting, but also different or additional state requirements," and it "precludes California's effort . . . to impose new rules, beyond any the [federal government] has chosen to adopt," for eggs shipped in interstate commerce. *Id.* at 461.

The EPIA's preemption clause thus prohibits States such as California from imposing non-federal standards on eggs shipped in interstate commerce. *See also, e.g.*, *Campbell v. Hussey*, 368 U.S. 297, 300-02 (1962) (Congress' adoption of "uniform standards of classification and inspection" of tobacco "left no room for any supplementary state regulation concerning those same types" even in the absence of an express preemption provision). And this Court would not be breaking new ground in enjoining non-federal egg quality standards under the EPIA. In *United Egg Producers v. Davila*, the district court seemingly had little trouble concluding that the EPIA invalidated Puerto Rico's attempt to impose a 42-day marketing window and separate freshness standards on eggs sold within the territory. *See* 871 F. Supp. 106, 108-09 (D.P.R. 1994), *aff'd on other grounds*, *United Egg Producers v. Dep't of Agric. of Com. of Puerto Rico*, 77 F.3d 567 (1st Cir. 1996).

The ordinary meaning of the EPIA's preemption clause comfortably reaches California's Sales Ban. That prohibition "require[s]" merchants to "use" "standards of quality [and] condition" that add to and differ from federal egg quality standards. *Id.* at 108. More specifically, the Sales Ban bars a business from selling eggs with certain disqualifying characteristics—those that are "the product of a [hen] who was confined in a cruel manner." Cal. Health & Safety Code § 25990(b)(3). In form and effect, that prohibition makes the legality of selling an egg turn on whether the egg satisfies a State-imposed "standard"—"a level of quality, achievement, performance, etc., that is considered acceptable or desirable." *See Standard*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/standard (last visited Dec. 8, 2025). This standard is preempted by the EPIA because it forces merchants to sort, exclude, and differentiate

among eggs based on criteria that federal law simply does not impose.

Moreover, the standards embedded in California's Sales Ban squarely regulate the "quality" and "condition" of eggs within the ordinary meaning of those terms. Although the EPIA does not define either word, the Oxford English Dictionary (OED) defines "quality," as applied to a thing, as "[a]n attribute, property; a special feature or characteristic," or as "[a] particular class, kind, or grade of something, as determined by its character, esp[ecially] its excellence." *Quality*, OED Online, https://www.oed.com/dictionary/quality_n?tab=meaning_and_use#27358090 (last visited Dec. 8, 2025). Under these definitions, the Sales Ban plainly establishes a quality standard: it prohibits a "particular class [or] kind" of eggs—those possessing the disqualifying "attribute" or "characteristic" of having been produced by hens kept in noncompliant enclosures. *Id.* That is exactly the sort of quality criterion Congress barred States from adding to the nationally uniform standards that govern eggs moving in interstate commerce.

Opposing Parties dismiss Plaintiff's reliance on ordinary meaning as "hyperliteral," ECF 61-1 at 19, but no resort to dictionaries is needed to see that the Sales Ban functions as an impermissible quality standard. Consider a simple hypothetical: if California barred the sale of eggs laid by hens exposed to avian flu, would anyone doubt that the State was imposing a quality standard on the eggs themselves? No one would hesitate to describe that rule as a quality standard, even though the flaw in the eggs (their exposure to disease vectors) would lie in a production attribute, not the eggs' physical characteristics. Yet under Opposing Parties' logic, a ban triggered by exposure to avian flu would somehow escape classification as a "quality" regulation because the disqualifying trait attaches to the circumstances of production rather than to an observable physical feature of the egg. That is backwards. The ordinary English speaker would recognize that when a jurisdiction forbids the sale of eggs because of some inherent, production-based characteristic, it is imposing a quality standard on eggs.

The same is true for "condition." The OED defines "condition" as "[a] particular mode of being of a person or thing; state of being." *Condition*, OED Online, https://www.

