BRETT A. SHUMATE
Assistant Attorney General
YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
ERIC HAMILTON
Deputy Assistant Attorney General
ALEXANDER K. HAAS (Cal. Bar No. 220932)
Director, Federal Programs Branch
JACQUELINE COLEMAN SNEAD
Assistant Director, Federal Programs Branch
JOHN BAILEY
Counsel
Civil Division
U.S. Department of Justice
950 Constitution Ave. NW
Washington, D.C. 20005
Telephone: (202) 514-6993
Facsimile: (202) 514-8071
E-mail: John.Bailey@usdoj.gov

BILAL A. ESSAYLI
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
JOSEPH W. TURSI (Cal. Bar No. 300063)
Assistant United States Attorney
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-3989
Facsimile: (213) 894-7819
E-mail: Joseph.Tursi@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

THE STATE OF CALIFORNIA; GAVIN C. NEWSOM, in his Official Capacity as Governor of California; KAREN ROSS, in her Official Capacity as Secretary of the California Department of Food & Agriculture; ERICA PAN, in her Official Capacity as Director of the California Department of Public Health; and ROB BONTA, in his Official Capacity as Attorney General of California,

Defendants.

No. CV 25-6230-

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff, the United States of America, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1. The United States is facing a historic cost-of-living crisis. Overly burdensome and unnecessary regulations have diminished the purchasing power and prosperity of the American worker. As a result, President Trump declared that it shall be the policy of the United States to eliminate the "crushing regulatory burden" that has "made necessary goods and services scarce." Presidential Memorandum, *Delivering Emergency Price Relief for American Families and Defeating the Cost-of-Living Crisis* (Jan. 20, 2025).

2. The State of California has contributed to the historic rise in egg prices by imposing unnecessary red tape on the production of eggs. Through a combination of voter initiatives, legislative enactments, and regulations, California has effectively prevented farmers *across the country* from using a number of agricultural production methods which were in widespread use—and which helped keep eggs affordable.

3. California's codified purpose in prohibiting the sale of eggs that are produced through various accepted animal husbandry practices is purportedly to increase the quality and fitness for human consumption of eggs and egg products sold in California.

4. But California's egg standards do not advance consumer welfare. For example, with respect to California's most recent voter initiative imposing new standards of egg quality, Proposition 12, the California Department of Food and Agriculture has stated in its regulatory analysis that despite the initiative's purported concern for consumer "health and safety," the egg standards "are not based in specific peer-reviewed published scientific literature or accepted as standards within the scientific community to reduce human food-borne illness . . . or other human or safety concerns."[1]

---

[1] Cal. Dep't of Food & Agric., Animal Confinement Notice of Proposed Action 16, https://www.cdfa.ca.gov/ahfss/pdfs/regulations/AnimalConfinement1stNoticePropReg_05252021.pdf.

5. California's regulation of eggs has, however, been effective in raising prices for American consumers. Indeed, Proposition 12 alone has "caused a significant increase" in egg prices, "and therefore led to a sizeable reduction in consumer surplus."[2]

6. Regardless of the intent or effect of California's various initiatives on egg prices, it is the prerogative of the federal government alone to regulate the quality, inspection, and packaging of eggs. In 1970, Congress passed the Egg Products Inspection Act (EPIA), which sets forth requirements to ensure that eggs and egg products are wholesome and properly labeled and packaged to protect the health and welfare of consumers of these products.

7. Through EPIA, Congress exercised its authority under the Supremacy Clause to expressly preempt state or local laws which impose requirements "in addition to" or "different from" those contained in EPIA. Thus, the Supremacy Clause does not permit California to inflate egg prices by imposing additional standards that regulate the quality of eggs, and the provisions at issue here are invalid.

8. The United States thus seeks a declaration invalidating and permanently enjoining the enforcement of certain provisions of California law that violate the Supremacy Clause and the EPIA, and that have raised the price of eggs and egg products for American families.