14

oed.com/dictionary/condition_n?tab=meaning_and_use#8688913 (last visited Dec. 8, 2025).  By rendering eggs unlawful solely because of the "mode" of production that defines their "state of being," California has adopted a condition-based restriction no different in kind from regulating cleanliness, texture, or any other pre-sale state of the product.  The EPIA's "sweep[ing]" preemption clause leaves no room for such additional State-imposed quality or condition requirements, *Harris*, 565 U.S. at 459, and California's imposition of such standards therefore cannot stand.

It should come as no surprise to the State that its Sales Ban impermissibly imposes standards of quality and condition on eggs.  When enacting AB 1437, the legislature expressly framed the law as a health-and-safety regulation designed to improve the quality and condition of eggs sold in the State.  Its codified purpose was "to protect California consumers from the deleterious, health, safety, and welfare effects of the sale and consumption of eggs derived from egg-laying hens that are exposed to significant stress and may result in increased exposure to disease pathogens including salmonella."  AB 1437 § 1; Cal Health & Safety Code § 25995.  Proposition 12 likewise declares that its restrictions respond to "threat[s] [to] the health and safety of California consumers" and "the risk of foodborne illness."  Proposition 12 § 2.

Though not themselves dispositive, these legislative findings confirm the commonsense conclusion that a ban on eggs with certain disqualifying attributes—specifically, eggs that "may result in increased exposure to disease pathogens" because they are "the product of" hens "confined in a cruel manner"—necessarily imposes standards of egg "quality" and "condition."  ECF 60-1 at 5 (quoting Cal. Health & Safety Code § 25995(e)).

Moreover, the Sales Ban imposes prohibited "quality" and "condition" standards as those terms are expressly defined in the EPIA's implementing regulations.  Start with "condition," which is expansively defined as "any characteristic affecting a product[']s merchantability including . . . [t]he state of preservation, cleanliness, soundness, wholesomeness, or fitness for human food of any product; or the processing, handling, or

15

packaging which affects such product." 7 C.F.R. § 57.1. The Sales Ban squarely imposes standards of "condition" under this capacious definition; whether an egg was produced in compliance with Proposition 12 is an objective characteristic related to its fitness for consumption that affects its merchantability—indeed, the Sales Ban makes that characteristic determinative of its merchantability in California.[5]

The Sales Ban likewise imposes standards of "quality" as that term is defined by regulation. "Quality" is defined as "the inherent properties of any product which determine its relative degree of excellence."[6] *Id.* § 57.1. Relying on snippets of dictionary definitions of "inherent," California and ACEF argue that a "quality" must be "intrinsic to a thing," and does not include "[e]xtrinsic facts like where and how the eggs were produced." ECF 61-1 at 20-21; *see* ECF 60 at 23. This argument fails on its own terms. A product's provenance—*i.e.*, how it came to possess the attributes it has—is not an "extrinsic" characteristic at all, but a foundational component of the product's inherent properties. And regardless of its characterization as "intrinsic" or "extrinsic," a product's method of production here may be considered part and parcel of "the constitution [and] essential character" of that product. ECF 60 at 23 (quoting *Inherent*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/inherent (last visited Dec. 8, 2025)). In the same way, the conditions under which a product is produced are inseparable from the product and thus "[e]xist[] in [it] as a permanent attribute or quality." *Inherent*, OED Online, https://www.oed.com/dictionary/inherent_adj?tab=meaning_and_use#

---

[5] Given that the Sales Ban makes noncompliant eggs unmarketable, ACEF's assertion that the challenged provisions "do not regulate eggs' 'merchantability,'" ECF 61-1 at 13—a term that is synonymous with "saleability"—makes little sense, *Merchantability*, OED Online, https://www.oed.com/dictionary/merchantability_n?tab=meaning_and_use#37296682 (last visited Dec. 8, 2025); *see also Merchantable*, Black's Law Dictionary 1139 (rev. 4th ed. 1968) ("salable and fit for the market").