## JURISDICTION AND VENUE

9. This Court has jurisdiction under 21 U.S.C. § 1050 and 28 U.S.C. §§ 1331 and 1345.

10. The United States has standing to vindicate its sovereign interests. *Arizona v. United States*, 567 U.S. 387 (2012). Conduct that impairs the United States' "ability to exercise its sovereign prerogatives, intangible as those prerogatives may be," "gives rise

---

[2] Mingcong Xie, *Sales of Cage-Free Eggs: The Impact of Proposition 12 on Egg Prices and Consumer Welfare in California*, J. of Purdue Undergraduate Rsch. Vol. XIII at 97 (2023), https://docs.lib.purdue.edu/cgi/viewcontent.cgi?article=1637&context=jpur.

to a cognizable injury in fact." *Arizona v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022). The United States' sovereign interests include ensuring that State laws do not interfere with federal law, or with the federal government's exclusive authority over interstate commerce.

11. Congress created an express cause of action for the United States to enforce the EPIA's provisions, directing that "[a]ll proceedings for the enforcement or to restrain violations of [the EPIA] shall be by and in the name of the United States." 21 U.S.C. § 1050.

12. Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b), because at least one Defendant resides in this District and because a substantial part of the acts giving rise to this suit occurred within the District.

13. This Court has authority to provide the relief requested under 21 U.S.C. § 1050; the Supremacy Clause, U.S. Const. art. VI, Cl. 2; 28 U.S.C. §§ 1651, 2201, and 2202; and its inherent legal and equitable powers.

**PARTIES**

14. Plaintiff is the United States of America, suing on its own behalf.

15. Defendant State of California is a state of the United States.

16. Defendant Gavin C. Newsom is Governor of the State of California and is sued in his official capacity.

17. Defendant Karen Ross is sued in her official capacity as the Secretary of the California Department of Food and Agriculture (CDFA), which is a State of California regulatory entity responsible for jointly issuing regulations to implement Proposition 12.

18. Defendant Erica Pan is sued in her official capacity as the Director of the California Department of Public Health, which is a State of California regulatory entity responsible for jointly issuing regulations to implement Proposition 12.

19. Defendant Rob Bonta is sued in his official capacity as the Attorney General of California. The Attorney General's office is responsible for enforcing the provisions of Proposition 12 that make its violation a criminal offense.

## FEDERAL LAW

**A. EPIA broadly regulates the quality, inspection, labeling, and packaging of egg and egg products.**

20. The federal EPIA, 21 U.S.C. § 1031 *et seq.*, governs the protection of human health in connection with the quality, inspection, labeling, and packaging of shell eggs. Section 1031, titled "Congressional statement of findings," provides that:

> It is essential, in the public interest, that the health and welfare of consumers be protected by the adoption of measures prescribed herein for assuring that eggs and egg products distributed to them and used in the products consumed by them are wholesome, otherwise not adulterated, and properly labeled and packaged. . . . It is hereby found that . . . regulation by the Secretary of Agriculture and the Secretary of Health and Human Services, . . . as contemplated by this chapter, are appropriate . . . to protect the health and welfare of consumers.

21. Section 1032 of EPIA contains a Congressional mandate for national uniformity of standards for eggs:

> It is hereby declared to be the policy of the Congress to provide for the inspection of certain egg products, restrictions upon the disposition of certain qualities of eggs, and uniformity of standards for eggs, and otherwise regulate the processing and distribution of eggs and egg products as hereinafter prescribed to prevent the movement or sale for human food, of eggs and egg products which are adulterated or misbranded or otherwise in violation of this chapter.

22. EPIA broadly defines "egg" to mean "the shell egg of the domesticated chicken, turkey, duck, goose, or guinea." 21 U.S.C. § 1033(g).

23. EPIA also broadly defines "egg product" to mean:

> any dried, frozen, or liquid eggs, with or without added ingredients, excepting products which contain eggs only in a relatively small proportion or historically have not been, in the judgment of the Secretary, considered by consumers as products of the egg food industry, and which may be exempted by the Secretary under such conditions as he may prescribe to assure that the egg ingredients are not adulterated and such products are not represented as egg products.

*Id.* § 1033(f).

24. The Secretary of Agriculture's sweeping authority under EPIA to establish uniform standards for the quality, inspection, labeling, and packaging of eggs is reinforced by the circumstances it permits the Secretary to *exempt*, including:

a. "the sale of eggs by any poultry producer from his own flocks directly to a household consumer exclusively for use by such consumer and members of his household and his nonpaying guests and employees, and the transportation, possession, and use of such eggs in accordance with this paragraph," *id.* § 1044(a)(3);

b. "the sale of eggs by shell egg packers on his own premises directly to household consumers for use by such consumer and members of his household and his nonpaying guests and employees, and the transportation, possession, and use of such eggs in accordance with this paragraph," *id.* § 1044(a)(5); and

c. "the sale of eggs by any egg producer with an annual egg production from a flock of three thousand or less hens," *id.* § 1044(a)(7).