[6] Although ACEF concedes that 7 C.F.R. § 57 is "the subpart containing regulations governing the inspection of eggs under the EPIA," it nonetheless claims that the applicable definitions are found in the previous subpart of Chapter 7—at 7 C.F.R. § 56.1. ECF 61-1 at 19. This is plainly wrong. The most relevant regulatory definitions are in subpart 57 because that is the subpart that codifies the EPIA's preemption clause in materially identical language by regulation. *See* 7 C.F.R. § 57.35. In other words, the EPIA's preemption clause should be interpreted with reference to the subpart of EPIA regulations that deals with preemption—not the one before it.

1    454518 (last visited Dec. 8, 2025).

2        Together or separately, the EPIA's ordinary meaning, the Supreme Court's analysis

3    in *Harris*, and Congress' expressed intent to establish "uniformity of standards for eggs,"

4    all point to the same conclusion: the Sales Ban is preempted.

5        **B.    Opposing Parties' counterarguments fail.**

6        None of Opposing Parties' counterarguments overcomes the EPIA's ordinary

7    meaning or Congress' expressed and unambiguous intent to "provid[e] for the 'uniformity

8    of standards for eggs.'"  ECF 60 at 16 (quoting 21 U.S.C. § 1032).

9        *First*, Opposing Parties are wrong that § 1052(b)(1)'s reference to "official Federal

10   standards" means that States are preempted only from imposing standards regarding the

11   physical characteristics of eggs. *See id.* at 15-16.  This follows, the Opposing Parties say,

12   because current federal standards do not address confinement conditions for egg-laying

13   hens.  This argument is inconsistent with the EPIA's plain meaning and is foreclosed by

14   the Supreme Court's unanimous decision in *Harris*.  No matter how current USDA egg

15   standards are characterized, the standards established by and under the EPIA govern what

16   kinds of eggs may be sold in interstate commerce, and the absence of a direct conflict with

17   the Sales Ban "is irrelevant, because the [EPIA]'s preemption clause covers not just

18   conflicting, but also different or additional state requirements." *Harris*, 565 U.S. at 461.

19   It is thus of no moment that current federal standards are not directly tied to confinement

20   conditions.  Because the Sales Ban erects an additional and different standard of quality

21   that the EPIA does not recognize, it functions as a standard for eggs preempted by the

22   EPIA.  And even apart from that, Opposing Parties' contrary interpretation is simply not

23   plausible.  Permitting States to erect a patchwork of divergent egg standards simply by

24   regulating a different characteristic of the product is irreconcilable with Congress's aim to

25   ensure the "uniformity of standards for eggs" nationwide.  21 U.S.C. § 1032.

26       *Second,* and relatedly, ACEF's reliance on the *noscitur a sociis* canon is

27   unpersuasive in this context.  *See* ECF 61-1 at 21.  According to ACEF, the upshot of

28   applying the canon is that "quality" and "condition" must be narrowly interpreted to

include only "physical characteristics detectable by sensory observation and not the manner of their production." *Id.* But this argument ignores that "quality," "condition," "weight," "quantity," and "grade" serve different regulatory functions and thus are not interchangeable. *See Russel Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923) (the canon is "not an invariable rule" and should not be applied when a term has "a character of its own not to be submerged by its association"). As used in the EPIA, these terms identify distinct types of standards that States may not impose precisely because each captures a different dimension of a product's marketability and regulatory classification. "Weight" and "quantity" address size- and count-based metrics; "grade" addresses composite evaluative judgments; and "quality" and "condition" refer to attributes affecting fitness, freshness, and marketability. A reading of these terms that limits them solely to superficial immediately observable physical characteristics collapses this differentiation and strips the preemption clause of its intended scope—and certainly is not a proper application of *noscitur a sociis*.