**B. EPIA expressly preempts state laws "in addition to or different from" federal egg standards.**

25. Under EPIA, Congress expressly preempted state laws intended to regulate the quality and condition of eggs: "For eggs which have moved or are moving in interstate or foreign commerce, . . . no State or local jurisdiction may require the use of standards of quality, condition, weight, quantity, or grade which are *in addition to or different* from the official Federal standards[.]" 21 U.S.C. §1052(b) (emphasis added).

26. This language "sweeps widely" and "prevents a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the [EPIA]." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459–60 (2012) (examining materially similar preemption clause in the Federal Meat Inspection Act).

27. The terms "condition" and "quality" are not defined within EPIA. Rather, Congress delegated to the Secretary of Agriculture broad authority to issue "such rules

and regulations as he deems necessary to carry out the purposes or provisions of this chapter." *Id.* § 1043. USDA carried out those obligations in part by enacting a series of definitions for the purpose of EPIA, set forth in 7 C.F.R. § 57.1. Relevant here:

> Condition means any characteristic affecting a product[']s merchantability including, but not being limited to, . . . [t]he state of preservation, cleanliness, soundness, wholesomeness, or fitness for human food of any product; or the processing, handling, or packaging which affects such product.
>
> . . .
>
> Quality means the inherent properties of any product which determine its relative degree of excellence.

28. Under EPIA, Congress also expressly preempted state laws intended to regulate the labeling and packaging of eggs and egg products, providing in relevant part:

> For eggs which have moved or are moving in interstate or foreign commerce, . . . no State or local jurisdiction other than those in noncontiguous areas of the United States may require labeling to show the State or other geographical area of production or origin . . . [and] [l]abeling, packaging, or ingredient requirements, in addition to or different than those made under [EPIA], the Federal Food, Drug, and Cosmetic Act and the Fair Packaging and Labeling Act, may not be imposed by any State or local jurisdiction, with respect to egg products processed at any official plant in accordance with the requirements under [EPIA] and such Acts.

21 U.S.C. § 1052(b).

## CALIFORNIA LAW

### A. California's Proposition 2 & AB1437.

29. In 2008, California voters passed Proposition 2, a ballot initiative that amended the California Health and Safety Code with prescribed requirements for housing covered farm animals, including egg-laying hens, within California.

30. Proposition 2 added five new sections numbered 25990 through 25994, which became effective January 1, 2015. Section 25990(a)-(b) provided that "a person shall not tether or confine any covered animal [including egg-laying hens], on a farm, for

all or the majority of any day, in a manner that prevents such animal from: (a) Laying down, standing up, and fully extending his or her limbs; and (b) Turning around freely." Section 25993 provided that a violation of § 25990 shall constitute a misdemeanor punishable by up to $1,000 fine and 180 days in county jail.

31. California in 2010 enacted AB1437, which added three additional sections (§§ 25995 through 25997) to the California Health and Safety Code. Whereas Proposition 2 was an animal welfare measure that imposed housing requirements on farmers, AB1437 aimed to regulate the quality of eggs sold for human consumption. The legislature's codified intent in passing AB1437 was "to protect California consumers from the deleterious, health, safety, and welfare effects of the sale and consumption of eggs derived from egg-laying hens that are exposed to significant stress and may result in increased exposure to disease pathogens including salmonella." Cal. Health & Safety Code § 25995(e).

32. AB1437 operated so as to impose new standards of quality keyed to Proposition 2's requirements on eggs sold in California. That is, AB1437 prohibited the sale of eggs that were the product of an egg-laying hen kept in violation of Proposition 2's requirements. AB1437 applied to all egg sales, even if the eggs were produced entirely outside of California.

33. Section 259996 provides that, "[c]ommencing January 1, 2015, a shelled egg shall not be sold or contracted for sale for human consumption in California if the seller knows or should have known that the egg is the product of an egg-laying hen that was confined on a farm or place that is not in compliance with animal care standards set forth in [§ 25990]." Under § 25996.1, a violation of § 25996 shall constitute a misdemeanor punishable by up to a $1,000 fine and 180 days in county jail.