*Third*, the EPIA does not "set a floor" that States are free to "supplement with more stringent regulations." ECF 59-1 at 19. That reading would gut the statute's preemption clause. Again, that clause exists precisely to stop States from hindering interstate trade with a jumble of conflicting and burdensome egg standards. Humane World's argument on this score falls flat for other reasons. *See id.* at 18-20. Most fundamentally, Humane World is wrong that FDA regulations somehow "welcome[]" laws like the Sales Ban. *Id.* at 18. The cited FDA regulation, 21 C.F.R. § 118.12(d), is a preemption clause that invalidates any state "requirement regarding prevention of [Salmonella] in shell eggs during production, storage, or transportation that is less stringent than those required by this part." It is a restriction on state authority, not a source of it—and certainly not an endorsement of a law like the Sales Ban. And even if this regulatory limitation on state power had any bearing on the scope of the EPIA, it would speak only to the States' ability to regulate conduct "*during* [egg] *production, storage, or transportation*." *Id.* (emphasis added). That has nothing to do with the Sales Ban.

*Fourth*, the USDA's statements to Congress while the EPIA was being considered (along with the rest of its legislative history) support the United States, not Opposing Parties. Reprising its argument that the EPIA only preempts States from imposing additional grading standards, ACEF points to the Assistant Secretary of Agriculture's observation that varying State grading requirements were "of great concern to producers and handlers." H.R. Rep. No. 91-1670 at 67. True, but nothing in that testimony suggests that those are the *only* kinds of standards that Congress intended to preempt. Quite the opposite. The Assistant Secretary made unmistakably clear that:

> To insure uniformity of labeling, standards, and other provisions and enhance the free movement of eggs and egg products in interstate commerce, the bill would provide that . . . no State or local jurisdiction could [1] restrict the entry of shell eggs to only those meeting certain of the Federal grade standards or weight classes *or [2] otherwise require the use of shell egg standards of quality, condition, quantity, or grade in addition to or different from the Federal standards.*

*Id.* at 66-67 (emphasis added). That explanation refutes ACEF's narrow view of EPIA preemption. Just as Congress did in drafting the statute, the Assistant Secretary expressly identified "quality" and "condition" standards as among the types of additional or different State requirements the EPIA would displace. And his testimony underscores why. Laws like the Sales Ban erect the very type of regulatory "barriers" to interstate trade of eggs that Congress expressly sought to eliminate. *Id.* at 67. That prohibition, by conditioning access to California's market on compliance with standards that go beyond (and differ from) the federal scheme, does exactly what the EPIA forbids: it creates a balkanized regulatory landscape in which egg sellers are forced to operate under various "sets of requirements." *Id.*

*Fifth*, and contrary to ACEF's assertion, the United States' interpretation of the EPIA's preemption clause is entirely consistent with the broader statutory scheme. ACEF's surplusage argument misunderstands both the United States' position and the scope of the 1991 amendment. *See* ECF 61-1 at 14-15. As an initial matter, the United States certainly has not alleged and does not argue here that the EPIA preempts any state

law "intended in part to reduce the risk of food-borne pathogens in eggs." *Id.* at 15. ACEF's surplusage argument based on this premise is thus nothing more than a straw man and so fails at the threshold.

Moreover, and more fundamentally, the 1991 amendment retains substantial independent force under the United States' reading. That amendment supplemented § 1052(b) with a new subsection (2), which provides that "with respect to egg handlers specified [herein], no State or local jurisdiction may impose temperature requirements pertaining to eggs packaged for the ultimate consumer which are in addition to, or different from, Federal requirements." Pub. L. 102-237, § 1012(g), 105 Stat. 1818, 1900 (1991). Section 1052(b)(2) thus is a broad, categorical prohibition: with respect to specified egg handlers, no State may impose "temperature requirements pertaining to eggs" that differ from federal law. In important respects, that sweep is broader than § 1052(b)(1) because a State law might impose "temperature requirements pertaining to eggs" without necessarily violating § 1052(b)(1)'s separate prohibition on imposing "standards of quality [or] condition." 21 U.S.C. § 1052(b). Suppose, for example, a State enacted two statutes: Law 1 obligates egg handlers to maintain train cars carrying eggs below 50 degrees, while Law 2 forbids egg handlers from selling eggs that were stored above that temperature. Section 1052(b)(2) would preempt both statutes because each "impose[s] temperature requirements pertaining to eggs." By contrast, § 1052(b)(1) would not displace Law 1, which regulates storage conditions and does not impose a competing substantive standard on eggs themselves. The Government's construction thus gives full and independent effect to both provisions and presents no surplusage problem.