34. By ratcheting up production costs, Proposition 2 and AB1437 caused a sharp decrease in egg production in California. One study found that, within a year and a half

of its effective date, "both egg production and number of egg-laying hens were about 35% lower than they would have been in the absence of the new regulations."[3]

35. The impact on consumers was nearly as significant. Less than two years after Proposition 2 and AB1437 went into effect, the average price paid per dozen eggs was approximately 20% higher than it would have been without those laws, causing a consumer welfare loss of between $12 and $15 per household over 22 months.[4]

**B. California's Proposition 12.**

36. On November 6, 2018, California voters approved Proposition 12, a ballot initiative that amends and adds to the egg standards and animal housing requirements already imposed by Proposition 2 and AB1437.

37. Proposition 12 was intended to increase animal welfare and the quality of eggs sold for human consumption. Its standards purported to reduce "threat[s] [to] the health and safety of California consumers" and "the risk of foodborne illness." Proposition 12 § 2.

38. Despite this stated purpose, Proposition 12's requirements were driven by activists' conception of what qualifies as "cruel" animal housing, not by consumer purchasing decisions or scientifically based food safety or animal welfare standards.

39. The California Department of Food and Agriculture has stated in its regulatory analysis that, notwithstanding Proposition 12's purported concern for consumer "health and safety," the "[a]nimal confinement space allowances . . . are not based in specific peer-reviewed published scientific literature or accepted as standards within the scientific community to reduce human food-borne illness . . . or other human or safety concerns."[5]

---

[3] Connor Lullally & Jayson L. Lusk, *The Impact of Farm Animal Housing Restrictions on Egg Prices, Consumer Welfare, and Production in California*, 100 Am. J. of Agric. Econ. 649 (2018)

[4] *See id.* at 650.

[5] *Supra* at n.1.

40. Proposition 12 prohibits "[c]onfining [egg-laying hens] in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely"—not just for the majority of a day, but (with limited exceptions) *at all times*.

41. This means an egg-laying hen must be able to fully extend all of its limbs "without touching the side of an enclosure or another animal," and must be able to "tur[n] in a complete circle without any impediment, including a tether, and without touching the side of the enclosure or another animal."

42. Proposition 12 also prohibits "confining an egg-laying hen with less than the amount of usable floorspace per hen required by the 2017 edition of the United Egg Producers' Animal Husbandry Guidelines for U.S. Egg-Laying Flocks: Guidelines for Cage-Free Housing." Those guidelines require:

a. providing a minimum of 1 square foot of usable floorspace per hen in multitiered aviaries and partially slatted systems; and

b. providing a minimum of 1.5 square foot of usable floorspace per hen in single-level floor systems.

43. When calculating "[u]sable floorspace," farmers "shall not include perches or ramps."

44. Beyond floorspace requirements, Proposition 12 prohibits confining an egg-laying hen in any "enclosure other than a cage-free housing system."

45. Proposition 12 defines "cage-free housing system" as "an indoor or outdoor controlled environment for egg-laying hens within which hens are free to roam unrestricted; are provided enrichments that allow them to exhibit natural behaviors, including, at a minimum, scratch areas, perches, nest boxes, and dust bathing areas; and within which farm employees can provide care while standing within the hens' useable floorspace."

46. Proposition 12 permits only narrow exclusions from its requirements. It does not apply:

a. during temporary periods for animal husbandry purposes for no more than six hours in any 24 hours, and not more than 24 hours in any 30 days;

b. during "examination, testing, individual treatment, or operation for veterinary purposes";

c. during medical research; and

d. during transportation, shows, slaughter, at establishments where federal meat inspection takes place, and at live animal markets.

47. Proposition 12's requirements apply to sales of covered products in California even if the product derives from a farm animal raised entirely outside of California. That is, covered products from an egg-laying hen cannot be sold in California if the egg-laying hen was ever confined in conditions that do not satisfy Proposition 12.[6]

48. This restriction covers business owners and operators who know or should know that covered product does not comply with Proposition 12.

49. Proposition 12 covers the sale of both shell eggs and liquid eggs. "Liquid eggs" means "eggs of an egg-laying hen broken from the shells, intended for human food, with the yolks and whites in their natural proportions, or with the yolks and whites separated, mixed, or mixed and strained." This definition does "not include combination food products . . . that are comprised of more than liquid eggs, sugar, salt, water, seasoning, coloring, flavoring, preservatives, stabilizers, and similar food additives."