ACEF's related argument based on an unsuccessful 2013 amendment to the EPIA fares worse. *See* ECF 61-1 at 15-16. Subsequent legislative history is always "a hazardous basis for inferring the intent of an earlier Congress." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). And "[i]t is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law." *Id.* Regardless, ACEF's reliance on the 2013 proposal fails for

20

the same reason as its reliance on the 1991 amendment. The 2013 proposal, if adopted, would have expressly preempted laws like California's Proposition 2 that impose "[r]equirements within the scope of this Act with respect to minimum floor space allotments or enrichments for egg-laying hens housed in commercial egg production." S.820, 113th Cong. § 4(c) (2013). But again, the United States has never asserted nor suggested that the EPIA's preemption provision "already performs that function." ECF 61-1 at 16.[7]

*Sixth,* Opposing Parties' appeal to the "historic police power of the State" cannot change the EPIA's preemptive scope. ECF 60 at 24; *see* ECF 59-1 at 22. That refrain adds nothing to the analysis. At the outset, and again, this argument is largely a red herring because the United States does not assert that the EPIA preempts State laws banning unsafe or inhumane production practices, or otherwise limits the States' traditional power to regulate in support of its citizens' welfare. The claim here is much narrower. Section 1052(b)(1) of the EPIA displaces a tiny slice of State authority: the power to impose quality standards on egg themselves. California's position also proves too much. If the EPIA has no preemptive effect on a "State's authority to regulate for the purpose of protecting its citizens' health and safety generally," ECF 60 at 24, then the EPIA would preempt nothing at all; seemingly any regulation of eggs could be couched as a health and safety measure. Nor when interpreting the EPIA is there any thumb on the scale in favor of supplementary State regulation. Contrary to AWA, *see* ECF 58-1 at 18, the presumption against preemption simply does not apply when interpreting § 1052(b). *See Franklin*, 579 U.S. at 125 ("because the statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption").

---

[7] ACEF's argument surrounding the FDA's adoption of Salmonella contamination regulations is unpersuasive for similar reasons; the United States has never asserted that the EPIA "regulate[s] the living conditions of egg-laying hens" or that § 1052(b) bars States from imposing requirements on egg production, transportation, or storage aimed at reducing Salmonella. ECF 61-1 at 16.

1    **III.    The EPIA Preempts California's Labeling Requirements.**

2          The EPIA also expressly preempts California's Labeling Requirements as applied

3    to liquid eggs.    Section 1052(b)(3) provides that, "with respect to egg products,"

4    "[l]abeling, packaging, or ingredient requirements, in addition to or different than those

5    made under this chapter, the Federal Food, Drug, and Cosmetic Act and the Fair Packaging

6    and Labeling Act, may not be imposed by any State or local jurisdiction."    Congress thus

7    ensured that egg products processed under federal inspection would move freely in

8    interstate commerce without being burdened by overlapping or conflicting State

9    packaging and labeling rules.

10          California's regulatory scheme disregards that command.    Subsections (b) and (c)

11    of Cal. Code Regs. § 1320.4 both expressly regulate the "label" of "liquid eggs" sold in

12    California.    Cal. Code Regs. tit. 3, § 1320.4(b)–(c).    Subsection (b) prohibits any person

13    from labeling liquid eggs with specified terminology unless the eggs were produced in

14    accordance with California's suite of animal housing requirements.    *See id.* § 1320.4(b)

15    ("No personal shall label . . . liquid eggs for purposes of commercial sale in California

16    using [any specified term] unless the . . . liquid eggs were produced in compliance with [§

17    25991].").    Subsection (c) goes further still: it forbids labeling egg products with the term

18    "cage free," or any similar descriptor, unless the producer satisfies a separate set of State-

19    mandated production standards.    *Id.* § 1320.4(c) ("No person shall label . . . liquid eggs

20    for purposes of commercial sale in the state using the term 'cage free' or other similar

21    descriptive term unless the . . . liquid eggs were produced in compliance with [Cal. Code

22    Regs. § 1320.1].").    Under "the plain wording of the express preemption clause," *Baden*,

23    107 F.4th at 939, these provisions are invalid as applied to labeling of liquid eggs.