50. Although Proposition 12's proponents also purport to be concerned with the welfare of egg-laying hens, California's code underscores that California's intent is instead to regulate the quality and condition of eggs themselves. California's codified belief is that "[e]gg-laying hens subjected to stress are more likely to have higher levels of pathogens in their intestines and the conditions increase the likelihood that consumers

[6] References to California's "Sales Ban" collectively refer to the provisions enacted by AB 1437 (now codified at Cal. Health & Safety Code § 25996) and Proposition 12 (codified at Cal. Health & Safety Code § 25990(b)(3)) that prohibit the sale of shell eggs that were produced by hens kept in conditions that fail to satisfy California law.

will be exposed to higher levels of food-borne pathogens," and California's codified "intent" is to "protect California consumers from the deleterious, health, safety, and welfare effects of the sale and consumption of eggs derived from egg-laying hens." Cal. Health & Safety Code § 25995.

**C. Proposition 12's Enforcement & Implementing Regulations.**

51. California has enforced, and continues to enforce, the Sales Ban. A violation of the Sales Ban is a criminal offense that carries a penalty of up to a $1,000 fine and 180 days in county jail.

52. A violation is also defined as "unfair competition" under the California Business & Professional Code § 17200, which subjects a seller to a civil action for damages or injunctive relief by any person injured in fact by the violation.

53. Proposition 12 charges the California Department of Food and Agriculture and California Department of Public Health with jointly issuing regulations to implement Proposition 12.

54. California has promulgated several regulations designed to monitor and ensure compliance with the Sales Ban. For example, an out-of-state egg distributor must apply for and obtain a registration from the CDFA before selling eggs into California. 3 Cal. Code Regs. § 1320.2(a). To register, distributors must submit a certificate of compliance for each facility from which eggs are distributed. *Id.* § 1320.2(a), (d). A compliance certificate may only be issued by an accredited certifying agent that conducts an on-site inspection of the distribution facility to verify compliance with the applicable requirements of California law. *See* CDFA, Animal Care Program Guidance: Distributor Registration (revised Sept. 2024), https://perma.cc/4WEP-MZAM.

55. California actively maintains a public list of registered distributors, including egg distributors, which was last updated on March 27, 2026. *See* CDFA, Registered Distributor – Animal Care Program (last updated March. 27, 2026), https://perma.cc/DN9T-Z38X.

56. Relatedly, California enforces the Sales Ban through a formal complaint process administered by CDFA. The State publishes an official "Animal Care Program Complaint Form" that enables members of the public to report suspected violations of California law, including the Sales Ban. *See* CDFA, Complaint Form (revised Dec. 2023), https://perma.cc/K7FD-S52M.

57. Considering the civil and criminal penalties attached to a violation of the Sales Ban, the onerous registration and certification requirements for egg distributors, the State's public solicitation of complaints, as well as California's vigorous defense of its law in litigation, regulated parties face ongoing coercive pressure to conform their conduct to California's requirements. At the least, regulated parties face a credible threat that California will enforce its Sales Ban against violators.

58. Further, Proposition 12's implementing regulations provide that:

a. "All documents of title and shipping manifests for shipments of shell eggs or liquid eggs entering the state or transported within the state for commercial sale in California shall include the statement 'Egg CA Prop 12 Compliant.'"

b. "For shipments of shell eggs or liquid eggs that were not produced in compliance with [Proposition 12] and this Article, and enter California exclusively for purposes of transshipment, export, donation, or sale to federal agencies or on tribal lands and are not destined for commercial sale in California, all documents of title and shipping manifests shall, upon entrance into the state and during transportation and storage within the state, be marked with the statement 'For Export,' 'For Transshipment,' or 'Not Prop 12 Compliant.'"