24          To salvage these plainly preempted provisions, California and ACEF halfheartedly

25    try to recast § 1320.4(b) and (c) as mere antifraud prohibitions that somehow do "not

26    impose labeling requirements."    ECF 60 at 20; *see* ECF 61-1 at 26-27.    This

27    counterintuitive argument does not work for several reasons.    Initially, California already

28    has plenty of general anti-fraud regulations, and none of those is at issue in this case, which

challenges only the regulations that explicitly dictate labeling of liquid eggs. And even if framed as a prohibition on false promotion, a rule that conditions the use of particular terms on a federally regulated label is still a "labeling requirement" in ordinary language; if a State dictates when a producer may or may not place specific words on an egg product label, it has imposed labeling requirements "in addition to or different than those" that exist under federal law. 21 U.S.C. § 1052(b)(3).

Last, the EPIA's savings clause has no application here. It provides:

> [A]ny State or local jurisdiction may exercise jurisdiction with respect to eggs and egg products for the purpose of preventing the distribution for human food purposes of any such articles which are outside of such [an official] plant and are in violation of any of said Federal Acts or any State or local law *consistent therewith.* Otherwise the provisions of this chapter shall not invalidate any law or other provisions of any State or other jurisdiction in the absence of a conflict with this chapter.

*Id.* (emphasis added). ACEF seemingly recognizes that its reliance on the savings clause only works if it is also right that the Sales Ban is "consistent[] with the EPIA." ECF 61-1 at 20. But for all the reasons already explained, that prohibition plainly conflicts with the ordinary meaning of the EPIA's preemption clause, so the savings clause has no application here.

**IV.    Equity Favors Granting Relief Against Preempted States Laws.**

Equitable principles favor (if not outright require) enjoining the Sales Ban for straightforward reasons.[8] Courts have long recognized that "[f]rustration of federal statutes and prerogatives are not in the public interest," nor is there "[any] harm from the state's nonenforcement of invalid legislation." *Alabama*, 691 F.3d at 1301. Yet when a State continues to enforce a preempted statute, the federal government suffers an ongoing sovereign injury that only prospective relief can cure. *See id.*; *supra* at 9–11. The equitable calculus is thus simple in cases like this one: equity requires enjoining preempted state laws, at least in suits brought by the United States. The Supremacy Clause is not subject

---

[8] These principles likewise favor this Court exercising its discretion to grant declaratory relief against the Sales Ban.

23

1    to ad hoc interest balancing or waiver.

2    ACEF's bold assertion to the contrary has no support in law and, if accepted, would

3    dangerously undermine federal supremacy.  Indeed, and quite tellingly, ACEF has not

4    identified a single case in which a court refused to enjoin a preempted state law on

5    equitable grounds—let alone in a suit brought by the United States to vindicate federal

6    supremacy.  ACEF offers no good reason for this Court to become the first to take such

7    an unprecedented step.

8    Instead, ACEF points to the federal government's amicus brief (submitted at the

9    Supreme Court's request) in *Missouri*.  To start, the United States there did not "back[]

10    [AB 1437's] lawfulness." ECF 61-1 at 23.  Rather, the federal government expressed its

11    view that the dispute was "not an appropriate case for the exercise of [the] Court's original

12    jurisdiction."  USA *Missouri* Br. at 7 (ECF 61-10 at 14).  The government gave several

13    reasons for this, including that Proposition 2 and AB 1437 were not preempted by §

14    1052(b) of the EPIA.  But the United States did not defend AB 1437 on the merits of the

15    constitutional claim brought against it; the government instead asserted the Dormant

16    Commerce Clause challenge "would be best decided after development of a factual record

17    in an adversary case brought in district court." USA *Missouri* Br. at 22 (ECF 61-10 at 29).