c. "For shipments of shell eggs or liquid eggs not produced in compliance with [Proposition 12] and this Article that originate from an official plant, whether located inside or outside of the state, under mandatory inspection and that holds an establishment number with prefix "G"

granted by the Food Safety Inspection Service of United States Department of Agriculture under the federal Egg Products Inspection Act . . . and being transported to another official plant in California under mandatory inspection and that holds an establishment number with prefix "G" granted by the Food Safety Inspection Service of United States Department of Agriculture under the federal Egg Products Inspection Act . . . , solely for purposes of using the shell eggs or liquid eggs for making food products not covered by the Act or this Article, all documents of title, shipping invoices, bills of lading, and shipping manifests shall, upon entrance into the state and during transportation within the state, be clearly marked with the statement 'Only for use at' immediately followed by the complete establishment number, including the prefix 'G', granted by the Food Safety Inspection Service of the United States Department of Agriculture for the specific facility where the shipment is destined for delivery."

d. "No person shall label, identify, mark, advertise, or otherwise represent shell eggs or liquid eggs for purposes of commercial sale in the state using the term 'cage free' or other similar descriptive term unless the shell eggs or liquid eggs were produced in compliance with section 1320.1 of this Article." 3 Cal. Code Regs. § 1320.4(a), (c).

## <u>CLAIMS FOR RELIEF</u>

### COUNT ONE
### Preemption of AB 1437

59. Plaintiff incorporates by reference all allegations stated above.

60. The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof

. . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

61. Under the Supremacy Clause, federal law expressly preempts state law where, as here, Congress acting within its constitutional authority expresses an intent to preempt state law through explicit statutory language.

62. In accordance with its power over interstate commerce and under the Supremacy Clause, Congress expressly pre-empted state and local laws requiring the use of standards of quality or condition for eggs which are "in addition to or different from the official Federal standards.". 21 U.S.C. § 1052(b).

63. To enforce the EPIA, Congress created an express and exclusive cause of action for the United States, directing that "[a]ll proceedings for the enforcement or to restrain violations of [the EPIA] shall be by and in the name of the United States." 21 U.S.C. § 1050.

64. The EPIA defines "official standards" to mean "the standards of quality, grades, and weight classes for eggs . . . under the Agricultural Marketing Act of 1946." 21 U.S.C. § 1033(r). Since 1955, USDA's Agricultural Marketing Service (AMS) has promulgated standards, grades, and weight classes for shell eggs pursuant to that authority. *See* 7 U.S.C. § 1622(c); 20 Fed. Reg. 667 (Feb. 1, 1955); USDA Agric. Mktg. Serv., *United States Standards, Grades, and Weight Classes for Shell Eggs*, AMS 56 (July 20, 2000). To facilitate interstate commerce in eggs, Congress required that the AMS grading standards "encourage uniformity and consistency in commercial practices." 7 U.S.C. § 1622(c).

65. In subsequently preempting state egg standards that add to or differ from the federal standards established by AMS, Congress through the EPIA statutorily mandated nationally uniform egg standards. *See* 21 U.S.C. § 1052(b); *see also id.* § 1032.

66. California's codified intent in passing AB 1437 was to "protect California consumers from the deleterious, health, safety, and welfare effects of the sale and consumption of eggs" that have certain inherent properties or qualities which purportedly

affect such products' degree of excellence, wholesomeness, and fitness for human food. Cal. Health & Safety Code § 25995(e).

67. While California may impose animal husbandry requirements on hens within its borders, AB 1437's sale prohibition imposes standards of quality and condition on eggs by prohibiting the sale within California of any shell egg that has certain inherent properties—namely, eggs that are "the product of an egg-laying hen that was confined on a farm or place that is not in compliance with animal care standards set forth in Chapter 13.8 [of the California Health and Safety Code]." Cal. Health & Safety Code § 25996.

68. Section 25996 of the California Health and Safety Code violates EPIA and the Supremacy Clause by imposing requirements that are "in addition to" and "different from" federal egg standards under EPIA, and is therefore invalid.

69. The United States has standing to assert this claim to protect its sovereign interests. California's enforcement, and threatened future enforcement, of the Sales Ban impairs the United States' "sovereign interest[] . . . [in] create[ing] and enforce[ing] a legal code," as well as in having that code "recogni[zed]" by "other sovereigns." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982).

70. More specifically, the United States has a sovereign interest in vindicating Congress's policy to "provide for the . . . uniformity of standards for eggs." 21 U.S.C. § 1032. Through implementation of the Sales Ban, California requires merchants to use a state-specific standard of quality and condition that is absent from federal egg standards. Thus, California's enactment and enforcement of the Sales Ban does not merely transgress the EPIA's text—it directly undermines the federal government's codified interest in nationally uniform egg standards. *Id.*

71. Separately, California's enactment and enforcement of the Sales Ban inflicts a sovereign injury on the United States by usurping exclusive federal authority. "The power of Congress to regulate interstate . . . commerce is exclusive and has no limitations other than such as arise from the Constitution itself." *Louisiana Pub. Serv. Comm. v. Texas & N.O.R. Co.*, 284 U.S. 125, 130 (1931).