18    That is hardly the sort of ringing defense of AB 1437 that could reasonably engender

19    reliance.  In any event, regardless of the government's position in *Missouri*, a change in

20    the federal government's litigating position over the course of several administrations is

21    unremarkable, not a convenient workaround to the Supremacy Clause.  The federal

22    government cannot waive or surrender federal supremacy.  Nor is a court's equitable

23    discretion unbounded, as the Supreme Court has recently reiterated. *See Trump v. CASA,*

24    *Inc.*, 606 U.S. 831 (2025).

25    ACEF's equitable argument also fails on its own terms.  It mainly claims that it

26    would be unfair to enjoin the Sales Ban because doing so would upset the "serious reliance

27    interests" of "farmers nationwide." ECF 61-1 at 9, 30.  But enjoining the Sales Ban would

28    not require any farmer—inside or outside of California—to change a single production

practice or undertake any new investment.  The injunction would impose no affirmative obligations at all; it would simply remove California's prohibition on selling eggs that otherwise comply with federal law.  The only "reliance" that could possibly be disturbed, then, is the reliance of certain California producers on the protectionist advantage the Sales Ban affords them by insulating the State's market from interstate competition.  But a producer's expectation that a State will continue to enforce a preempted, protectionist barrier is not a cognizable equitable interest—much less one capable of overriding Congress' explicit command that egg standards be nationally uniform.[9]

## CONCLUSION

For these reasons, the Court should grant Plaintiff summary judgment on all counts and deny Opposing Parties' respective motions.

---

[9] Humane World's judicial estoppel argument, *see* ECF 59-1 at 9-11, fails for all these reasons and more, including that the doctrine of judicial estoppel only applies to "a party [that] assumes a certain position in a legal proceeding," *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012), and an *amicus curiae* "has never been recognized, elevated to, or accorded the full litigating status of a named party or a real party in interest," *United States v. Michigan*, 940 F.2d 143, 165 (6th Cir. 1991) (collecting cases).  Nor did the United States "succeed[] in maintaining" any position as to AB 1437, *Baughman*, 685 F.3d at 1133, when the Supreme Court ultimately "declined to rule whether" it complies with federal law, *Parker v. Sager*, 174 F.2d 657, 661 (D.C. Cir. 1949).

1    Dated:  December 9, 2025          Respectfully submitted,

2

3                                      BRETT A. SHUMATE
4                                      Assistant Attorney General

5                                      YAAKOV M. ROTH
6                                      Principal Deputy Assistant Attorney General

7                                      ERIC HAMILTON
8                                      Deputy Assistant Attorney General

9                                      ALEXANDER K. HAAS
10                                     Director, Federal Programs Branch

11                                     JACQUELINE COLEMAN SNEAD
12                                     Assistant Director, Federal Programs Branch

13                                         /s/ John Bailey
14                                     JOHN BAILEY
                                       Counsel to the Assistant Attorney General
15                                     U.S. Department of Justice
                                       Civil Division
16
                                       BILAL A. ESSAYLI
17                                     First Assistant United States Attorney
                                       DAVID M. HARRIS
18                                     Assistant United States Attorney
                                       Chief, Civil Division
19                                     DANIEL A. BECK
                                       Assistant United States Attorney
20                                     Chief, Complex and Defensive Litigation Section

21
                                           /s/ Joseph W. Tursi
22                                     JOSEPH W. TURSI
                                       Assistant United States Attorney
23
                                       Attorneys for Plaintiff
24                                     United States of America

25

26

27

28

                                       26

## **LOCAL RULE 11-6.1 CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record for Plaintiff United States of America certifies that this brief contains 8,295 words, which complies with the word limit set in the Court's September 23, 2025 Order, ECF 56.


_/s/ John Bailey_
JOHN BAILEY
Counsel to the Assistant Attorney General