72. Congress through the EPIA sought to promote free and unhindered commerce in the interstate market for eggs and egg products. The EPIA provides that "regulation by the Secretary of Agriculture . . . and cooperation by the States . . . as contemplated by this chapter . . . are appropriate to prevent and eliminate burdens upon [interstate] commerce." 21 U.S.C. § 1031. Congress saw the need to "insure uniformity of labeling, standards, and other provisions and enhance the free movement of eggs and egg products in interstate commerce." H.R. Rep. No. 91-1670 at 66, 1970 WL 5922, at *5246 (Dec. 3, 1970).

73. Under the Commerce Clause and the EPIA, it is the federal government's prerogative alone to establish standards of quality and condition for eggs in interstate commerce. *See* 21 U.S.C. § 1052(b). Yet California has chosen to erect a state-specific standard of quality and condition through its enactment and enforcement of the Sales Ban, usurping the federal government's exclusive authority over interstate commerce.

74. California's enforcement of the Sales Ban burdens interstate commerce by increasing the regulatory burden on non-California egg producers and distributors.

**COUNT TWO**
**Preemption of Proposition 12**

75. Plaintiff incorporates by reference all allegations stated above.

76. Proposition 12 prohibits the sale of eggs with certain inherent properties or qualities that purportedly affect such products' degree of excellence, wholesomeness, and fitness for human food. *See* Proposition 12 § 2 ("The purpose of this act is to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness[.]").

77. Proposition 12 imposes standards of quality and condition on eggs by prohibiting the sale within California of any shell egg or liquid eggs that have certain inherent properties—namely, eggs or liquid eggs that are the product of an egg-laying hen that "was confined in a cruel manner," as defined by California law. *See* Cal. Health & Safety Code § 25990(b)(3), (4).

78. By prohibiting the sale of non-compliant eggs, Proposition 12 and its implementing regulations likewise violate EPIA and the Supremacy Clause by imposing requirements that are "in addition to" and "different from" federal egg standards under EPIA, and are therefore invalid.

**COUNT THREE**
**Preemption of California's Regulations Regarding the Packaging and Labeling of Egg Products**

79. Plaintiff incorporates by reference all allegations stated above.

80. The Secretary of Agriculture under EPIA has promulgated regulations regarding the labeling and packaging of egg products. *See* 7 C.F.R. §§ 590.410 *et seq.*; *id.* § 57.840.

81. California's regulations regarding the packaging and labeling of egg products, *see* 3 Cal. Code Regs. § 1320.4, violate EPIA and the Supremacy Clause by imposing labeling and packaging requirements "in addition to" and "different than" those imposed by EPIA, and are therefore invalid. 21 U.S.C. § 1052(b).

**PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests that this Court:

A. Enter a judgment declaring that Sections 25990(b)(3)–(4) and 25996 of the California Health and Safety Code and 3 Cal. Code Regs. § 1320.1 are expressly preempted by EPIA, violate the Supremacy Clause, and are invalid;

B. Enter a judgment declaring that 3 Cal. Code Regs. § 1320.4(b)-(c) is expressly preempted by EPIA, violates the Supremacy Clause, and is invalid;

C. Permanently enjoin Defendants as well as their successors, agents, and employees from enforcing Sections 25990(b)(3)–(4) and 25996 of the California Health and Safety Code and 3 Cal. Code Regs. § 1320.1;

D. Permanently enjoin Defendants as well as their successors, agents, and employees from enforcing 3 Cal. Code Regs. § 1320.4(b)-(c);

E. Award the United States its costs in this action; and

F. Award any other relief it deems just and proper.

Dated: April 1, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

ERIC HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Director, Federal Programs Branch

/s/ *John Bailey*
JOHN BAILEY
Counsel
U.S. Department of Justice
Civil Division

BILAL A. ESSAYLI
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section

/s/ *Joseph W. Tursi*
JOSEPH W. TURSI
Assistant United States Attorney

Attorneys for Plaintiff
United States of America